**E-FILED**
Friday, 17 June, 2005  04:30:05 PM
Clerk, U.S. District Court, ILCD

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE CENTRAL DISTRICT OF ILLINOIS

3               ROCK ISLAND DIVISIION

**ORIGINAL**

4

MARK W. JENNINGS,                    )

5                                     )

          Plaintiff,                  )

6                                     )

          vs.                         ) CASE NO. 03-4087

7                                     )

DEPARTMENT of CORRECTIONS,           )

8                                     )

          Defendant.                  )

9

10          THE DEPOSITION of MARK JENNINGS, called

11     for examination pursuant to Federal Rule of Civil

12     Procedure 30, as it applies to the taking of

13     depositions, taken before Kathy L. Johnson,

14     C.S.R., a Notary Public in and for the County of

15     Henry, State of Illinois, on the 8th day of

16     November, 2004, at the hour of 2:00 p.m., at the

17     Law Offices of Katz, Huntoon & Fieweger, 200

18     Plaza Office Building, 1705 Second Avenue, P.O.

19     Box 3250, Rock Island, Illinois 61204-3250.

20

21

22

23               PAOLETTI & ASSOCIATES

EXHIBIT

3

```
  1              A P P E A R A N C E S

  2
                MR. STEPHEN F. FIEWEGER, ESQ.
  3             Katz, Huntoon & Fieweger
                200 Plaza Office Building,
  4             1705 Second Avenue
                P.O. Box 3260
  5             Rock Island, Illinois 61204-3250
                309/786-5661
  6             Appeared on behalf of the Plaintiff;

  7             MR. WILLIAM E. JARVIS, ESQ.
                Assistant Attorney General
  8             500 South Second Street
                Springfield, Illinois 62708
  9             217/785-4555
                Appeared on behalf of the Defendant.
 10
                ALSO PRESENT:
 11
                Mr. Thomas H. Klein,
 12             Assistant Attorney General

 13             WITNESS:  MARK JENNINGS

 14             EXAMINATION BY:                    Page:

 15             Mr. Jarvis                            3

 16                  E X H I B I T S

 17             Exhibit Number 1                      6
                Exhibit Number 2                      9
 18             Exhibit Number 3                     10
                Exhibit Number 4                     17
 19             Exhibit Number 5                     15
                (all attached)
 20
                Signature not required
 21
                CERTIFICATE OF REPORTER            98-99
 22

 23
```

1                              (Witness sworn.)

2

3                         MARK JENNINGS,

4       being first duly sworn on oath, was examined

5       and testified as follows:

6                         EXAMINATION BY

7              .          MR. JARVIS:

8       Q.    Mr. Jennings, my name is Bill Jarvis and I

9       introduced myself to you a few moments ago.

10      I'm with the Attorney General's office.

11                        And in the purpose of this case I

12      represent the Illinois Department of

13      Corrections, and Mr. Klein is also with our

14      office here today.

15                        I'm going to ask you a series of

16      questions.    If at any time any question I ask

17      you is unclear, please ask me to repeat it and

18      I'll do so.    All right?

19      A.    Yes.

20      Q.    Okay.    The second thing is is that

21      everything we're saying right now is being

22      taken down by the court reporter, even my uhs

23      and ums and things of that nature, but we need

1        to make sure that we have audible answers.

2                       She can't take down a head shake

3        and things of that nature.  Okay?

4        A.    Yes.

5        Q.    All right.   Have you ever given your

6        deposition before today?

7        A.    No.

8        Q.    Okay.  All right.   This case, my

9        understanding, involves a lawsuit you have

10       against Illinois Department of Corrections; is

11       that right?

12       A.    Yes.

13       Q.    All right.   Let me begin by talking to

14       you a little bit about your work experience at

15       the Illinois Department of Corrections.

16                       My understanding is you worked

17       for the Department about 14 years; is that

18       right?

19       A.    Correct.

20       Q.    Was it always at the East Moline

21       Correctional Center?

22       A.    Yes, it was.

23       Q.    And what position were you hired on there?

1       A.      Correctional officer.

2       Q.      Okay.  Now, when you started working for

3       the Department of Corrections, did you go

4       through some mandatory training as to the

5       administrative and institutional directives

6       which would have been in place at the time at

7       East Moline?

8       A.      If I, if I recall they give you different

9       articles to read.  They have a one week

10      training program per year now where they change

11      things, but they would give you different

12      things to read in your first week.

13                      And you would just read the book

14      and then you're required to sign it.

15      Q.      Okay.  And you're familiar with the

16      Department of Corrections has a number of rules

17      and regulations concerning rules of conduct of

18      employees --

19      A.      Yes.

20      Q.      -- in the Department; is that correct?

21      And when you first started you were aware, were

22      you not, there were certain rules about the

23      relationship between the correctional staff or

1        the security staff and the inmates?

2    A.    Yes.

3    Q.    For example, you're aware that there were

4    rules prohibiting socializing or trading and

5    trafficking with inmates?

6    A.    Yes.

7    Q.    Okay.  And you would agree with me that

8    those rules are in place to ensure security --

9    A.    Yes.

10   Q.    -- of the facility; is that right?

11   A.    Yes.

12               (Exhibit No. 1 marked for

13                  identification.)

14   Q.    All right.  Let me show you what I've

15   marked as Exhibit Number One which I believe is

16   some of the rules that are pertinent to this

17   case.  Have you ever seen those rules before

18   in any published form?

19   A.    It's quite possible.

20   Q.    Okay.

21   A.    They're different.

22   Q.    All right.

23   A.    I mean, I see the stamp on the head so I

1     know --

2     Q.    Got you.    And one of them in particular,

3     and counsel can look at this in just a moment

4     if he needs to do so, is 120, I believe, 70,

5     and that's called trading or trafficking.    Do

6     you see that section?

7     A.    Yes.

8     Q.    Okay.    And to the best of your knowledge

9     was that a rule, a prohibition, that you

10    couldn't trade and traffic --

11    A.    Yes.

12    Q.    -- during your entire tenure?

13    A.    Yes.

14    Q.    Okay.    Fair enough.    All right.    During

15    the time that you were at the Department of

16    Corrections, say before the year 2002, had you

17    received any discipline?

18    A.    Yes.

19    Q.    Okay.    Specifically over a period of years

20    did you receive a three day suspension in

21    September of 2001 for unprofessional conduct?

22    A.    I believe so.

23    Q.    Did you also receive a one day suspension

1          for an off duty incident where you allegedly

2          struck another employee?

3          A.    I believe it was five days reduced to one

4          day.

5          Q.    Okay.  Do you recall also receiving a

6          three day suspension in February 1991 for

7          refusing overtime?

8          A.    Oh, yes.

9          Q.    Okay.  In fact, you got also another

10         suspension about the same period of time also

11         for refusing overtime?

12         A.    Right.

13         Q.    Okay.

14         A.    Right around Christmas was some of them.

15         Q.    Okay.  And then a five day suspension it

16         looks like when you first started when you had

17         a miscount; is that right?

18         A.    I was terminated and arbitrated and it was

19         reduced to a five day suspension.

20         Q.    I see.  Okay.  Fair enough.  Now, this

21         case involves, my understanding, in part your

22         discharge from the Illinois Department of

23         Corrections; is that correct?

1    A.    Yes.

2                    (Exhibit No. 2 marked for

3                    identification.)

4    Q.    All right.    Let me show you Exhibit

5    Number Two which I believe is a notice,

6    approval of charges, from the Department of

7    Central Management Services and ask you if

8    you've seen that document before?

9    A.    I'm sure I, yes.

10    Q.    Okay.    And this document suggests, does it

11    not, that on or about October 23rd, 2002 the

12    director of the Department of Illinois Central

13    Management Services approved discharge against

14    you; is that correct?

15    A.    Yes.

16    Q.    All right.    Now, at the time that this

17    discharge took place were you a member of any

18    union?

19    A.    Yes.

20    Q.    What union was that, please?

21    A.    AFSCME.

22    Q.    All right.    And had you been in AFSCME

23    the entire time you've been with the Department

1        of Corrections?

2        A.    Yes.

3        Q.    And is there in place a series of

4        collective bargaining agreements which relates

5        to employee grievances?

6        A.    Yes.

7        Q.    All right.    Now, you filed a grievance

8        concerning this discharge, did you not?

9        A.    I'd have to see that.

10       Q.    Okay.

11       A.    I don't know what --

12                        (Exhibit No. 3 marked for

13                         identification.)

14       Q.    Let me show you Exhibit Number Three

15       and --

16       A.    -- exactly what needs to be.

17       Q.    -- see if that refreshes your recollection

18       about a potential grievance concerning your

19       discharge.

20       A.    I haven't seen this one.   Dino Leone wrote

21       this one.

22       Q.    Okay.

23       A.    I mean --

1       Q.    And just for the record, is Dino Leone a

2       union representative?

3       A.    Yes.  He's higher up.  I've only met him

4       once.

5      ·Q.    Okay.

6       A.    I've only seen him once.

7       Q.    To the best of your knowledge is it

8       automatic procedure any time a Department of

9       Corrections employee who's under the collective

10      bargaining agreement has been discharged, do

11      they automatically file a grievance on your

12      behalf or do you know?

13      A.    Yes, I believe they do.

14      Q.    Okay.  And your grievance I take it

15      concerning your discharge went through the four

16      step process; it went to the immediate

17      supervisor and all the way up to potentially

18      arbitration; is that correct?

19      A.    If I'm not mistaken you have an ERB,

20      employee review board.

21      Q.    Right.

22      A.    And they might have skipped the next steps

23      and went right to three or four, arbitration.

1        I'm not exactly sure.

2        Q.    Okay.  And it's my understanding at

3        sometime in the year 2003 you appeared for an

4        arbitration; is that correct?

5        A.    What year was that?

6        Q.    2003.

7        A.    I believe.

8        Q.    Before an arbitrator by the name of

9        Edwin --

10       A.    Yes.

11       Q.    -- Benn?

12       A.    Yes.

13       Q.    All right.  And it's correct, sir, is it

14       not, that in that the arbitrator upheld the

15       decision of the Illinois Department of

16       Corrections to discharge you?

17       A.    Yes.

18       Q.    Okay.  And let me just show you quickly

19       here if you recall ever receiving a copy of

20       this --

21       A.    Yes, I have one.

22       Q.    -- arbitration?

23       A.    Yes.  I have one of these.

1       Q.    All right.    Let's talk a little bit about

2       the events that led up to your discharge.    It's

3       my understanding that there were some inmates

4       at the facility who informed someone on the

5       staff at East Moline that you had been giving

6       them cigars and other items of personalty; is

7       that right?    Personal goods.    Is that what the

8       allegation was?

9       A.    Not at first.

10      Q.    Okay.

11      A.    But over a period of time that's what it

12      came to be.

13      Q.    Okay.    And these inmates, do you recall

14      Jose Davila?    Am I pronouncing that correctly?

15      A.    Yes.    I know who he is.

16      Q.    And John Turner and Steve Mantulla?

17      A.    He has a couple different names.    I'm not

18      sure what they are.    I think it's Mantulla.

19      Q.    Mantulla.

20      A.    And that's not his real name either.

21      Q.    Okay.    It's the name at least he gave

22      us - -

23      A.    At that hearing, yeah, that was his name.

1       Q.    All right.  And these three individuals

2       provided information to the Illinois Department

3       of Corrections?

4       A.    Over a period of time, yes.

5       Q.    Okay.  Do you know who they gave

6       information to, if you can recall?

7       A.    I believe it goes through, it's my

8       assumption that it goes through internal

9       investigator Pearsall.

10      Q.    Okay.

11      A.    I can't remember his first name.

12      Q.    Pearsall?

13      A.    Pearsall.  Lieutenant Pearsall.

14      Q.    Okay.  And he would have been like the

15      Internal Affairs investigator for East Moline?

16      A.    He would be just the intake.

17      Q.    Okay.  Do you recall a lady by the name of

18      Anita Emrich?

19      A.    Oh, yes.

20      Q.    Okay.

21      A.    Yes, I do.

22      Q.    She was the individual who was assigned to

23      that investigation concerning the allegations

1       of trading and trafficking at East Moline

2       involving yourself?

3       A.    After they were done with it then they

4       brought her in.

5       Q.    I see. All right. And did Miss Emrich in

6       fact interview you?

7       A.    No. No.

8       Q.    Okay. And let me go ahead and --

9       A.    I did give her some intake information,

10      but I refused to talk to her until a union rep

11      came.

12      Q.    I see.

13      A.    But she disregarded that.

14                    (Exhibit No. 5 marked for

15                    identification.)

16      Q.    Okay. Let me show you what I've marked as

17      Exhibit Number Five and ask you if you've ever

18      seen that report from Miss Emrich summarizing

19      her findings in this investigation?

20      A.    I believe I've seen this. I didn't know

21      Miss Emrich did this one. But yes, I've seen

22      this one.

23      Q.    Okay. And apparently, from what I can

1        gather from reading this, Miss Emrich or

2        someone on behalf of Miss Emrich spoke to at

3        least 11 or 12 individuals, and I notice that

4        it's even got you listed as number 12 there.

5        Do you see number 13?

6        A.   Okay.   Would you repeat that, please?

7        Q.   Sure.   There's a number of individuals who

8        are listed as being interviewed pursuant to

9        this investigation, and one of the 12 would

10       have been yourself?

11       A.   By who?

12       Q.   Miss Emrich.

13       A.   Yes.   But my contention is she did, she

14       tried to talk to me but I wouldn't, she did not

15       have an investigation with me.

16       Q.   Got you.   Got you.

17       A.   Okay.

18       Q.   All right.   Do you know what Miss Emrich

19       did with this report when she was finished with

20       it?   Was that ever explained to you, how that

21       works?

22       A.   No.

23       Q.   Okay.   Would it surprise you that the

1      Department of Corrections utilized that

2      document in part to decide whether or not to

3      discipline you?  That is the findings of Miss

4      Emrich.

5      A.    Oh, no.  I knew when they brought my name

6      up that they would do something to me.

7      Q.    All right.  Let's talk about those

8      charges for a moment.  The allegations are

9      that you gave one or two of these inmates,

10     maybe perhaps Mr. Davila or Mr. Turner, items

11     of personal property such as cigars of some

12     type.  Do you recall that allegation being made

13     against you?

14     A.    Yes.

15     Q.    Okay.  Did you in fact ever give --

16     A.    No.

17     Q.    -- any cigars to inmate Davila or --

18     A.    None of them.  I give the inmates nothing.

19     Not even grief.  I just give them a fair day

20     and that's all they get.

21                     (Exhibit No. 4 marked for

22                      identification.)

23     Q.    All right.  Now, did you have the advice

1        of counsel during your arbitration that is

2        depicted in Exhibit Number Four?

3                    Did you have an attorney from the

4        union representing you in other words?

5        A.    Yes.

6        Q.    Okay.  Who was that, please?

7        A.    I have no idea.

8        Q.    Okay.

9        A.    I want to say Ed but I don't know.  I have

10       no idea.  I met him the night before.  That's

11       the only time I saw him, that day and the next

12       day.

13       Q.    Did you discuss with him, without going

14       into specifics; I don't want to violate any

15       potential attorney/client relationship here,

16       your side of the case and potential witnesses

17       and that kind of thing that he could present on

18       your behalf?

19       A.    He more or less had an agenda already.

20       Q.    But you did --

21       A.    But we did talk somewhat.

22       Q.    Okay.

23       A.    But very limited because he came into

1       town, I met him. He was staying in a motel.

2       He went home and I saw him the next day.

3       Q.   Okay.  And just so I'm clear, was there

4       any kind of an appeal from the arbitrator's

5       final decision?

6                   Was there an action filed to set

7       aside the arbitrator's decision in any form in

8       court, if you know?

9       A.   I'm not sure.  I don't believe that's

10      allowed.  I think all arbitrator's findings

11      are legal and binding.

12      Q.   Fair enough.  That's my understanding as

13      well, but I want to make sure we're on the same

14      page on that.

15                  MR. FIEWEGER:  There are no

16      appeal rights.

17                  MR. JARVIS:  Very good.  All

18      right.

19      BY MR. JARVIS:

20      Q.   Now we got some of that out of the way.

21      Let's talk a little bit about you for a moment.

22      Are you married, sir?

23      A.   No.

1       Q.    Okay.  Do you have any children?

2       A.    Yes.

3       Q.    How many children do you have?

4       A.    Is this necessary?

5       Q.    Well, background information about you.

6                   MR. FIEWEGER:  It's relevant.

7                   THE WITNESS:  All right.  It's

8       just kind of personal.  I have five kids.

9       BY MR. JARVIS:

10      Q.    Okay.  Are they, are they all of adult age

11      or are any of them living at home or?

12      A.    One's seven; one's 10; one's 16; one's 17;

13      and I believe one's 30.

14      Q.    Okay.  All right.  And the 30 year old I

15      assume doesn't live with you?

16      A.    No.

17      Q.    We can only hope.  And the reason I'm

18      asking these questions, if this case goes to

19      jury I need to know who may be a potential

20      relative may be amongst the jury pool because

21      this case, I would assume, would be tried in

22      Federal Court in Rock Island.

23      A.    Only one would be old enough and she can't

1        come in the State of Illinois.

2        Q.    Fair enough. So, okay. Fair enough.

3        After you were discharged you filed a complaint

4        with the Equal Opportunity Employment

5        Commission; is that correct?

6        A.    Correct.

7        Q.    And in it you have alleged discrimination

8        based upon either race or national origin?

9        A.    Right.

10       Q.    Is that right? All right. And I believe

11       you claimed that you are a Mexican-American; is

12       that right?

13       A.    Hispanic.

14       Q.    Hispanic. Okay. Are you, are you

15       Hispanic blood from both your mother and father

16       or?

17       A.    My mother.

18       Q.    Your mother. Do you know who at the

19       Department of Corrections would have made the

20       decision to discharge you?

21                     Do you know, was that the warden

22       of your facility? Was that someone in

23       personnel? Do you know who that individual is?

1       A.    No.

2       Q.    Okay.  Do you know the race or national

3       origin of the person who made that decision?

4       A.    If I don't know who they are I can't know

5       the race.

6       Q.    All right.  Fair enough.  Do you have

7       reason to believe that the person who made that

8       decison from the Illinois Department of

9       Corrections knew your national origin?

10      A.    Everyone knows my national origin because

11      I belong to the Hispanics, they have a chapter

12      for us to get promoted and I belonged to Upward

13      Mobility.

14      Q.    I see.

15      A.    But there's an Illinois Hispanic

16      Association.  I'm not exactly sure the whole

17      nomenclature.

18      Q.    I see.  Is this something also that would

19      be contained in your personnel file that you

20      put down --

21      A.    Oh, yes.  When I signed in in '85 I

22      originally wasn't hired.  I guess I didn't look

23      Hispanic, but I pushed it in '85 because I am

1        Hispanic and then I did finally get hired.

2        Q.    Okay.  Now, one of the things that the

3        courts look at in a discrimination lawsuit is

4        whether there's someone who's similarly

5        situated to you and was treated better.    Or

6        worse for that matter --

7        A.    Oh.

8        Q.    -- depending on circumstances.

9        A.    A different nationality?

10       Q.    Yes.  And I'm going to talk to you about

11       some people here in just a minute.

12       A.    All right.

13       Q.    Okay.  So we're on the same page.

14       A.    Okay.

15       Q.    Your attorney filed a complaint in this

16       case, and I'm referring to a specific paragraph

17       seven where you talked about some people with,

18       and I'm going to ask you about each one of

19       these individuals one at a time.

20                    The first one I believe you

21       mentioned in paragraph seven is a gentleman by

22       the name of Mark Koster.  K-O-S-T-E-R?

23       A.    K-O-S-T-E-R.  That's correct.

1      Q.    Okay.  Who is Mr. Koster?

2      A.    He's a correctional officer at East Moline

3      Correctional Center.

4      Q.    Okay.  And would he have been at the

5      correctional facility the same time you were?

6      A.    Yes.

7      Q.    Okay.

8      A.    He has more time than I do.

9      Q.    Okay.  And what, if any, infraction did

10     Mr. Koster engage in, or what violation did he

11     commit that is similar to what you've been

12     charged with here?  That is trading and

13     trafficking.

14     A.    They had an investigation that involved

15     several personnel up there and they actually

16     tried to, it's my understanding they went

17     before a grand jury because they wanted to put

18     these individuals, they didn't want to just

19     discharge them.  They wanted to prosecute them

20     with criminal charges.

21     Q.    Now, who's they?  I'm a little unclear

22     about that.  You mean the Department of

23     Corrections?

1     A.    Whenever I say that's, yeah, a management.

2     Q.    Okay.  Got you.  So they wanted to

3     prosecute Mr. Koster?

4     A.    Yes.  They were, it's my understanding

5     they went before a grand jury.

6     Q.    All right.  Do you know the results of

7     that grand jury proceeding?

8     A.    Not in its entirety.

9     Q.    All right.

10    A.    I know that -- well, go ahead.

11    Q.    Okay.  Well, what do you know about

12    Mr. Koster's case?  What was he accused of

13    doing?

14    A.    It was a big, I don't know a lot about it,

15    and I've read some different things but he,

16    they were all involved in bringing things in,

17    get them fixed for their own personal use;

18    ordering different articles and equipment; and

19    just basically farming out labor and stuff that

20    inmates would do for them and then paying the

21    inmates on the side, which you can't give the

22    inmates anything.

23    Q.    Okay.  And there was an investigation by

1      someone at the Department of Corrections

2      regarding Mr. Koster?

3      A.   Oh, yes.

4      Q.   Okay. What was the result of that

5      investigation about Mr. Koster, if you know?

6      A.   I'm not real clear. I know he came back

7      to work and they just dropped all the charges.

8      Q.   Okay. Do you know whether or not the

9      Department of Corrections sought any discipline

10     against him before the charges were dropped?

11     A.   You'd have to look in the files.

12     Q.   Okay. And it would be fair to say you

13     don't have access to all those files?

14     A.   Right. No.

15     Q.   Okay. And Mr. Koster, did he report to

16     the same supervisor you did?

17     A.   There's a, you'd have to be clear on the

18     definition of supervisor.

19     Q.   Okay.

20     A.   I have immediate supervisors. Everybody's

21     under the major.

22     Q.   Okay.

23     A.   The major's under the 3-2-1 wardens.

1    Q.   All right.

2    A.   So everybody's your supervisor.

3    Q.   Did you work on the same shift as

4    Mr. Koster?

5    A.   No.

6    Q.   Okay. So would he have had a different

7    shift commander than you would have?

8    A.   Yes. I may have had the same one over a

9    period of years but at, never at the same time.

10                He's always been on days, I've

11   always been on third.

12   Q.   All right. Now, I assume you ultimately

13   all would report to the warden of the facility;

14   is that correct?

15   A.   We never reported to him.

16   Q.   He was in your chain of command I guess?

17   A.   Yes. Oh, yes.

18   Q.   Okay. All right. And, Mr. Koster, what

19   was his race?

20   A.   I have no idea. I know he's white.

21   Q.   Okay.

22   A.   I mean, I would assume on appearance he's

23   Caucasian, but I have no idea.

1    Q.    You don't know for a fact?

2    A.    I have no idea.

3    Q.    It's hard to tell sometimes.

4    A.    Oh no, not at all.  I mean, he's white

5    but --

6    Q.    Okay.

7    A.    -- like I'm saying, I'm not, you know.

8    Q.    Okay.  All right.

9    A.    He's never declared it.

10   Q.    The second person you have named as an

11   alleged comparable is a Robert Huskey.

12   H-U-S-K-E-Y.  Do you know who that individual

13   is?

14   A.    Yes.

15   Q.    What position was Mr. Huskey?

16   A.    He was a correctional officer at one time

17   and he may have had more than one assignment.

18   I believe he was still one working a certain

19   assignment.  I'm not really sure.

20   Q.    Okay.  And what act of misconduct did he

21   engage in?

22   A.    Trading and trafficking.  And the trading

23   and trafficking involves, they just throw it in

1        to catch all, socializing because you must

2        socialize with them if you're dealing with

3        them.  And it carries unprofessional conduct.

4        So all the same charges.

5        Q.   Okay.  And was Mr. Huskey investigated by

6        the Department of Corrections for that

7        misconduct?

8        A..  Yes.

9        Q.   Do you know what discipline, if any, he

10       received for that?

11       A.   He was involved in that with Koster and

12       Belinda Rusch.  He got, well -- Belinda Rusch.

13       Excuse me.

14              They were all involved in the, I

15       don't know what you call it, operation, and

16       they were, all had the similar charges and they

17       were all taken before a grand jury.

18              It's my understanding that Huskey

19       and Koster said they were innocent and they

20       couldn't bring criminal charges so a deal was

21       made and they returned to work.

22       Q.   Okay.  Do you know whether Mr. Huskey

23       received any discipline as a result of this

1       investigation?

2       A.    Oh.  Yeah, I'm sure he did.

3       Q.    Okay.  Do you know what the form of that

4       discipline was?

5       A.    Not exactly.

6       Q.    In other words did he, was he also

7       discharged and did he file a grievance or an

8       appeal of that discharge or do you know?

9       A.    I can't remember because they tried to

10      file criminal charges against him so I don't

11      know how that exactly --

12      Q.    Okay.  So is it fair to say you don't know

13      all the specifics about the --

14      A.    No.  I can't recall them all.  I mean, you

15      hear things, you know, certain things, but no,

16      I don't have specifics on his situation.

17      Q.    Okay.  And then the third person you

18      talked about a moment ago was Belinda Rush?

19      A.    Rusch.

20      Q.    And was she also an employee of East

21      Moline Correctional Center?

22      A.    Yes.

23      Q.    What position was she?

. 31

1       A.      She was a correctional officer at first

2       and then a leisure time activity specialist.

3       Q.      Okay. At the time that these allegations

4       surfaced regarding the trading and trafficking

5       or socializing with an inmate was Miss Rusch in

6       leisure time services or was she acting as a

7       correctional officer, if you know?

8       A.      Leisure time. Leisure time.

9       Q.      Okay. Would that have been a separate

10      line or chain of command at the facility? In

11      other words, they would report to I believe the

12      warden of the program?

13      A.      I don't know who the immediate supervisors

14      are, but yeah, they go up a chain of command.

15      Q.      Okay.

16      A.      And I have, I do know certain things about

17      all these, you know, not just run of the mill

18      but I've read different reports and have things

19      that I've read and stuff. It's just I can't

20      remember it's so mass.

21      Q.      Okay.

22      A.      I mean, everything that happened to all

23      these people, I'm aware of some things as facts

1          and some things I don't know because that was

2          ongoing for a long time.

3          Q.    I understand. The fourth person you name

4          in your complaint is a gentleman by the name of

5          John Krup, K-R-U-P, is that correct?

6          A.    Okay. Yes.

7          Q.    And was he also an employee at East Moline

8          Correctional Center?

9          A.    Yes.

10         Q.    And what was his rank or position?

11         A.    Correctional officer.

12         Q.    Okay. Do you know what the nature of the

13         allegations against him were?

14         A.    You need to be more specific.

15         Q.    Well, you've alleged in your complaint

16         that he engaged in the same kind of conduct you

17         did and was treated differently?

18         A.    He was accused but he was never even

19         investigated.

20         Q.    Okay.

21         A.    He was accused by the same inmates that

22         accused me, but he was never investigated.

23         Q.    And how do you know that, sir, that he was

1      not investigated?

2      A.    It's in the report.

3      Q.    Oh.

4      A.    Oh, that he wasn't investigated?

5      Q.    Yes.

6      A.    They asked him.

7      Q.    Okay.

8      A.    The union asked him.  I asked him.  He

9      didn't want to get involved in it and he never

10     did.

11     Q.    Okay.  And what is Mr. Krup's race?

12     A.    He's white, the same as Huskey and the

13     same as Koster.

14     Q.    And what about Miss Rusch?

15     A.    She's black.

16     Q.    She's African American?

17     A.    A black female, yes.

18     Q.    All right.  Do you know the disciplinary

19     history of any of these four individuals you

20     just mentioned, Koster --

21     A.    Yes.

22     Q.    -- Rusch, Krup, and Huskey?

23     A.    Yeah, I've read it.

1   Q.   Okay.  You've read it because it's been

2   provided to you --

3   A.   Right.

4   Q.   -- in discovery in this case?

5   A.   That's what I mean.  I noticed, I just

6   can't remember it all, it's so vast.

7   Q.   Okay.  Do you recall off the top of your

8   head if any of those individuals had five prior

9   suspensions?

10   A.   Oh, yeah.  I'm sure.  If I recall

11   correctly Belinda Rusch had quite a few.  I'm

12   not exact number.  But I know she's had trading

13   and trafficking in the past.

14                    And she's had some different

15   cases dropped for whatever reason.  It's in

16   there.  I don't understand, the pilot programs,

17   I don't understand that.

18   Q.   Okay.

19   A.   And that's what I believe any, what I got

20   from reading it.  They've all had a number of

21   infractions.

22                    I'm not sure about Mark Koster.

23   I never got that far.

1     Q.    Okay.   Now, in this complaint I've just

2     gone through in paragraph seven the people that

3     you say were of a different race than you and

4     received different or better treatment than

5     you, is there anyone else that you are claiming

6     other than those four individuals that I've

7     just mentioned?

8     A.    I know for a fact Mike Dundee.

9     Q.    Mike Dundee?

10    A.    Yeah.   Dundee like Crocodile.

11    Q.    Okay.   Was he an employee of East Moline?

12    A.    Yes.   He still is.

13    Q.    Okay.   And what infraction did he engage

14    in that led to an investigation of some sort?

15    A.    He attacked a guy in role call.   The

16    specifics were over standing in a spot or

17    something.

18    Q.    Okay.

19    A.    And Mike got one day and then it's my

20    understanding, we haven't got his records

21    yet --

22    Q.    Okay.

23    A.    -- that it was taken down to a verbal or a

1       written.   We don't know because we don't have

2       it in writing.

3       Q.    Okay.   Did that, to the best of your

4       knowledge did any charges lodged against him

5       involve trading and trafficking or socializing

6       or anything?

7       A.    No.   This is a different situation that

8       coincides with me pushing Major Dunn's guy.

9       Q.    Okay.

10      A.    And I got, you know, I get ten days for

11      pushing the guy and telling him if he didn't,

12      you know, quit bothering me I'd beat his ass.

13                  Mike Dundee told this guy in

14      front of everybody, the whole role call, I

15      think there was close to a hundred people, he'd

16      stick a knife in his heart and turn it until

17      he's dead.   He got a day.   He's white and I'm

18      Hispanic.

19      Q.    Okay.   But to the best of your knowledge

20      he didn't engage in any, or not accused of

21      engaging in any trading and trafficking or

22      socializing or anything like that?

23      A.    I've never seen his, I don't know.

1    Q.    All right.  My question might have been

2    poorly put before, and I apologize for that.

3    Do you know any other individuals who were

4    employed at East Moline who engaged in the same

5    kind of conduct as what your discharge?

6    A.    Oh.  The same type of --

7    Q.    Other than the four we mentioned.

8    A.    See, I've been accused of different types.

9    You talking about trading and trafficking?

10    Q.    Yes.  I'm confining my question now to

11    that specific charge.

12    A.    Okay.

13    Q.    You mentioned four people.  I'm wondering

14    if there's anyone else that you're aware of

15    that you're alleging were treated better based

16    upon their race?

17    A.    Just for trading and trafficking?

18    Q.    Yes.

19    A.    Belinda had at least a couple, maybe more.

20    Koster.  Al Whiting was involved in that

21    situation.

22    Q.    Al Whiting?

23    A.    Yes.  W-H-I-T-I-N-G.

1   Q.   Okay. And you said in that situation;

2   what do you mean by that?

3   A.   With Koster, Belinda Rusch. All this

4   operation where they're getting labor done and

5   getting, according to the inmates.

6   Q.   According to the inmates. Okay.

7   A.   Yeah. I mean that, well, Belinda actually

8   confessed and pleaded guilty because she said

9   she was involved in it.

10   Q.   And what happened to Belinda? Was she

11   discharged?

12   A.   No.

13   Q.   What was the result of her discharge?

14   A.   They couldn't prove the value of the

15   television so they couldn't bring criminal

16   charges so they threw it back to the State.

17   Q.   Okay.

18   A.   And since she didn't have any previous

19   record, previous infractions, that they could

20   use she got her job back with ten days.

21   Q.   A ten day suspension. Okay. And I might

22   have asked you before in terms of John Krup,

23   did he receive any discipline for trading and

1      trafficking?

2      A.   He's never been investigated. We don't

3      know what his record says.

4      Q.   And what about Huskey? What discipline

5      did he receive in trading and trafficking?

6      A.   He got, I don't know. I mean, it's in

7      there. I don't recall offhand.

8      Q.   And Koster, do you know what he received

9      by way of discipline?

10     A.   They made little deals with them.   I

11     don't know exactly. I know they came back to

12     work.

13     Q.   Okay. Was the warden at the time of these

14     deals were made with these three or four

15     individuals the same --

16     A.   Yes.

17     Q.   -- at the time? What was the warden's

18     name?

19     A.   Gary Wyant.

20     Q.   Terry Wine?

21     A.   Gary Wyant.

22     Q.   Oh, Wyant.

23     A.   Yeah.

1    Q.   Got you.  And is Gary Wyant a Caucasian

2    individual?

3    A.   Yes.

4    Q.   Now, let me talk to you a little bit about

5    some of the allegations in the complaint.  You

6    allege in paragraph five that the Department

7    falsely accused you of trading and trafficking

8    with inmates.

9    A.   Yes.

10    Q.   All right.  What information do you

11    possess that leads you to believe that the

12    Department knew that the information they

13    received from these inmates was false?

14    A.   That there's no evidence.  And they also

15    implied in their charges, which didn't just

16    upset me but the other officers, that they had

17    officer corroboration.  And they didn't.

18    Q.   All right.

19    A.   And that really upset the officers that

20    were named.

21    Q.   Okay.  In terms of corroboration, are you

22    referring to the investigation that we talked

23    about before that was performed by Miss Emrich?

1       Is that what you're talking about in terms of

2       witness corroboration?

3       A.    I believe so.

4       Q.    You also allege that you were falsely

5       accused because you wrote an incident report

6       February 15th, 2002 involving an inmate by the

7       name of Sanchez.

8       A.    Yes.

9       Q.    Okay.  What run-in or problems did you

10      have with inmate Sanchez that you're referring

11      to in that paragraph?

12      A.    When I worked segregation Mr. Sanchez knew

13      that I was a Christian so he asked me to hand a

14      Christian magazine to another inmate at the end

15      of the segregation unit.  That's not allowed.

16                  I took it and I walked down and I

17      dropped it on the floor and I told inmate

18      Sanchez, I said he's sleeping now.  He said

19      just slide it under the door.

20                  I picked it up and set it on the

21      desk.  When I opened it up he was trying to

22      pass information to the other inmate.

23                  Mr. Sanchez was a Latin King and

1          his name, gang name, was Flacko. And the other

2          individual, I don't remember what his name was,

3          I don't know the term he used, a gump.

4                         He, she, it. I don't exactly

5          know how to say it. A man who's like a woman

6          in there.

7          Q.    Okay.

8          A.    Okay.

9          Q.    I think I understand.

10         A.    Okay. I don't even, you know, we just

11         call them gumps.

12         Q.    Okay.

13         A.    That's not allowed in the Latin culture at

14         all. I mean, it's, in the Gangster Disciples

15         once you're 23, I don't know if there's a magic

16         age, once you're a man you do what you want.

17         You're only accountable for gang activity.

18                         With the Latin against you it's

19         against your culture to engage in homosexual

20         activity.

21                         He was, there was another

22         Hispanic across the seg who was in there under

23         all of this, all of these charges. Some

1    grievance charge.

2                    He couldn't even get out of seg

3    because, I mean, his own gang, people, culture,

4    would hurt him extremely.

5                    And he would cry every night, and

6    I was aware of that. And when these two people

7    came in, it's a big involvement, but I wrote an

8    incident report on it.

9    Q.    Against inmate Sanchez?

10   A.    Yes.

11   Q.    Okay. And was he disciplined, given some

12   discipline ticket of some sort?

13   Q.    He had, once they found, once I disclosed

14   the letter and the information he was passing

15   he had to be, he had to be transferred.

16                    The other inmate was found

17   innocent. He had to be transferred.   Okay.

18   It was an incredible disruption.

19                    I'm not an internal investigator.

20   I just inadvertently came across this

21   information. But he was their gang member and

22   this one wasn't.

23                    They turned around and filed the

1          same charges and found the other guy guilty

2          again, which I don't know how you do that.

3          Q.    I'm a little confused.  How is it that

4          your report, incident report, involving inmate

5          Sanchez led to inmates Davila, Turner or

6          Mantulla making complaints against you?  That's

7          what I'm trying to drive at.

8          A.    Okay.  Sanchez is the chief at the prison

9          because he asked me, his name's something

10         Sanchez.

11                        And when he made the threat

12         against me he said do you know who I am.  And I

13         said yes, Flacko, I know who you are.  In other

14         words, I knew who he was.  I knew he called the

15         shots there.

16         Q.    Okay.

17         A.    He called the shots for the Latin Kings at

18         the East Moline Correctional Center at that

19         time.

20                        Okay.  And that's when he told me

21         if I didn't give him back his information,

22         which was already filed, I filed it earlier

23         that night, there's no way to give it back.

1                    He said that he would make sure,

2       and in that letter, if they would bring forward

3       the letter, how he had the warden and he made

4       all these accusations against all these high

5       officials about he had them in his back pocket.

6                    I mean, the chaplain, the warden,

7       all of them. And by me exposing that they had

8       to transfer him out.

9                    And he said that if I didn't give

10      it back he would go to Warden Wyant and tell

11      him that I was dirty. And that's why he was

12      trying to impress upon me do you know what I

13      can do.

14      Q.   Now, I think you're inferring that Sanchez

15      then told Davila, Turner and Mantulla to make

16      those allegations against you; is that what

17      you're saying.

18      A.   That's a possibility. I never, I don't

19      know how they want to come up with me but it

20      did come up with me.

21      Q.   Got you.

22      A.   All the seg officers were removed from seg

23      except for me because I wasn't even mentioned.

1    Q.    Okay. So that I'm understanding

2    correctly, you're not saying because of the

3    ticket, disciplinary ticket you gave inmate

4    Sanchez, these three inmates made this story up

5    about you?

6    A.    Whether that initiated it, but I know that

7    was the motive, yes.

8    Q.    How do you know that was their motive?

9    A.    That's my opinion.

10    Q.    What information or evidence do you

11    possess that leads you to that conclusion?

12    A.    The talk on the Hill. A lot of talk on

13    the Hill. I talked to see, what I tried to

14    impress upon you is I didn't leave segregation

15    when remarks were made. Inmates told me what

16    was going on. I was still in segregation.

17                The other officers were pulled

18    because they were implicated. Okay. I wasn't

19    implicated. I didn't come up until the end of

20    the spectrum.

21                I'm the only one that was

22    investigated. My name didn't come up right

23    away. Okay. So when it all came down to, I

1         had an inmate Rogers.  Right there.

2                   I give juice at the beginning of

3         the shift because I'm not getting up out of the

4         chair to cater to these people in the middle of

5         the night, and they know it.

6                   So at the beginning of the shift

7         can we have juice, yes.  I give it to them.  I

8         walked over to his cell and he says, he asked

9         me my name.

10                  And I didn't wear a name tag, I

11.       wore a badge with my picture on it because the

12        tag kept popping off.  So when he looked at it,

13        I just held it up.  I'm not going to sit there

14        and tell him, I let him look at my badge.

15                  He has that right.  And he just

16        became real upset.  He goes, I'm not going to

17        say exactly, just mother fricking Mark

18        Jennings.  Mark Jennings, you mother fricking.

19                  But he's cursing, Mark Jennings.

20        And I said what's wrong with that.  And he said

21        to me, this is a tall black guy by the name of

22        Rogers; he said I was taken in.

23                  And this investigation's been

1         going on.  He said I was taken in and told that

2         you gave me black and milds.  He said, I don't

3         even know a mother fricking·Mark Jennings.

4                        And he said they told him they'd

5         let him out Thursday if he told them that I

6         ·gave him, he said I can't, I don't know him

7         when he was looking at my badge as I walked

8         away.  And I made an inadvertent remark that

9         was not taken in context there.

10                        I said oh boy, here we go.  We've

11        got another one that's going to say me.  But

12        I'm still in seg so obviously I didn't, still

13        didn't think that they were thinking I was

14        guilty.

15                        And this is an inmate telling me.

16        How do I know what he's saying.  And then I,

17        when I'm walking away he said I never would

18        have recognized you.

19                        The pictures they're showing is

20        the picture you're wearing on your chest.

21        That's when I was young, had a full head of

22        hair, dark hair, not white, gray or anything.

23                        So I didn't look, he couldn't

1       identify me by the picture they were showing

2       anyway.

3       Q.   This Jose Davilla, John Turner and Steve

4       Mantulla, were they in the same cell block that

5       you were assigned to?

6       A.    They moved around quite a bit.  They had

7       been on my decks together at different places.

8       But see, all I worked was decks.  I would have

9       worked everywhere sooner or later.

10      Q.    Okay.

11      A.    I never got any other assignment.

12      Q.    Did you have like 90-day assignments?

13      A.    Yes.

14      Q.    Okay.  I guess I'm still a little unclear

15      though.   You're saying that you believe that

16      after you had this incident with inmate Sanchez

17      that Davila, Turner and Mantulla made

18      allegations against you about trading and

19      trafficking; is that what you're saying?

20      A.    Yes.

21      Q.    Okay.  And you said, I think you said

22      before that this is the information I got on

23      the Hill I think is what you said, right?

1       A.    I was in segregation.  I got to listen to

2       the inmates talking.

3       Q.    Okay.  And who specifically did you hear

4       talking saying that these individuals either

5       had or were going to make --

6       A.    I don't remember.

7       Q.    -- allegations against you?

8       A.    That's been over two years ago.

9       Q.    Okay.  Did you speak to anybody in the

10      correctional facility about Davila, Turner, or

11      Mantulla making false accusations against you?

12      A.    I think the general concensus, everyone

13      knew that it wasn't true.  They just knew I was

14      going to get disciplined.

15      Q.    Okay.  Do you know whether or not Davila,

16      Turner or Mantulla were offered to take

17      polygraph tests or not?

18      A.    Yes, I read that.

19      Q.    Okay.  And do you believe or do you recall

20      that at least one of them took a polygraph test

21      and passed?

22      A.    One out of all eight of them?  Was there

23      eight inmates involved?  I'm not sure, because

1       a lot of them didn't know me so that was the

2       end of that.

3       A.    Between the three that, I know, I know

4       that Turner said he would take one. They all

5       said they'd take one and then they all changed

6       their minds.

7                   But they, they meaning the State

8       and this investigation, tried to imply that

9       Turner took a polygraph. But there's

10      absolutely no evidence that he did.

11                  Even on the sheet that he

12      consented to the examiner didn't even sign the

13      sheet. He might have a name printed on there

14      but I got some papers that are possibly in

15      there that said be sure all these are signed to

16      show that they're valid. You know. He

17      didn't sign that paper.

18      Q.    Were you ever given a copy of the findings

19      by Miss Emrich, her investigative findings?

20      A.    Isn't that what you just showed me a

21      little while ago?

22      Q.    Yes. Yes.

23      A.    Yeah. I believe they're in there.

1                      MR. FIEWEGER: Were you given

2          them before you filed this lawsuit?

3                      MR. JARVIS: Yes. That's my

4          question.

5                      THE WITNESS: I'm not sure.

6          BY MR. JARVIS:

7          Q.   Okay.

8          A.   There was so much paperwork kept rolling

9          in.

10         Q.   Before you were disciplined were you given

11         what's called a free disciplinary hearing where

12         you go in and they tell you roughly what the

13         charges against you are and given an

14         opportunity to hear your side of the story? Do

15         you remember --

16         A.   That might be the ERB board.

17         Q.   Okay. All right. And did you have an

18         opportunity to present any information you had

19         about Davila, Turner or Mantulla to them that

20         you felt that their allegations against you

21         were false?

22                      Did you let them know that at

23         that time at the ERB hearing?

1       A.    You're automatically found guilty at all

2       the levels until you go to arbitration.  I

3       mean, I don't even know if you go to second or

4       third always.  You're always guilty.

5       Q.    Every person who goes before the ERB is

6       instantly guilty?

7       A.    No.  I am.

8       Q.    You're guilty?

9       A.    I've never, I mean that I recall --

10      Q.    Who was the ERB hearing officer for your

11      case?

12      A.    I believe that, Steven Wright.

13      Q.    Steven Wright?

14      A.    Yes.

15      Q.    When you had your ERB hearing were you

16      allowed to speak on your own behalf?

17      A.    Very little.  There were so many arguments

18      going that --

19      Q.    Okay.  Do you recall what you said during

20      the ERB hearing?

21      A.    Pertaining to what?

22      Q.    These charges against you.  The trading

23      and trafficking or socializing with an inmate.

```
 1      A.    I addressed the issues but it didn't

 2      matter.

 3      Q.    Did you have the, did you have a union

 4      representative present with you at the ERB

 5      hearing?

 6      A.    Yes.

 7      Q.    Who was that, please?

 8      A.    I can't really recall.  We have so many of

 9      them.  I think it was Steve Slokum.

10      Q.    Okay.  Do you recall --

11      A.    I know Steve Small, he was at arbitration.

12      I'm not exactly sure on the --

13      Q.    Whoever was there at the ERB hearing for

14      the union, did they also speak on your behalf

15      if you can recall?

16      A.    I don't recall.

17      Q.    Now, it's my understanding the process in

18      terms of discipline is the ERB officer makes a

19      recommendation to the warden, and apparently

20      the warden accepted the ERB hearing officer's

21      recommendation in this case.

22                     (Whereupon, the witness' phone

23                      rang.)
```

1                        THE WITNESS:  I'm sorry.  Could

2       you repeat that?

3       BY MR. JARVIS:

4       Q.    Yes.  Is it your understanding that the

5       ERB hearing officer made a recommendation for

6       the warden, Mr. Wyant, regarding your possible

7       discipline in this case?

8       A.    Yes.

9       Q.    Okay.  And then from there apparently from

10      the documents that we've all been provided and

11      are using here that decision was sent up to the

12      chain of command to corrections and then over

13      to the Department of Central Management

14      Services who ultimately, as seen in Exhibit

15      Number Two, authorized your discharge.  Is that

16      what, your understanding would have occurred?

17      If you know?

18      A.    That sounds reasonable.

19      Q.    Okay.  Did you have an opportunity to talk

20      to anybody at the Department of Central

21      Management Services about your case?

22      A.    Not that I remember.

23      Q.    Okay.  Do you know a, there's a name on

1        here.  It says for the State, Gregory P.

2        Newton.  Do you recall ever speaking to Gregory

3        Newton about your case?

4        A.    Not that I recall, no.  I don't believe I

5        know him, but I met a lot of people.

6        Q.    And it says for the union Thomas J.

7        Edstrom?

8        A.    That might be the lawyer.

9        Q.    The lawyer?  Okay.

10       A.    I thought it was Ed but it might have been

11       Thomas Edstrom.

12       Q.    Okay.  Now, you allege in paragraph nine

13       that the Defendant, that being the Department

14       of Corrections supervisory employees, knew the

15       fact that the only supporting evidence for the

16       charges against you was inmate testimony.

17       A.    Okay.

18       Q.    Is that your allegation in this case, they

19       relied essentially entirely upon these inmates'

20       testimony?

21       A.    Yes, I believe that.

22       Q.    And, again, what information do you

23       possess or are you aware of that leads you to

1        believe that the Department of Corrections knew

2        that the testimony of Mr. Davila, Mr. Turner or

3        Mr. Mantulla was false?

4        A.    I, well --

5        Q.    That they knew.  Not what you know, but

6        what the Department of Corrections knew.

7        A.    Partially because of what Mr. Rogers said.

8        I mean, that they were actually showing my

9        picture and asking them to say that I was the

10       one that gave them this contraband.

11                      I mean right there, why would

12       they have to show the picture if I was guilty?

13       Couldn't he just pick me out?    That's one

14       reason.

15                      Warden Wyant made a remark to me

16       before he passed away in church one Sunday, and

17       that led me to believe it too.

18       Q.    When was this that you saw Warden Wyant in

19       church?

20       A.    It was Christmas, I believe Christmas, I'm

21       not saying exactly Christmas day.  It was on a

22       Sunday up at Wildwood Baptist Church.

23                      I believe him and his wife, I've

1        never met her, they were in church, I was in

2        church, and I sit in the back. Because of my

3        back I have to sit in a pew in the back. And

4        he walked by and we had a little, just a brief

5        encounter.

6    Q.    Do you recall what he said to you?

7    A.    He stopped and wished me merry Christmas.

8    He extended his hand and I shook his hand and I

9    said merry Christmas to you, Warden.

10                    And though it's been awhile back,

11   but I know he said, I know he said I'm sorry.

12   I'm sorry. And I can't remember the exact so

13   I'll just stop there. But he said I'm really

14   sorry. And I said I forgive you.

15   Q.    You don't recall anything else about the

16   conversation?

17   A.    I don't recall the exact words so I, you

18   know, it doesn't make sense to even say it if

19   you don't remember exactly.

20   Q.    Did Warden Wyant or any of his command

21   staff, that being assistant wardens or majors

22   ever make any racially inappropriate comments

23   in your presence?

1        A.    Oh, yeah.  .I mean, it's sort of a common

2        occurrence when you work in a prison because

3        when they're mad at the inmates, and maybe

4        they're not -- I'm talking about officers.

5        Q.    Yes.

6        A.    Maybe the officers aren't extremely racist

7        but it's a unique situation you're in when you

8        hear Spic, Taco, this and that when you appear

9        white, and you are white.

10                    My father was white.  .But you're

11       also Mexican which you're not Mexican but

12       you're Hispanic, you're a blend.

13                    So that when the people become

14       aware of who you are when they see you at the

15       Hispanic workshops and stuff it's kind of

16       unsettling to some people.

17       Q.    Okay.

18       A.    Some people apologize.

19       Q.    Did Warden Wyant ever tell you in your

20       presence the reason that you were discharged

21       was because you're Mexican-American?

22       A.    Oh, no.  No.  I don't think he's going to

23       walk up and just tell me that.

1    Q.    Okay. I didn't think so --

2    A.    No.

3    Q.    -- but I thought I'd ask.

4    A.    I would hope, but no.

5    Q.    Okay. What about the ERB officer? Did

6    your ERB officer make any comment that you

7    were, he made a recommendation you be

8    disciplined and/or discharged because of your

9    nationality?

10   A.    He's made remarks that led me to believe

11   that these are true. But no, I mean he

12   doesn't, nobody comes up and admits that

13   they're a racist. Well, some people do.

14   Q.    Okay. Where have you been employed since

15   your discharge?

16   A.    I've been an armed security guard for

17   local security. I may still be employed there

18   now.

19              I'm not, I'm supposed to do

20   special events for them but I'm working so much

21   security down at John Deere Harvester that I

22   don't have time to work for the other one.

23   Q.    Okay. What was your salary, your annual

1        salary as a correctional officer when you left

2        the Department of Corrections in October of

3        2002, approximately?

4        A.    I believe high thirties.

5        Q.    Okay.  And what has been your salary since

6        then, approximately, per year?

7        A.    I didn't have a job the first year.

8        Q.    Okay.

9        A.    I thought this would be resolved at an

10       earlier date.

11       Q.    Okay.

12       A.    I make 10 dollars an hour now.  Roughly 10

13       dollars.  I work a lot of overtime so it comes

14       higher.  So whatever that equals out to.

15       Q.    Okay.

16       A.    I worked for six dollars and fifty cents

17       for Global Security for armed security.

18       Q.    Okay.  Prior to being discharged did you

19       ever seek a promotion in the Department of

20       Corrections?

21       A.    To get a promotion you have to go to

22       classes.  I put in my name.  I've never been to

23       a class in 14 years.

1       Q.    Okay.  And the next rank above you would

2       have been a sergeant?

3       A.    Yes.  I was a TA sergeant during the

4       investigation.  I was in the armory with the

5       weapons and handing things out.

6                     So yeah, I would have, I probably

7       would have been a sergeant by now.  That's my

8       belief because I have a law enforcement

9       background.

10      Q.    Okay.  You received TA pay so I assume you

11      were paid as a sergeant for that period of

12      time?

13      A.    Yes.  Yes.

14      Q.    Okay.  Your complaint also alleges that

15      you have suffered severe emotional and mental

16      distress.  Have you been to a therapist or a

17      counselor since October 2000?

18      A.    I almost went to the, I don't have any

19      insurance.

20      Q.    Okay.

21      A.    To this day now I have Public Aid, or

22      whatever they call it.  I have a card.

23      Q.    Medicaid?

1      A.    Is that what they call it?

2      Q.    Okay.

3      A.    You get it through the Public Aid.  You go

4      down and sit in the Public Aid office.  At one

5      time I received food stamps.

6                      When I got my job I turned that

7      in.  They said you no longer get food stamps,

8      but I can't get insurance.

9      Q.    Okay.

10     A.    Okay.  I'm presently on Paxil for anxiety.

11     Q.    Okay.

12     A.    A high blood pressure medicine.

13     Q.    Who prescribed Paxil for you?

14     A.    Dr. John Golden.

15                     MR. JARVIS:  Off the record.

16                     (Discussion off the record.)

17                     (Break taken at this time.)

18     BY MR. JARVIS:

19     Q.    I think we were talking before about

20     emotional distress and I think you were telling

21     me that you don't have any insurance.

22                     And I assume by that you're

23     saying that you have not gone to a therapist

1    since October of 2002; is that correct?

2    A.    No, I don't believe so.

3    Q.    Okay.  Have you been treated by any doctor

4    for a sleep anxiety or dietary problems or

5    things of that nature since October of 2002?

6    A.    Everything I went through was Dr. Golden.

7    I lost my insurance but the lady that runs his

8    office, her name's Rita, when I contacted her I

9    tell her I'm having these problems.

10              She goes Mark, you're a previous

11   patient so you bring the medical card.  They

12   don't take it but they will me because I'm a

13   previous patient.  Plus Dr. Golden's the one

14   that, through my, all my time at East Moline.

15              He has a number of records to

16   show all the trouble that I was going through

17   there.  He wanted me to quit at East Moline.

18              So he was aware of it.  So he was

19   the one that I needed to go to.  It wasn't just

20   to go to a doctor.

21   Q.    Okay.

22   A.    I was, my family, meaning two of the

23   mothers of four of the kids, got together at my

1       house and tried to commit me to Franciscan but,

2       you know, I was afraid that if I went there I

3       wouldn't be able to work at the prison so I

4       didn't go.

5       Q.    What's Franciscan?

6       A.    Mental health unit.

7       Q.    Okay.  Were you suicidal?

8       A.    I don't know what it was.  They thought I

9       was nuts.

10      Q.    Okay.  Was there any mental health

11      commitment proceedings brought against you by

12      the States Attorney's office or anyone?

13      A.    Mental health?

14      Q.    Right.

15      A.    Not that I recall.

16      Q.    So no one tried to involuntarily commit

17      you to --

18      A.    Well, no.  My, my children's mothers, two

19      different mothers, thought it would be best if

20      I went there but, you know.

21      Q.    Okay.

22      A.    Robert Young Mental Health Center I think

23      it's called.  They tried to take me down there

1        because I was depressed.

2                         I couldn't sleep for days and I

3        took a bunch of Benedryl like the whole pack.

4        I slept for maybe ten minutes.

5        Q.    When was this?

6        A.    That was actually, that actually started

7        during, when my name came up, it bothered me so

8        much when I was working at the prison that my

9        name came up.

10                        And it just seemed like I didn't

11       have a voice.  I mean, nobody asked me

12       anything; they just started throwing this stuff

13       at me.

14       Q.    So this was obviously before your

15       discharge in October of 2002?

16       A.    That's when it started.

17       Q.    Okay.

18       A.    It continued on and, you know, continually

19       grew worse and worse.

20       Q.    All right.  Have you received any other

21       medical treatment since October of 2002 other

22       than what we've talked about for anything?

23       Other than the common cold.  I don't need to

1 know about that.

2 A. I don't really go, I really don't go to

3 the doctor often other than, like I said, I get

4 my Paxil and my Zestrol through the cards I'm

5 provided by the State.

6      Paxil and Zestrol, those are,

7 they're generic but those are the main ones.

8 Q. Okay. Typically in Federal court cases

9 the party is listed but the individual may be a

10 potential witnesses at trial, and I'm not sure

11 we've been provided that. That came to me

12 earlier this morning.

13      MR. FIEWEGER: I think we have.

14 BY MR. JARVIS:

15 Q. So let me just ask you a little bit about

16 that now since we have you here. Have you

17 arranged to have certain people, or believe

18 that certain people will testify on your behalf

19 at trial in this case?

20 A. Oh, I'm sure.

21 Q. Okay. Could you give me some of the names

22 of those individuals who may testify on your

23 behalf?

1       A.    I think, I haven't discussed this with my

2       attorney at this time who would be the best,

3       you know, how would they influence it.  I don't

4       really know about --

5                      MR. FIEWEGER:  You can list

6       people who have knowledge of the facts of your

7       case.

8       BY MR. JARVIS:

9       Q.    Okay.  That's right.

10      A.    Is that what you're talking about?

11      Q.    Yes, I am.

12      A.    I'm sorry.

13      Q.    And again, I'm referring mostly to, to be

14      clear, the allegations that the Department of

15      Corrections discriminated against you and have

16      knowledge about that allegation or about

17      investigations or discipline --

18      A.    Or how they're treated as

19      Mexican-Americans?

20      Q.    Exactly.

21      A.    Okay.

22      Q.    So if you can give me some of those names.

23      A.    I'll give you Fernando Pena.

1       Q.      Fernando Pena?

2       A.      Yes.

3       Q.      And who is Mr. Pena?

4       A.      A correctional officer at East Moline

5       Correctional Center.

6       Q.      And how long have you known him?

7       A.      The entire time I was at the prison.

8       Q.      Okay.  And what does he know, if anything,

9       about this case?

10      A.      I spoke to my friends, we're all

11      Christians, and I spoke to them and they more

12      or less rode through it with me because they

13      kept wondering when my name came up what are

14      they going to say I did.

15      Q.      Okay.  Were they interviewed?  Was

16      Mr. Pena interviewed --

17      A.      No.

18      Q.      -- by anybody at the Department of

19      Corrections?  Okay.

20      A.      He goes through the everyday activity of

21      being Hispanic on third shift at East Moline

22      Correctional Center.

23      Q.      Okay.  So I assume he would testify about

1       his treatment --

2       A.   Oh, yes.

3       Q.   -- at the facility?

4       A.   Yes.

5       Q.   Okay.  Who else?

6       A.   William Sanduval.  Pastor William

7       Sanduval.

8       Q.   Is he the pastor of your church?

9       A.   No.  He's the correctional officer up at

10      East Moline Correctional Center.  I started a

11      bible study and he became a pastor.

12      Q.   Okay.  And does he know anything about

13      this case or the investigation?

14      A.   The same as Fernando, and then his

15      disparity in treatment.

16      Q.   Okay.  And who else?

17      A.   Harry Hitchcock.  Sergeant Harry

18      Hitchcock.

19      Q.   Okay.  Is he also an employee of East

20      Moline?

21      A.   Yes.

22      Q.   What position was he?

23      A.   Sergeant.

1      Q.   Okay.  And what does he know about this
2      case?

3      A.   Harry's also a union representative.

4      Q.   Has he been in that, a representative for
5      a number of years?

6      A.   Oh, yes.  Yes.

7      Q.   So he probably would be a pretty good
8      person to talk to if we were looking at other
9      individuals such as Koster, Huskey and so forth
10     if they've been, if somebody was disciplined he
11     may know --

12     A.   Uh-huh.

13     Q.   -- about those things?

14     A.   Yeah.

15     Q.   Okay.  Who else?

16     A.   Well, in that aspect Steve Slokum.

17     Q.   Mr. Slokum I think we mentioned before.
18     What does he do?

19     A.   He's been, he's a correctional officer.

20     Q.   Is he also a union representative?

21     A.   He's been a union representative, the
22     president, discharge.  The whole gamut.

23     Q.   Okay.  Who else?

```
 1      A.    I don't need this in entirety at this

 2    point?

 3      Q.    No.   Your attorney can supplement.

 4      A.    Okay.

 5      Q.    Just give somewhat of an idea.

 6      A.    I'm trying to think.   Well, I think Alex

 7    Wrangle.

 8      Q.    What's his position with the --

 9      A.    Correctional officer, East Moline

10    Correctional Center.

11      Q.    Would his knowledge be very similar to the

12    other individuals?

13      A.    Disparity in treatment for Hispanics for

14    him personally.

15      Q.    For him personally?

16      A.    And for me.

17      Q.    Was he disciplined by anyone at East

18    Moline?

19      A.    Oh, yes.   Oh, yes.

20      Q.    All right.   Who else?

21      A.    At this moment I'm not exactly sure.

22      Q.    Okay.

23                     MR. FIEWEGER:   Let me just add
```

1          that we would name Belinda Rusch.

2                          MR. JARVIS:  Oh, okay.

3                          MR. FIEWEGER:  Mark Koster,

4          Robert Huskey.

5                          MR. JARVIS:  Okay.

6                          MR. FIEWEGER:  John Krup and

7          correctional officer Ron Bea.  All of them have

8          either had allegations or been charged and

9          found to have committed trading and trafficking

10         and socilizing and non professional conduct,

11         all of which have received much less in terms

12         of discipline --

13                         MR. JARVIS:  Okay.  Fair enough.

14                         MR. FIEWEGER:  -- than what the

15         plaintiff has received.

16                         MR. JARVIS:  Okay.

17                         MR. FIEWEGR:  And, in fact, Krup

18         and Bea were not investigated at all despite

19         allegations that they were involved in trading

20         and trafficking relative to the charges against

21         Mr. Jennings.

22                         MR. JARVIS:  Thank you.

23         BY MR. JARVIS:

1       Q.    Mr. Bea, was he also, he was also a

2       correctional officer?

3       A.    Yes.

4       Q.    And there was an allegation against him

5       that he was trading and trafficking with

6       inmates?

7       A.    Yes.

8       Q.    How did you learn about that?

9       A.    It's in the reports. Well, I also heard

10      it up at the Hill. It's gossip center.

11      Q.    Okay.

12      A.    I just heard that he was alleged. I'm not

13      saying that he brought any in either.

14      Q.    Okay. Fair enough. Have you retained

15      the services of any expert to testify in your

16      behalf in this case?

17                   MR. FIEWEGER:   No.

18                   MR. JARVIS:  Okay.  All right.

19      BY MR. JARVIS:

20      Q.    Have you ever been convicted of a

21      misdemeanor or a felony?

22      A.    Not a felony.

23      Q.    Okay. What misdemeanor offense have you

1          been convicted of?

2          A.    Maybe driving violations when I was

3          younger.

4          Q.    Is that a DUI or anything?

5          A.    Oh, no.

6          Q.    Have you ever been convicted of any crime

7          involving theft or dishonesty?

8          A.    No.   No.

9          Q.    Now, you're asking as part of the relief

10         in this case the payment of attorney fees, your

11         attorney who's seated next to you today.

12         A.    Oh, yes.

13         Q.    Have you incurred any expenses or attorney

14         fees thus far in this litigation?

15         A.    $4,000.

16         Q.    $4,000.   Okay.

17                         MR. FIEWEGER:   I don't know if

18         he's incurred that amount.   I think that was

19         the retainer.

20                         THE WITNESS:   I put that down as

21         a retainer.

22                         MR. FIEWEGER:   Yes.

23                         THE WITNESS:   It's going fast, as

1     it always does.

2                         MR. FIEWEGER:  Yes.  And my rate

3     is an hourly rate of $180.00.

4                         MR. JARVIS:  $180.00 an hour.

5     Okay.  Thank you.

6                         MR. FIEWEGER:  I won't produce

7     billing statements or, because I think that's

8     privileged until the conclusion of the case.

9                         MR. JARVIS:  Sure.  I just want

10    somewhat of an idea.

11                        MR. FIEWEGER:  Okay.

12    BY MR. JARVIS:

13    Q.  Mr. Jennings, is this your first lawsuit

14    you ever filed?

15    A.  I had to file one about my house damage.

16    Q.  House damage.  Is that with your insurance

17    company or something?

18    A.  No.  The guy sold me the house, he covered

19    up a bunch of damage.

20    Q.  Ah.

21    A.  And the whole house just started to fall

22    apart.  And I won it, and I never got a dime.

23    He moved to Florida.

1      Q.   Okay.

2                      MR. FIEWEGER:   So that was a

3      failure to disclose on the real estate purchase

4      contract type claim?

5                      THE WITNESS:   Yeah.   He had it on

6      the disclosure form.

7                      MR. FIEWEGER:   Okay.

8      BY MR. JARVIS:

9      Q.   Any other lawsuits?

10     A.   Does it count on injury?

11     Q.   Sure.

12     A.   I got hurt at the prison in '93.  '92.

13     No.   Was that, yeah, I think it was something

14     like that.

15     Q.   And was there a Worker's Compensation

16     claim filed or something for that injury?

17     A.   Yes.

18     Q.   Was that paid by the State?

19     A.   In the end, yes.

20     Q.   Any other litigation you're aware of?

21     A.   Not that I, that I know of, I mean.

22     Q.   Okay.

23     A.   I know I've never had a felony or

1       anything.

2       Q.    Now, after you filed an action with the

3       Federal Equal Opportunity Employment Commission

4       or the Illinois Department of Human Rights, was

5       there any kind of an investigation had by the

6       Illinois Department of Human Rights?

7                   Did they ever have you show up

8       and maybe ask questions or anything of that

9       nature?

10      A.    No.

11                  MR. FIEWEGER:   You were not

12      interviewed?

13                  THE WITNESS:.  No.

14      BY MR. JARVIS:

15      Q.    Okay.

16      A.    The only interview I had was with the

17      Unemployment.  And that was approved after

18      they --

19      Q.    Did the Department of Employment Security

20      approve an award of unemployment for you?

21      A.    No.   They contested it.

22      Q.    They contested it.

23      A.    I had the hearing and she awarded it.

1      Q.    The hearing officer awarded it?

2      A.    Yes.

3      Q.    You're receiving that now?

4      A.    Oh, no.  That's been, gosh, I've been off

5      for two years.

6      Q.    Two years?

7      A.    Yeah.

8      Q.    And that just relates to the discharge in

9      this case?

10     A.    Yes.

11     Q.    You know why the hearing officer awarded

12     you that money if they --

13     A.    Oh, yeah.

14     Q.    What was the rationale for that?

15     A.    She asked me what happened and I explained

16     the case.

17     Q.    Uh-huh.

18     A.    And she told me that that couldn't be the

19     only reason.  I said yes it was.  And she told

20     me I'm required to tell you to your face a

21     thousand dollar fine, whatever, and a year in

22     prison, or jail.

23                I said I'm just telling you the

1          facts.  I got off the phone and I told my

2          girlfriend, so I'm not getting unemployment.

3                        She sent it right out.  She says

4          oh yeah, there was no grounds for that.

5                        MR. FIEWEGER:  Did you get a

6          written decision on that?

7                        THE WITNESS:  Yes.  I'm pretty

8          sure I have it at home.

9                        MR. FIEWEGER:  Do you have that?

10                        MR. JARVIS:  I do not.

11                        MR. FIEWEGER:  I don't have it

12          either.  I'm asking him.

13                        THE WITNESS:  Yes.  I believe --

14                        MR. FIEWEGER:  Could you get us a

15          copy of that?

16                        MR. JARVIS:  Yeah, if you could.

17                        THE WITNESS:  I'll try.  Like I

18          said, it's been two years.  But I usually

19          packrat everything.

20          BY MR. JARVIS:

21          Q.   Prior to coming to your deposition today

22          did you speak with anyone other than your

23          attorney about this case?

1       A.     Since I've been off work?

2       Q.     Right.

3       A.     Oh, yes.

4       Q.     Okay.  You've named a number of people,

5       seven or eight individuals.  Are those the same

6       people perhaps you would have discussed this

7       case with?

8       A.     Some of them, yes.

9       Q.     Is there anyone that we haven't talked

10      about that you also spoke to about this case?

11      A.     Oh, I have family, Christian friends,

12      church members.

13      Q.     Okay.

14      A.     They call, you know, weekly and ask what's

15      going on.

16      Q.     Okay.

17      A.     My girlfriend went out looking for child

18      support, you know.

19      Q.     You said that you have two ex-wives?

20      A.     No.

21      Q.     One ex-wife?

22      A.     I have children, five children, with three

23      different women.

1    Q.    Okay.

2    A.    I never said I was married or anything.

3    Q.    All right.  Have you ever been married,

4    sir?

5    A.    Yes.

6    Q.    Okay.  So were you divorced?

7    A.    Yes.

8    Q.    What county was the divorce entered in?

9    A.    Clinton County.  Clinton County.  Clinton,

10   Iowa.

11   Q.    Okay.  And did you file for divorce or did

12   your ex-spouse?

13   A.    My ex did.

14   Q.    Okay.  Do you know what the grounds for

15   the divorce were?

16              MR. FIEWEGER:  There are no

17   grounds in Iowa.

18              MR. JARVIS:  Oh.  Well --

19              THE WITNESS:  It's just a no

20   fault divorce.  We didn't like each other.

21   BY MR. JARVIS:

22   Q.    No fault.  Okay.  Fair enough.

23              MR. FIEWEGER:  What year was

1       that?

2                       THE WITNESS:   We got married

3       because she was pregnant.   I'm pretty sure,

4       boy.   I think I was married in '75.

5                       MR. FIEWEGER:   Okay.

6                       THE WITNESS:   I'm not sure.

7                       MR. FIEWEGER:   And what year were

8       you divorced?

9                       THE WITNESS:   I think it was the

10      next year.

11                      MR. FIEWEGER:   '76.

12                      THE WITNESS:   I would believe so

13      because she got pregnant and I was Catholic at

14      the time so we got married.

15      BY MR. JARVIS:

16      Q.   Now, Mr. Jennings, I've asked you a number

17      of questions about this lawsuit and the basic

18      allegations; you believe the Department

19      discriminated against you because of your race

20      and/or national origin, being a

21      Mexican-American.

22                      Is there anything that we haven't

23      talked about so far that forms the basis of

1       that complaint other than what we've talked

2       about thus far?

3       A.    Steve Wright for one doesn't just dislike

4       me, in my opinion he hates me. He doesn't even

5       know me.

6                   I've spoken limited times since

7       early on when I, possibly quite early. It's

8       been so long. I mean, he was a captain before.

9                   And, like I say, there's a lot of

10      banter up there, but supervisors aren't

11      supposed to get involved in the everyday back

12      and forth.

13                  I mean, you have to watch what

14      you say when you're a supervisor. And I know

15      he's made inappropriates that I can't say

16      exactly, but I know that there's a lieutenant

17      up there called Tony Gonzalez and his nickname

18      is Token Tony.

19                  He's the first lieutenant and one

20      of the few Hispanics that was allowed to be an

21      officer for years until they had a push for

22      Hispanics through one of the directors.

23                  Anyway, I remember when he saw

1           that I was going to these Hispanic workshops it

2           just, because he had made remarks in front of

3           me as a lot of the officers have, he said well,

4           why would you be going there.

5                        I'm like because I'm Hispanic.

6           He said you're Mexican. I said no, I'm

7           Hispanic. And he didn't know the difference.

8           That's the start of our trouble somewhat.

9           Q.    Steve Wright?

10          A.    Yes.

11          Q.    And what was Mr. Wright's position?

12          A.    I believe he was a captain at the time.

13          He could have been a lieutenant but I don't

14          remember, it's been quite awhile ago.

15          Q.    But how was he involved in your discipline

16          at all?

17          A.    Oh, he spearheaded, everybody goes through

18          him.  Pearsall, the allegations, everything.

19          He was the one that decided these other white

20          individuals wouldn't be investigated.

21                        MR. FIEWEGER: He was your

22          referring employer?

23                        THE WITNESS: Right. And he also

1        does that too.  He was the one --

2        BY MR. JARVIS:

3        Q.    Was he like an assistant warden?

4        A.    He's the major.

5        Q.    The major?

6        A.    Chief of security.

7        Q.    Okay.  And his nationality is what?

8        A.    White.  And it goes a little deeper than

9        that.    During the arbitration I made reference

10       that why would they just pick me out?

11                     Well, I'm not going to sit there

12       and give my opinion that it was brought right

13       at me because, I mean, I believe it was.

14                     As soon as I, I don't believe my

15       name ever came up.  I believe it was put up.

16       Okay?  But I can't prove that.

17                     But I do know that on my deck on

18       dorm six before this happened, before this

19       trading and trafficking accusations, he came on

20       my deck and I was forewarned that he was coming

21       because, you know, everybody knew he'd come to

22       my deck.

23                     And he came in there and started

1        looking the deck up and down to find it being

2        dirty.  Not a chance.  Not a chance of

3        finding any dirt on my deck.

4                       He went under the sinks,

5        everything.  And I was doing my wakeups.  And

6        he comes up and says where are your porters at.

7                       You usually let them go to bed

8        after they get your deck clean.  They were

9        sitting in the day room because I knew he was

10       coming.  And I said they're right there.

11                      He said why aren't they doing

12       anything.  I said because everything's done.

13       He said well, they're not done.  I said yes,

14       they are Steve.

15                      And he said well, you need to

16       find something for them to do.  I said I

17       already have.  They're done.

18                      So he started looking all over

19       the unit.  He couldn't find anything, so he

20       went along the baseboards, and he says from

21       previously when they waxed the floors some of

22       the wax went on the baseboards.

23                      Some of them may even wax the

1       baseboards. He said you don't see that wax.

2       And I said no, I don't. And he got on his

3       hands and knees, took a dime out of his pocket

4       and started scraping the wax off the

5       baseboards.

6                    And he said you don't see that?

7       I said no, I don't. He said well, get down

8       here. And I said well, I'll take your word for

9       it.

10                   I don't know what he wanted me to

11      do about waxing the baseboards. While he was

12      down there and he stood up he noticed that I

13      didn't have my name tag on and he goes, where's

14      your name tag.

15                   And this is before I started

16      putting the badge on because it kept popping

17      off. And I said I don't know.

18                   He says well, you didn't put it

19      on, you're out of uniform. And he started

20      reading me basically the riot act about these

21      rules that you come up with. Or that you've

22      produced that we're to know.

23      Q.    Uh-huh.

1     A.    Conduct and unprofessional.  So I went, I

2     said well, it must have fallen off in the

3     office.  And he said well, let's go right now.

4                   And I'm walking with him.  I said

5     well, this is fine.  I went in there.  We took,

6     he turned the light on right away, and laying

7     under the desk was my name tag.

8                   So I went over and I put it back

9     in like before.  I said I told you, Steve.  And

10    he started berating me, trying to argue with

11    me.  And he kept saying well, your deck's this.

12                  And I said Steve, if you find

13    anything to be cleaned it will be cleaned, and

14    I just turned away from him.  I knew there was

15    no reason to having a continued conversation

16    with him.

17                  And he touched on some different

18    topics that made no sense and then he said, he

19    told me; and these inmates don't need to be

20    sleeping.  And I'm not going to answer that.

21                  They're not sleeping, they're

22    sitting right there in the dayroom.  I didn't

23    say anything.  I just didn't look at him.

1             And he said, and you don't need
2    to be sleeping in seg.  I'm not sleeping.  I'm
3    not in seg.  I've never been written up for
4    sleeping in seg.  I've never been accused of
5    sleeping in seg.
6             And as he turned away he made, he
7    said three words; I don't know what the first
8    word was but the last two were lazy Mexican.
9    And I hadn't said anything at that point other
10   than just, you know, pacifying.
11            And I yelled at him.  I said what
12   did you say, and he just continued walking.  I
13   said you don't, you should have had something
14   written on me if you're saying these things.
15            I said what did you say?  He's
16   not going to say it to my face.  And as he
17   walked out I said hey Steve, and he did turn
18   around, I said you need to write yourself up
19   for not writing me up.
20            Well, in the process of me
21   yelling and him yelling before I lost my
22   temper, the inmates come out of their rooms
23   because, I mean you're right in the center.

1                      They're all, their rooms are

2         there and they all heard it.  And I know that

3         one of them was, my belief was Turner; I don't

4         remember his first name.  He came out.

5                      His room was right across there.

6         And all the inmates go wow.  I mean, they was

7         just really impressed how much he hated me.

8         But like I say, he has no reason to hate me, he

9         doesn't even know me.

10        Q.   When was this conversation you're talking

11        about?

12        A.   I have no idea.  It was, we brought it up

13        at, well, at arbitration.  He just disallowed

14        me.  They write up the notes.

15                     We don't have recorders so

16        whatever they want in they put in.  Whatever

17        they don't want in they don't put in.

18                     MR. FIEWEGER:  What year was this

19        conversation?

20                     THE WITNESS:  2000 and, it would

21        have to be 2002 --

22                     MR. FIEWEGER:  Okay.

23                     THE WITNESS:  -- I do believe.

1      BY MR. JARVIS:

2      Q.   If you were discharged on October of 2002

3      could you give me a rough idea, would that have

4      been the early part of 2002 or when would

5      that --

6      A.   It was before the accusations, so I'm

7      pretty sure those were 2/24.

8      Q.   February 24th?

9      A.   I think that's when the accusations for

10     the Black and Milds.

11     Q.   The cigars?

12     A.   Yeah.  Anita called it the white tip

13     scandal.

14     Q.   Did you complain to anybody about these

15     alleged comments from Mr. Wright?

16     A.   I made reference to Sergeant Hitchcock but

17     no, I don't make the waves up there, the same

18     as some of these other gentlemen.

19                    You don't, what are you going to

20     say?  They give their own discipline.  They

21     investigate their own discipline.  You don't

22     want to bring it up.

23     Q.   Did the major, to the best of your

1       knowledge, have any unilateral authority to

2       discharge someone at the Department of

3       Corrections?

4       A.   He, the major, being the chief of

5       security, steers the investigations the

6       direction they go. That's the start.

7                So wherever he starts it, I'd

8       like to point out that this happened in

9       February. Okay. In a timely manner. I was

10      discharged in October.

11      Q.   Okay. And I believe your union raised

12      that during the arbitration, didn't they?

13      A.   Oh, yeah. They ignored it.

14      Q.   You mean the arbitrator ignored it?

15      A.   No. They ignored it all the way through.

16      And at the end when he brought it up he put it

17      in his, that they had brought it up. He put it

18      in his --

19      Q.   His findings?

20      A.   Uh-huh.

21      Q.   Okay. Is there anything else we haven't

22      talked about regarding your claim? I mean,

23      other than the major, Major Wright?

1           A.    There are, I don't recall at this time.

2           There are a number of different things that

3           happened to me that other people such like

4           Alex, he'll bring up.

5                          He had 15 days off for not

6           wearing a tie.  I know another person there

7           that's white, he told the guy who told him to

8           put a tie on to go get fricked.

9                          He didn't even get a verbal or

10          written or anything.   Oh.  And there is

11          another one.   Major Wright, I think I was

12          talking with this with Steve today, I can't

13          remember.

14                          But my supervisor does a DP.   I

15          don't know the exact, but it's an evaluation

16          profile.  Only he can do it.  Someone else,

17          another shift commander can't do it.

18                          He has to watch you work.  He has

19          to see if you know what you're doing.  And he

20          checks you constantly because every night he

21          has to make the rounds on the Hill every night

22          and he'll walk on you.

23                          And you never know when he's

1       coming.  He, there are evaluations, you

2       evaluate yourself and they evaluate you.  And

3       you've got meets expectation, exceeds

4       expectation, and needs improvement.  And it may

5       not be in that order.

6                     And I would constantly get more

7       than one because, no brag, just fact, I ran the

8       best deck on the Hill.  And if not, it's right

9       up there.  But I did.

10                    I would get exceeds from my

11      supervisor, the only one who could write my DP.

12      And they would constantly get sent back to the

13      point where I went up to Lieutenant Al and said

14      Mark, look, it's not like this is a real big

15      deal, it doesn't affect my pay, but I want to

16      know why don't I get exceeds.  And he just kind

17      of hung his head.

18                    And he was getting close to

19      retirement and he didn't like these questions.

20      But he told me for a fact, look, I gave them to

21      you, they got sent back.

22                    I was told by Steve Wright you

23      cannot get all exceeds.  And he'd tell me hey,

1        Mark I slid two in this time.   Okay.   Or I'd
2        have exceeds in all these.
3                        Not all of them, not all of them,
4        because at one point my time.   But I also, they
5        have a placque up there with people's names on
6        it for never missing a day.
7                        There are like four or five
8        people who have done it.   I'm one of those
9        people.   My name is not on that plaque.   Steve
10       Wright made the plaque up.
11                       It's in honor of a fellow officer
12       who went in for a routine operation and died.
13       A good friend.   But I'm not on that plaque.
14                       I'm like, and I'm serious.   You
15       can check the records.   Very few people in
16       corrections as correctional officers have gone
17       the entire year and never missed, never been
18       late.   Never.   And I was one of them.
19       Q.   Okay.
20                       MR. JARVIS:   Off the record here
21       for a minute.
22                       (Discussion off the record.)
23                       MR. JARVIS:   I think that's all I

1    have.

2                    MR. FIEWEGER:    All right.

3

4            FURTHER DEPONENT SAYETH NOT

5                SIGNATURE NOT REQUIRED

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1                           CERTIFICATE

2

3                   I, Kathy L. Johnson, Certified

4       Shorthand Reporter, and Notary Public duly

5       commissioned and qualified in and for the

6       County of Henry, State of Illinois, DO HEREBY

7       CERTIFY that, pursuant to notice, there came

8       before me on the 8th day of November, 2004, at

9       the Law Offices of Katz, Huntoon & Fieweger,

10      200 Plaza Office Building, 1705 Second Avenue,

11      P.O. Box 3250, in the City of Rock Island,

12      State of Illinois, the following named person

13      to wit:

14                          MARK JENNINGS,

15      who was by me first duly sworn to testify to

16      the truth and nothing but the truth of his

17      knowledge, touching and concerning the matters

18      in controversy in this cause and that he was

19      thereupon carefully examined upon his oath and

20      his examination was immediately reduced to

21      shorthand by means of stenotype by me.

22                  I ALSO CERTIFY that the deposition is

23      a true record of testimony given by the

1       witness, that the reading and signing of the

2       deposition by the said witness were not

3       required and that the necessity of calling the

4       court reporter at time of trial for the purpose

5       of authenticating said transcript was waived.

6              I FURTHER CERTIFY that I am neither

7       attorney or counsel for, not related to or

8       employed by, any of the parties to the action

9       in which this deposition is taken, and,

10      further, that I am not a relative or employee

11      of any attorney or counsel employed by the

12      parties hereto, or financially interested in

13      the action.

14             IN WITNESS WHEREOF, I have hereunto

15      set my hand and affixed my notarial seal at

16      Kewanee, Illinois, the 14th day of November,

17      2004.

18

19      ____Kathy Johnson_____

20            CSR, NOTARY PUBLIC

21

22

23