**E-FILED**

Illinois Department of Corrections Friday, 17 June, 2005 04:30:57 PM
INTERNAL INVESTIGATIONS    Clerk, U.S. District Court, ILCD

## REPORT OF INVESTIGATION

| Case Number | Institution | Case Investigator |
|---|---|---|
| 02-EMO-153 | East Moline Correctional Center | EMRICH |

Time, Date and Nature of Incident
02/24/02; Conduct of Individual, Socializing, Trade, Traffick, Aid or Abett a Resident, Failure to Report an Offense or Incident, Conflict of Interest, Trading or Trafficking, Unauthorized Property

| | Name (Last, first, middle) | Complainant ☐ | Victim ☐ | Inmate ☐ |
|---|---|---|---|---|
| S U B J | JENNINGS, MARK W., (Correctional Officer) | Offender ☒ | Witness ☐ | Employee ☒ |
| | Institution Number | Institutional Nickname (s) | | |

REPORT STATUS:    Initial Open ☒    Final ☒

Interviewed:
1. TURNER, JOSEPH J., B-11090
2. WORKMAN, STEPHANIE L., Correctional Officer
3. DAVILA, JOSE (NMN), R-00947
4. MANTULLA, STEVE J., N-10463
5. ROGERS, MELVIN L., B-13292
6. RIGGS, BRIAN (NMN), B-12025
7. KRODEL, CHRISTOPHER L., B-35546
8. PEEPLES, JOHN D., N-82826
9. HOPKINS, TORY J., K-80996
10. DAVIS, DAVID (NMN), Inmate, K-69739
11. HAMILTON, GREGORY A., Inmate, K-72756
12. JENNINGS, MARK W., Correctional Officer

```
EXHIBIT
    4
```

Case Summary:
This investigation was conducted at the request of Warden GARY WYANT, East Moline Correctional Center, when, on 02/24/02, Inmates JOHN TURNER, B-11090; JOSE DAVILA, R-00947; BRIAN RIGGS, B-12025; and STEVE MANTULLA, N-10463, admitted to trading and trafficking with Correctional Officer MARK JENNINGS (Attachment #1).

Correctional Officer DOUGLAS MATHIS reported by Incident Report that, on 02/24/02, an unnamed inmate pointed out Inmate "JOHN" TURNER, B-22090, and said that TURNER was selling Black & Mild cigars on the yard. According to MATHIS, twelve packs of Newport cigarettes were found on TURNER who claimed that he was selling them to buy gym shoes (Attachment #2).

Correctional Lieutenant DARRELL PEARSALL, Internal Affairs, provided copies of his interviews of Inmates TURNER, DAVILA, RIGGS, MANTULLA, MELVIN ROGERS, B-13292, JOHN PEEPLES, N-82826, and TORY HOPKINS, K-80996. These inmates all stated, substantially, the same information as in their interviews that follow (Attachments #3 through #11).

On 02/26/02, Inmates TURNER, B-11090; MANTULLA, N-10463; DAVILA, R-00947; RIGGS, B-12025; and KRODEL, B-35546, were transferred from East Moline Correctional Center to other facilities (Attachment #12).

Inmate JOSEPH "JOHN" TURNER, B-11090, stated that Inmate JOSE DAVILA, R-00947, moved into TURNER's cell (#30) in Dorm #6 in 08/01. TURNER noticed that DAVILA had Black & Mild cigars which weren't sold in the commissary. TURNER related that one day he (TURNER) bought ten cigars from DAVILA for

Continued

| Case Number | Subject's Name (Last, first, middle) | Institution Number | Institution |
|---|---|---|---|
| 02-EMO-153 | JENNINGS, MARK W., (C.O.) | | East Moline C.C. |

$18.00 in commissary and sold the remaining eight cigars for ten packs of cigarettes. TURNER stated that he figured that DAVILA got the cigars, about 20 boxes each week, from staff in dietary where DAVILA worked. TURNER stated that DAVILA also brought bags of sunflower seeds and chewing gum to their cell. TURNER stated that DAVILA stopped getting Black & Milds when the 90 day staff assignments changed in 10/01. TURNER stated that, while he was in Segregation from 10/20/01 to 10/31/01 for a different issue, Correctional Officer MARK JENNINGS gave him cigarettes. TURNER stated that, after he was out of Segregation, he learned that JENNINGS worked third shift in Dorm #2 where a friend, Inmate STEVE MANTULLA, lived. TURNER had MANTULLA take JENNINGS three packs of cigarettes that he owed JENNINGS. TURNER stated that MANTULLA reported back that JENNINGS didn't want the cigarettes, but asked if TURNER wanted "more cigars." TURNER then realized that DAVILA must have gotten the Black & Milds from JENNINGS. TURNER stated further that he was living in Dorm #12 at that time, so MANTULLA became the middle man, and came back with five boxes of Black & Mild cigars from JENNINGS. TURNER related that he and MANTULLA sold the five boxes and MANTULLA took 11 packs of cigarettes to JENNINGS. TURNER stated that, according to MANTULLA, JENNINGS said they were short; it was three packs of cigarettes for every box of cigars. TURNER stated that, for a few weeks, MANTULLA got two to five boxes of cigars from JENNINGS, they sold them to other inmates for cigarettes and commissary and paid JENNINGS in cigarettes. TURNER stated that he smoked free and MANTULLA got commissary. TURNER remembered that JENNINGS also brought MANTULLA shaving cream, red crushed pepper, cologne and a watch in exchange for cigarettes. TURNER stated that he then moved to Dorm #2 where JENNINGS worked two days a week, and by Christmas, 2001, JENNINGS was bringing cigars directly to him. TURNER stated that JENNINGS brought in five to ten boxes of Black & Milds at a time for 2 ½ packs of cigarettes per box. TURNER stated that JENNINGS unlocked the bathroom in the middle of Dorm #2 when he came in to do "count" and, between 12:00 a.m. and 1:30 a.m., TURNER went in the bathroom, picked up the cigars that JENNINGS had put in a desk drawer and TURNER left cigarettes (in the drawer). TURNER stated that this continued for a couple of weeks and then one day JENNINGS brought in ten boxes of cigars and said that he could use a pair of "Lugz" boots. TURNER related that he had Inmate DAVE DAVIS, K-69739, purchase size 10 boots from the commissary and he gave DAVIS 20 packs of cigarettes for the boots. TURNER stated that he put the boots in the desk drawer and told JENNINGS that they were there. TURNER stated that JENNINGS next wanted gym shoes so he traded Inmate "J-DOG" cigarettes for gym shoes that he put in the desk drawer for JENNINGS. TURNER stated that JENNINGS moved up to Dorms #3 & #4 and, with his female officer's (STEPHANIE WORKMAN's) knowledge, TURNER went up to see JENNINGS. TURNER stated that JENNINGS continued to bring him cigars and next JENNINGS wanted a beard trimmer and some "Skoal." TURNER stated that he purchased the items himself at the commissary and traded them with JENNINGS for more cigars. TURNER stated that JENNINGS then gave him a pack of sunflower seeds and said that he wanted a pair of "Al Iverson" gym shoes. TURNER related that, on 02/24/02, as he was on the way to trade 12 packs of cigarettes with Inmate "COBRA" for the gym shoes, he was stopped and taken to Internal Affairs. TURNER added that Inmate BRIAN RIGGS, B-12025, also sold Black & Milds that he got from JENNINGS in exchange for meat from dietary for JENNINGS' dogs. TURNER stated that JENNINGS bragged about his dogs getting cheeseburgers and steaks "on the state." TURNER stated that Black & Milds also came in through his cellmate, Inmate CHRIS KRODEL, B-35546. TURNER stated that he was with KRODEL when Corrections Supply Supervisor II JOHN KRUP handed KRODEL a manila envelope. TURNER stated that KRODEL pulled pornographic magazines and a box of Black & Milds out of the envelope. TURNER stated that he saw KRODEL give Inmate PEEPLES, N-82826, Black & Milds two or three times. TURNER added that he had seen Officer BEA give single cigars to Inmate "BIG G" and other inmates who helped him, but he couldn't recall when or where that happened (Attachment #13).

TURNER agreed to submit to a polygraph and signed a Polygraph Consent Form on 03/05/02 (Attachment #14).

Records confirmed that TURNER lived in Dorm #6 from 03/19/01 to 10/22/01, in Segregation from 10/22/01 to 10/31/01, and in Dorm #12 from 10/31/01 to 11/09/01. TURNER lived in Unit #2 from 11/09/01 to 12/12/01 and

| Case Number | Subject's Name (Last, first, middle) | Institution Number | Institution |
|---|---|---|---|
| 02-EMO-153 | JENNINGS, MARK W., (C.O.) | | East Moline C.C. |

then in Dorm #2, Rooms #55 & #56 of the Administration Building from 12/12/01 to 02/24/02 (Attachment #15).

TURNER's property was searched on 02/26/02, and one bag of sunflower seeds and one typewriter ribbon were confiscated. The items will be maintained as evidence at East Moline Correctional Center (Attachment #16).

Polygraph Examiner MIKE MUSTO administered a polygraph examination to Inmate JOSEPH TURNER, B-11090, on 03/16/02. TURNER tested truthful when he answered yes to questions regarding Correctional Officer JENNINGS handing him boxes of Black & Milds and his paying JENNINGS for the Black & Milds (Attachment #17).

After 23 days in Segregation, TURNER was released to Parole on 03/19/02 (Attachment #18).

Correctional Officer MARK JENNINGS was assigned to Dorm #6 from 07/16/01 to 10/15/01, to Segregation and Dorms #1 & #5 from 10/16/01 to 01/15/02, and to Segregation and Dorms #3 & #4 from 01/16/02 to the present (Attachment #19).

A photo of JENNINGS was obtained (Attachment #20).

Correctional Officer STEPHANIE WORKMAN recognized Inmate JOSEPH TURNER, B-11090, by photo. WORKMAN remembered TURNER asking her, after the 11:00 p.m. "count," if he could go up and talk with JENNINGS. WORKMAN stated that she then called JENNINGS on Dorms #3 & #4 and told him that TURNER wanted to talk with him. WORKMAN recalled JENNINGS saying to send him up. WORKMAN recalled that happening two times and each time TURNER talked with JENNINGS just ten minutes. WORKMAN did not notice if TURNER had anything on him when he left or came back (Attachment #21).

Inmate JOSE DAVILA, R-00947, stated that, in 08/01, at his roommate's, TURNER's, suggestion he asked JENNINGS if it was possible to get Black & Mild cigars. DAVILA related that two weeks later, during third shift, JENNINGS called DAVILA to the control center and handed him two boxes of Black & Mild cigars. DAVILA smoked one cigar and it was too strong so he gave the remaining nine to TURNER. DAVILA stated that TURNER gave him four packs of cigarettes and DAVILA gave them to JENNINGS. DAVILA stated that, every two weeks in 08/01 and 09/01, JENNINGS gave him two or three boxes of cigars, DAVILA gave them to TURNER, who sold them for cigarettes, and DAVILA gave the cigarettes to JENNINGS. DAVILA stated that he got all of the cigarettes he needed plus a bag of sunflower seeds from JENNINGS during that period, but then it stopped in 10/01. DAVILA stated that there were no Black & Milds on the yard when he understood that JENNINGS was suspended, but they reappeared in 11/01 and were still around East Moline. DAVILA added that his involvement ended in 10/01 (Attachment #22).

DAVILA agreed to submit to a polygraph and signed a Polygraph Consent Form on 03/11/02 (Attachment #23).

Records confirmed that DAVILA lived in Dorm #6 from 08/24/01 to 02/25/02 (Attachment #24).

DAVILA was issued a Disciplinary Report on 03/20/02, for Unauthorized Property and Trading and Trafficking. DAVILA received two months Demotion to "C" Grade and one month Segregation (Attachments #25 & #26).

DAVILA refused polygraph testing on 04/02/02 (Attachment #27).

Inmate STEVE MANTULLA, N-10463, stated that, in 08/01 or 09/01, TURNER told him that his cellmate, Inmate DAVILA, was coming back from work with 10 to 15 boxes of Black & Mild cigars. MANTULLA stated that TURNER learned that DAVILA was getting the cigars from JENNINGS so TURNER cut DAVILA out and got the

| Case Number | Subject's Name (Last, first, middle) | Institution Number | Institution |
|---|---|---|---|
| 02-EMO-153 | JENNINGS, MARK W., (C.O.) | | East Moline.C.C. |

cigars from JENNINGS himself. MANTULLA stated that TURNER gave him a couple of cigars that MANTULLA then sold for cigarettes. MANTULLA stated that TURNER went to Segregation and later told MANTULLA that JENNINGS gave him cigarettes while TURNER was in Segregation. MANTULLA related that JENNINGS was working in MANTULLA's dorm (#2) and TURNER was living in Building #2. MANTULLA stated that TURNER asked MANTULLA to tell JENNINGS that he had the five packs of cigarettes that TURNER owed JENNINGS. MANTULLA stated that JENNINGS said to tell TURNER to forget it. MANTULLA stated that around Thanksgiving 2001, JENNINGS woke him and motioned him to the control center. MANTULLA stated that JENNINGS showed him a desk drawer with five boxes of Black & Mild cigars in it. MANTULLA took the cigars to TURNER and TURNER gave MANTULLA ten packs of cigarettes to give to JENNINGS. MANTULLA stated that JENNINGS said, "He's short" referring to the ten packs of cigarettes. MANTULLA stated that JENNINGS and TURNER worked it out and MANTULLA passed cigars and cigarettes between TURNER and JENNINGS for five more weeks. MANTULLA stated that, each week, JENNINGS brought in five to ten boxes of cigars and took out 25 packs of cigarettes. MANTULLA stated that he got three or four of every ten boxes of cigars and he sold them for cigarettes. MANTULLA stated that, per his request, JENNINGS handed him shaving cream, spices, a watch, and super glue for TURNER, while they were in the control center of Dorm #2. MANTULLA stated that TURNER repaired his TV with the super glue. MANTULLA paid JENNINGS with ten packs of cigarettes that he didn't need for himself. MANTULLA stated that he stopped passing cigars and cigarettes when TURNER moved into Dorm #2 where MANTULLA lived and where JENNINGS worked two nights a week. MANTULLA stated that TURNER moved into MANTULLA's room in mid 01/02 and MANTULLA heard JENNINGS tell TURNER he had too many cigarettes and later TURNER said JENNINGS wanted shoes. MANTULLA related that an inmate, possibly DAVIS, went into the commissary where MANTULLA worked and bought a pair of boots. MANTULLA later saw TURNER leave their room in the middle of the night with the boots and return without them. MANTULLA understood that TURNER got 14 boxes of cigars for the boots. MANTULLA stated that TURNER continued to give him boxes of cigars for cigarettes and commissary. MANTULLA stated that TURNER had a pair of Reebok Ridge gym shoes and said he was giving them to JENNINGS. MANTULLA stated that TURNER bought a razor at the commissary, and then told MANTULLA that he gave JENNINGS his cleaned up old razor. MANTULLA stated that, on 02/16/02, TURNER said that JENNINGS wanted "Lugz" gym shoes, but since he (TURNER) got out in a month, he was going to pick up the usual ten boxes of cigars and hold off on paying JENNINGS the shoes. MANTULLA stated that on 02/24/02, TURNER gave MANTULLA two boxes of cigars while they were in their room and TURNER left. MANTULLA put one box in his shirt pocket and exited the room. MANTULLA stated that, as he met up with TURNER in the hall, Officer MATHIS called TURNER to him. MANTULLA returned to their room where he told Inmate ROGERS, B-13292, to hold the box of cigars from his pocket and a second box from his property. MANTULLA stated that, later, he saw ROGERS taken out in cuffs, and then he (MANTULLA) was questioned. MANTULLA stated further that another roommate, Inmate CHRIS KRODEL, B-35546, showed him two new pornographic magazines in early 02/02 and said (C.S.S. II) JOHN KRUP gave them to him. MANTULLA stated that he also saw KRODEL give another roommate, Inmate JOHN PEEPLES, N-82826, ten boxes of Black & Milds, but he didn't know where KRODEL got the cigars (Attachment #28).

MANTULLA agreed to submit to a polygraph examination and signed a Polygraph Consent Form on 03/12/02 (Attachment #29).

Records indicated that MANTULLA lived in Unit #1, Dorm #11 from 06/27/01 to 11/14/01 and in the Administrative Building, Dorm #2, Room #55 from 11/14/01 to 02/24/02 (Attachment #30).

One black wristwatch was confiscated from MANTULLA on 02/24/02. MANTULLA's property was searched on 02/25/02 and containers of spices, bottles of cologne and a can of shaving cream were confiscated. These items will be maintained as evidence at East Moline Correctional Center (Attachments #31 & #32).

MANTULLA was issued a Disciplinary Report on 03/20/02, for Unauthorized Property and Trading and

DC 346
IL 426-0438

ບ໐໐໐໐9

| Case Number | Subject's Name (Last, first, middle) | Institution Number | Institution |
|---|---|---|---|
| 02-EMO-153 | JENNINGS, MARK W., (C.O.) | | East Moline C.C. |

Trafficking. MANTULLA received 38 days Segregation (Attachments #33 & #34).

MANTULLA refused polygraph testing on 05/07/02 (Attachment #35).

Inmate MELVIN ROGERS, B-13292, stated that, when MANTULLA moved into his room (#55) in Dorm #2, he noticed that MANTULLA had a lot of commissary and cigarettes. ROGERS related that MANTULLA sold the cigarettes to other inmates for $2.50 per pack when they cost $3.47 per pack in the commissary. ROGERS stated that, when TURNER moved into their cell, ROGERS observed TURNER showing MANTULLA boxes of Black & Mild cigars. ROGERS heard TURNER and MANTULLA say they got them from an officer, but they didn't say a name. ROGERS stated that TURNER and MANTULLA had at least ten boxes of cigars each week that they sold on the "Pavilion" for cigarettes and cosmetics. ROGERS stated that, on 02/23/02, Inmate RIGGS told him that RIGGS "took" some Black & Milds from TURNER and now the unnamed officer was giving cigars to RIGGS. ROGERS stated that, on the morning of 02/24/02, MANTULLA came in their room, handed him two boxes of Black & Milds and said to hold them until the afternoon. ROGERS stated that MANTULLA left, ROGERS put the cigars in his (ROGERS) property box and went to lunch. ROGERS stated that his room was searched and he was locked up for having the cigars. ROGERS related that, while in Segregation, Officer JENNINGS asked him why he was there, RIGGS said for some Black & Milds and JENNINGS said he hoped that he (ROGERS) wasn't going to say it was his (JENNINGS) fault. ROGERS maintained that he didn't smoke Black & Milds and he never bought or sold any (Attachment #36).

ROGERS agreed to submit to a polygraph and signed a Polygraph Consent Form on 03/13/02 (Attachment #37).

On 02/24/02, two packs of Black & Mild cigars were confiscated from ROGERS (Attachment #38).

ROGERS lived in Dorm #2, Room #55 in the Administration Building from 10/03/01 to 02/24/02 (Attachment #39).

ROGERS was issued a Disciplinary Report for Unauthorized Property on 02/24/02. ROGERS received 2 months Demotion to "C" Grade, 45 days Segregation and Transfer (Attachments #40 & #41).

Inmate BRIAN RIGGS, B-12025, stated that JENNINGS gave him one to two boxes of Black & Mild cigars each week, starting a couple of months ago. RIGGS stated that he worked in dietary and he sent extra food to JENNINGS on the inmate carts. RIGGS stated that he sold the cigars for cigarettes for himself. RIGGS added that TURNER ran his mouth about TURNER getting cigars from JENNINGS. RIGGS declined polygraph testing (Attachment #42).

Records indicated that RIGGS lived in Dorm #3, Room #22 of the Administration Building from 01/09/02 to 02/25/02. RIGGS had worked in dietary since 11/18/01 (Attachments #43 & #44).

RIGGS was issued a Disciplinary Report on 03/20/02, for Trading and Trafficking and he received 1 month Demotion to "C" Grade, 28 days Segregation and 1 month Loss of Commissary (Attachments #45 & #46).

Inmate CHRISTOPHER KRODEL, B-35546, stated that he knew that TURNER and RIGGS were selling Black & Mild cigars, that they supposedly got from JENNINGS. KRODEL indicated that he had nothing to do with the Black & Milds. KRODEL stated further that, on 02/24/02, illegal pornography was found in his property. KRODEL stated that friends had sent him the magazines and he kept them because they were valuable to trade. KRODEL related that he had loaned his pornographic magazines to inmates and staff, always in a brown envelope. KRODEL admitted that he had taken the magazines to his job in General Stores and KRUP had looked at them. KRODEL thought that KRUP could have handed KRODEL's own magazines back to him.

| Case Number | Subject's Name (Last, first, middle) | Institution Number | Institution |
|---|---|---|---|
| 02-EMO-153 | JENNINGS, MARK W., (C.O.) | | East Moline C.C. |

KRODEL stated that no staff gave him Black & Milds with or without pornographic magazines. KRODEL didn't recall ever being with TURNER in General Stores. KRODEL did remember TURNER asking him how to get his inmate number off of a beard trimmer he purchased for someone else. KRODEL stated that TURNER once said that he had to get a pair of shoes for someone who owed him ten boxes of Black & Milds (Attachment #47).

KRODEL agreed to submit to a polygraph and signed a Polygraph Consent Form on 03/11/02 (Attachment #48).

KRODEL's property was searched on 02/24/02, and 18 pornographic magazines and seven pornographic books were confiscated. These items will be maintained as evidence at East Moline Correctional Center (Attachment #49).

KRODEL lived in Dorm #2, Room #63 of the Administration Building from 09/28/01 to 02/24/02 (Attachment #50).

KRODEL was issued a Disciplinary Report on 03/20/02, for Contraband/Unauthorized Property and for Trading and Trafficking. KRODEL received 1 month Demotion to "C" Grade, 29 days Segregation and 1 month Loss of Commissary (Attachments #51 & #52).

Inmate JOHN PEEPLES, N-82826, stated that his cellmate, TURNER, always had Black & Mild cigars that he didn't smoke, so PEEPLES assumed that TURNER sold them. PEEPLES stated that TURNER was "tight" with another cellmate named MANTULLA and MANTULLA also had Black & Milds. PEEPLES stated further that eight pornographic magazines were found in PEEPLES' property on 02/24/02. PEEPLES stated that he got the 2002 "Hustler" from Inmate BOSKI, who had since gone home. PEEPLES stated that his magazines dated back to 1998 and he got them on visits and from other inmates. PEEPLES stated that he shared pornographic magazines with KRODEL who never said where he got his. PEEPLES stated that he never saw KRODEL with Black & Milds and he (PEEPLES) hadn't messed with them since he quit smoking on 04/30/01 (Attachment #53).

PEEPLES agreed to submit to a polygraph and signed a Polygraph Consent Form on 03/13/02 (Attachment #54).

PEEPLES lived in Dorm #2, Room #55 of the Administration Building from 01/16/02 to 02/24/02 (Attachment #55).

PEEPLES was issued a Disciplinary Report on 03/15/02, for Trading and Trafficking and Unauthorized Property. PEEPLES received 2 months Demotion to "C" Grade, 45 days Segregation, and Transfer (Attachments #56 & #57).

Inmate TORY HOPKINS, K-80996, stated that, shortly after 01/01/02, TURNER asked HOPKINS to purchase a pair of size 12 "Lugz" boots for him in return for a carton of cigarettes and four to five boxes of Black & Milds. HOPKINS stated that he purchased the boots and met TURNER on the yard, just outside the commissary. HOPKINS stated that he put the boots in TURNER's shopping bag and TURNER gave him the cigarettes and cigars. HOPKINS stated that he smoked all of the cigars himself (Attachment #58).

HOPKINS agreed to submit to a polygraph and signed a Polygraph Consent Form on 03/13/02 (Attachment #59).

Records indicate that HOPKINS purchased a pair of "Lugz" boots on 01/23/02 (Attachment #60).

| Case Number | Subject's Name (Last, first, middle) | Institution Number | Institution |
|---|---|---|---|
| 02-EMO-153 | JENNINGS, MARK W., (C.O.) | | East Moline C.C. |

HOPKINS was issued a Disciplinary Report on 03/15/02, for Trading and Trafficking. HOPKINS received 2 months Demotion to "C" Grade, 1 month Segregation and Transfer (Attachments #61 & #62).

Inmate DAVID DAVIS, K-69739, stated that, after Christmas, he purchased a pair of "Lugz" boots at the commissary and exchanged them with TURNER on the yard for 20 packs of cigarettes. DAVIS stated that he also purchased five packs of cigarettes from TURNER for $2.50 worth of commissary per pack (Attachment #63).
Records indicate that DAVIS purchased a pair of "Lugz" boots on 01/04/02 (Attachment #64).

DAVIS was issued a Disciplinary Report on 03/15/02, for Trading and Trafficking. DAVIS received 2 months Demotion to "C" Grade, 1 month Segregation, and Transfer (Attachments #65 & #66).

Inmate GREGORY HAMILTON, K72756, denied ever getting or selling Black & Mild cigars (Attachment #67).

Correctional Officer MARK JENNINGS denied bringing Black & Mild cigars and food items into East Moline Correctional Center and giving them to any inmate. JENNINGS denied receiving boots, shoes and/or a beard trimmer from any inmate (Attachment #68).

According to John Middleton, Inc., the makers of Black & Mild cigars, a particular box of cigars could have been sold in any store, anywhere. The UPC number on the box simply identified the product. John Middleton, Inc., was located in King of Prussia, PA 19406, telephone number 610-265-1400.

Conclusion:
Based on inmate and employee statements, supported by polygraph test results, the charges of Conduct of Individual, Socializing, Trade, Traffick, Aid or Abett a Resident, Failure to Report an Offense or Incident and Conflict of Interest are substantiated against Correctional Officer MARK JENNINGS.

Based on their own admissions and direct evidence, Inmates JOSEPH TURNER, B-11090; STEVE MANTULLA, N-10463; and CHRISTOPHER KRODEL, B-35546, violated the Institutional Rules regarding Trading or Trafficking and Unauthorized Property. TURNER was paroled on 03/19/02, after 23 days in Segregation. MANTULLA and KRODEL have received discipline.

Based on their own admissions, Inmates JOSE DAVILA, R-00947; BRIAN RIGGS, B-12025; TORY HOPKINS, K-80996; and DAVID DAVIS, K-69739, violated the Institutional Rule regarding Trading or Trafficking and all have received discipline.

Based on their own admission and direct evidence, Inmates MELVIN ROGERS, B-13292, and JOHN PEEPLES, N-82826, violated the Institutional Rule regarding Unauthorized Property and both have received discipline.

Attachments:
1. Outlook Message, WYANT, 02/26/02
2. Incident Report, MATHIS, 02/24/02
3. Interview, TURNER, 02/24/02
4. Re-Interview, TURNER, 02/24/02
5. Interview, DAVILA, 02/25/02
6. Interview, MANTULLA, N-10463
7. Interview, RIGGS, B-12025
8. Interview, KRODEL, 02/25/02

DC 346
IL 426-0438

000012

| Case Number | Subject's Name (Last, first, middle) | Institution Number | Institution |
|---|---|---|---|
| 02-EMO-153 | JENNINGS, MARK W., (C.O.) | | East Moline C.C. |

9.  Interview, ROGERS, 02/24/02
10. Interview, PEEPLES, 02/25/02
11. Interview, HOPKINS, 02/26/02
12. Outlook Message, WYANT, 02/26/02
13. Re-Interview, TURNER, 03/05/02
14. Polygraph Consent Form, TURNER, 03/05/02
15. Inmate Occupancy History, TURNER
16. Shakedown Record, TURNER, 02/26/02
17. Polygraph Test Report, TURNER, 03/16/02
18. Inmate Movement History, TURNER
19. Assignment Roster, JENNINGS
20. Photo, JENNINGS
21. Interview, WORKMAN, 05/06/07
22. Re-Interview, DAVILA, 03/11/02
23. Polygraph Consent Form, DAVILA, 03/11/02
24. Inmate Occupancy History, DAVILA
25. Disciplinary Report, DAVILA, 03/20/02
26. Adjustment Committee Summary, DAVILA, 03/28/02
27. Polygraph Examination Report, DAVILA, 04/02/02
28. Re-Interview, MANTULLA, 03/12/02
29. Polygraph Consent Form, MANTULLA, 03/12/02
30. Inmate Occupancy History, MANTULLA
31. Shakedown Record, MANTULLA, 02/24/02
32. Shakedown Record, MANTULLA, 02/25/02
33. Disciplinary Report, MANTULLA, 03/20/02
34. Adjustment Committee Summary, MANTULLA,
35. Polygraph Examination Report, MANTULLA, 05/07/02
36. Re-Interview, ROGERS, 03/13/02
37. Polygraph Consent Form, ROGERS, 03/13/02
38. Shakedown Record, ROGERS, 02/24/02
39. Inmate Occupancy History, ROGERS
40. Disciplinary Report, ROGERS, 02/24/02
41. Adjustment Committee Summary, ROGERS, 03/12/02
42. Re-Interview, RIGGS, 03/11/02
43. Inmate Occupancy History, RIGGS
44. Program/Assignment History, RIGGS
45. Disciplinary Report, RIGGS, 03/20/02
46. Adjustment Committee Summary, RIGGS, 03/24/02
47. Re-Interview, KRODEL, 03/11/02
48. Polygraph Consent Form, KRODEL, 03/12/02
49. Shakedown Record, KRODEL, 02/24/02
50. Inmate Occupancy History, KRODEL
51. Disciplinary Report, KRODEL, 03/20/02
52. Adjustment Committee Summary, KRODEL, 03/24/02
53. Re-Interview, PEEPLES, 03/13/02
54. Polygraph Consent Form, PEEPLES, 03/13/02
55. Inmate Occupancy History, PEEPLES
56. Disciplinary Report, PEEPLES, 03/15/02
57. Adjustment Committee Summary, PEEPLES, 03/19/02
58. Re-Interview, HOPKINS, 03/13/02

DC 346
IL 426-0438

000013

| Case Number | Subject's Name (Last, first, middle) | Institution Number | Institution |
|---|---|---|---|
| 02-EMO-153 | JENNINGS, MARK W., (C.O.) | | East Moline C.C. |

59. Polygraph Consent Form, HOPKINS, 03/13/02
60. Commissary Order, HOPKINS, 01/23/02
61. Disciplinary Report, HOPKINS, 03/15/02
62. Adjustment Committee Summary, HOPKINS, 03/19/02
63. Interview, DAVIS, 02/26/02
64. Commissary Order, DAVIS, 01/04/02
65. Disciplinary Report, DAVIS, 03/15/02
66. Adjustment Committee Summary, DAVIS, 03/19/02.
67. Interview, HAMILTON, 02/25/02
68. Interview, JENNINGS, 03/13/02
AE

Reviewed By:

000014

# CMS ILLINOIS

George H. Ryan, Governor

## DEPARTMENT OF CENTRAL MANAGEMENT SERVICES

DEPARTMENT OF  CORRECTIONS

vs.

MARK JENNINGS

### NOTICE OF THE APPROVAL OF WRITTEN CHARGES BY THE DIRECTOR OF CENTRAL MANAGEMENT SERVICES

You are hereby notified that the written charges by the above listed DEPARTMENT dated _____September 16_____, 20 _02_, seeking your:

_X_ discharge  _____ demotion  _____ suspension for more than 30 days in a 12-month period

as an employee of said DEPARTMENT are herewith approved by the Director of Central Management Services of the State of Illinois, pursuant to Illinois Revised Statutes, Chapter 127, Paragraph 63b109(5).

According to our records, your position is subject to the _____RC006_____ collective bargaining agreement providing for the grievability of the action taken against you. If you wish to grieve this action you should contact your grievance representative immediately to apprise him or her of your wishes.

You are also notified that should you wish to appeal these charges instead of grieving them, you may make written request to the Civil Service Commission, State of Illinois, Springfield, Illinois, on the enclosed form to be received by that Commission within 15 days following receipt of this notice.

PLEASE NOTE, HOWEVER, THAT IF YOU APPEAL THIS ACTION TO THE CIVIL SERVICE COMMISSION, YOU CANNOT HAVE A GRIEVANCE PROCESSED UNDER THE COLLECTIVE BARGAINING CONTRACT FOR YOUR POSITION. FURTHER, EVEN IF YOU WITHDRAW YOUR APPEAL TO THE COMMISSION, THAT WITHDRAWAL WILL NOT RESTORE YOUR ELIGIBILITY TO GRIEVE THIS MATTER UNDER THE COLLECTIVE BARGAINING CONTRACT. NO UNION OFFICIAL OR ANY PERSON IS AUTHORIZED TO INFORM YOU OTHERWISE.

Approved and served this date: _____October 23_____, 20 _02_

DEPARTMENT OF CENTRAL MANAGEMENT SERVICES
State of Illinois

By _____

000017

**EXHIBIT**

5

CMS-10D (rev. 1-92)

OCT-28-02 MON 3:04 PM   LABOR/ RELATIONS         FAX NO. 2175228531         P. 2

*Discharge*



**EXHIBIT**

**6**

AFSCME / State of Illinois
**CONTRACT GRIEVANCE**   **PRIORITY** 371184

| Employee's Name: Mark Jennings | Agency: DOC | AFSCME Local No. 0046 | Date Raised at Step 1: 10/23/2002 |
|---|---|---|---|

Job Title: Correctional Officer    RC  004  Facility or Office: East Moline

**STEP 1 - Oral Step**

NOT APPLICABLE

Signature of immediate supervisor acknowledging discussion of grievance.          (DATE)                              ( Date of Discussion)

**STEP 2 -** (To be submitted within 5 work days after supervisor's answer given or due, whichever occurs first.)
**Statement of Grievance** (Include facts of the complaint, sections of the Agreement violated -- if applicable, and relief requested):

I grieve that I have been discharged and/or suspended pending discharge
without just cause in violation of Article IX and all other pertinent
articles and sections of the collective bargaining agreement.

I ask that this action be rescinded and that I be made whole for all
wages and benefits deprived me as a result of this unwarranted action
taken by the employer.

EMPLOYEE X                           AFSCME hereby appeals    *[signature]*           10-23-02
                                     the grievance to Step 2  (Union Representative)   (DATE)

Date received by Intermediate Administrator or Designee _____ (DATE) _____ (DATE/S)

**Answer** (to be given within 15 working days of receipt -
use attachment if additional space is required)     Date settlement meeting held _____

NOT APPLICABLE

┌ **RECEIVED**

OCT 2 3 2002

Labor Relations                              000013

Signature _____  Date ____
          (Employer Representative)

Signature _____  Date ____
          (Union Representative)

☐ Accepted by Union  ☐ Rejected by Union

**STEP 3 - To be submitted to Agency Head** (certified mail - return receipt recommended) within 15 working days after Step 2
answer was given or due, whichever occurs first. *Local must send copy to Council 31 (include fact sheets, information and
documentation with Union copy only.)*
AFSCME hereby appeals the grievance to Step 3    Signature _____  Date ____
                                                          (Union Representative)

**STEP 4 - To be submitted to Director of Central Management Services** within 15 days after Step 3 sign off.
AFSCME hereby appeals the grievance to Step 4    Signature _____  Date ____

815/727-0134

BEFORE
EDWIN H. BENN
ARBITRATOR

| | |
|---|---|
| In the Matter of the Arbitration | |
| between | |
| ILLINOIS DEPARTMENT OF CENTRAL MANAGEMENT SERVICES | |
| and | |
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO | |

GRIEVANT:    M. Jennings

DEPARTMENT:    Corrections

CASE NOS.:    Arb. No. 4405
6-0001-03
371184
Arb. Ref. 02.088
(Discharge)

### OPINION AND AWARD

RECEIVED
JUN 3 0 2003
LABOR RELATIONS
JOLIET CORR. CENTER

APPEARANCES:

    For the State:     Gregory P. Newton, Esq.

    For the Union:     Thomas J. Edstrom, Esq.

Place of Hearing:     East Moline, Illinois

Date of Hearing:     June 12, 2003

Date of Award:     June 29, 2003

**EXHIBIT**

tabbies

7

## CONTENTS

I. ISSUE ........................................................................................... 1

II. FACTS .......................................................................................... 1

    A. Background ............................................................................ 1

    B. The Evidence ......................................................................... 1

    C. Grievant's Prior Record ........................................................ 4

III. DISCUSSION ................................................................................ 4

    A. The Standard And Burden ..................................................... 4

    B. Has The State Shown That Grievant Engaged
In Misconduct? ....................................................................... 4

    C. Has The State Shown That Discharge Was Appropriate? ........ 6

IV. CONCLUSION ............................................................................. 7

V. AWARD ....................................................................................... 7

000602

## I. ISSUE

Did the State have just cause to discharge Grievant Mark Jennings? If not, what shall the remedy be?

## II. FACTS

### A. Background

Grievant was an employee of the Department of Corrections for approximately 14 years. At the relevant time, Grievant was a Correctional Officer at the East Moline Correctional Center ("EMCC").

Grievant was discharged in October, 2002 for allegedly bringing items of contraband into EMCC during the period August 1, 2001 through February 24, 2002 in order to trade and traffic that contraband with inmates. Joint Exh. 3 at 2.

The Union grieved the discharge. Joint Exh. 2. The parties were unable to resolve the dispute. This proceeding followed.

### B. The Evidence

During varying periods in late 2001 and early 2002, Jose Davila, John Turner and Steve Mantulla were inmates at EMCC.[1] During their careers, Davila had been incarcerated for aggravated battery; Turner for drug possession, arson, burglary and parole violations; and Mantulla for burglary, forgery, and theft.

Black & Mild cigars are contraband at EMCC. However, because a number of the inmates favor those cigars, inmates were willing to trade packs of cigarettes for individual cigars. A potential market therefore existed.

Davila testified that he asked Grievant if Grievant could get him Black & Milds. According to Davila, approximately one week later, Grievant gave Davila five boxes of Black & Milds, which Davila gave to Turner to trade for packs of cigarettes with Turner sharing the profits of the trades with Davila. Davila testified that this arrangement with Grievant went on for approximately one month. In return for providing the Black & Milds, according to Davila, he gave Grievant packs of cigarettes which Turner was able to obtain from his trading efforts. Further, according to Davila, Grievant gave him gum and sunflower seeds.

Turner testified that he observed Davila with the Black & Milds and told Davila that he could trade those cigars for cigarettes at a

---

[1]    Mantulla states that his real name is Mantucca.

profit. According to Turner, Davila was able to supply the Black & Milds and Turner was able to trade those for cigarettes and shared the profits with Davila. Turner testified that this arrangement began in August, 2001 and lasted for about one to one and one-half months.

Further, according to Turner, when he was in the segregation unit, Grievant asked Turner why he was there. After they talked, according to Turner, Grievant asked Turner if there was anything he could do for Turner. Although he was not supposed to have cigarettes in segregation, Turner replied that he would like a couple of cigarettes, which Grievant gave to him and Turner smoked. The next night, according to Turner, Grievant gave him two packs of cigarettes, which Turner again smoked.

Turner also testified that after he was released from segregation, he began receiving Black & Milds from Grievant and, after trading with other inmates, gave Grievant cigarettes in return. Turner testified that Grievant advised him that he had too many cigarettes and could not get rid of them and asked Turner for other items that Grievant had seen in the commissary. Turner states that he bought gym shoes,

boots, a beard trimmer and chewing tobacco through another inmate and gave those items to Grievant. Turner further states that on occasion, Grievant also gave him gum and sunflower seeds. Turner also states that he observed Grievant give Mantulla cologne, a black faced wrist watch, coffee creamer and red crushed pepper.

Turner testified that the transactions came to a halt after he was searched by Officer Mathis who found about a dozen packs of cigarettes on him in the yard which raised the question of trafficking. Turner was then taken to segregation.

Mantulla testified that after Turner told him that he had Black & Milds, he began trading with Turner. Mantulla testified that Turner once told him that he owed Grievant cigarettes and, as a result, Mantulla spoke with Grievant and told Grievant that Turner was a good friend and wanted to pay Grievant. According to Mantulla, Grievant told him to tell Turner to forget about the debt.

Mantulla further testified that on one occasion, Grievant gave him five boxes of Black & Milds and told him to give them to Turner, which Mantulla did. The Black & Milds

were then traded and Mantulla gave Grievant cigarettes in return. This arrangement continued. According to Mantulla, he would get as many as 10 boxes of Black & Milds and, after conducting business with the other inmates, gave Grievant 25 packs of cigarettes in return.

Mantulla testified that his trading arrangement with Grievant went beyond cigars and cigarettes. According to Mantulla, he asked Grievant for a watch, cologne, coffee creamer and crazy glue to repair Turner's television case. Mantulla testified that a few weeks later he received a black face watch, cologne and glue. According to Mantulla, Grievant told him that those items would cost him 12 packs of cigarettes. Mantulla states that he offered Grievant 10 packs and Grievant agreed.[2] Further, according to Mantulla, he also received chewing tobacco from Grievant.

Mantulla further testified that his trading ended after he was discovered with cigars and he gave other cigars to another inmate Melvin Rogers to hold. A shakedown of the cells yielded the results of Mantulla's trading and, he gave up the information on Grievant's activities.

By stipulation, the parties agreed that if called to testify, Rogers would have stated that he received Black & Milds from Mantulla on February 24, 2002 and was asked to hold them for Mantulla; Rogers cell was searched and the cigars were found and Rogers disclosed that he received the cigars from Mantulla.

Grievant testified that he had no trading arrangements with Davila, Turner or Mantulla and denied all of the conduct attributed to him by those inmates. According to Grievant, he had no relationship with Mantulla; Mantulla never asked him to return cigarettes to Turner; his conversations with Turner were limited to small talk while Turner was a porter, discussions concerning the Bible and the fact that Turner's father was suffering from ALS, and two further occasions when Turner requested to speak with another officer on a different level; and his contact with Davila was limited to Davila's frequent requests to go to Dietary at night and on one occasion Davila spoke in a negative fashion about a nurse and Grievant threatened to write him up if he said anything

---

[2]    Mantulla testified that he poured the cologne from a glass bottle into an empty plastic bottle of Visine.

bad. Grievant was emphatic that he did not engage in the charged misconduct.

### C. Grievant's Prior Record

Grievant's prior disciplinary record shows a September 14, 2001 three day suspension for unprofessional conduct; a February 27, 1991 one day suspension for striking another employee while off duty; a February 17, 1991 three day suspension for refusal of mandatory overtime; a February 7, 1991 one day suspension for refusal of mandatory overtime; and a March 9, 1990 five day suspension for a miscount. Joint Exh. 3. at 2.

Grievant's evaluations are mixed, with mostly supervisor ratings in the "meets expectations" category, but also receiving ratings in the "exceeds" and "needs improvement" categories. Joint Exh. 9.

### III. DISCUSSION

#### A. The Standard And Burden

Because this is a discipline case, the burden rests with the State to demonstrate the existence of just cause for Grievant's discharge. That burden requires the State to make two showings. First, the State must demonstrate that Grievant engaged in the charged misconduct. Second,

If the State makes that showing of misconduct, the State must then demonstrate that the amount of discipline — in this case discharge — was appropriate.[3]

#### B. Has The State Shown That Grievant Engaged In Misconduct?

The State has shown that Grievant engaged in misconduct.

First, for obvious reasons, in their relationships with inmates, Correctional Officers are prohibited by the Department's rules from socializing, receiving gifts or gratuities, or trading and trafficking. See DR 120 at Sections 120.50, .60 and

---

[3] *The Common Law of the Workplace* (BNA, 1998), 50, 177:

> In a discipline case the employer best knows why it penalized an employee, often with grave repercussions for the individual. For these reasons the burden of proof in such cases traditionally has been placed on the employer.
>
> * * *
>
> The employer bears the burden of proving just cause for discipline. That includes proof that the level of discipline imposed was appropriate.

See also, Elkouri and Elkouri, *How Arbitration Works* (BNA, 5th ed.), 905 [footnote omitted]:

> There are two areas of proof in the arbitration of discharge and discipline cases. The first involves proof of wrongdoing; the second, assuming the guilt of wrongdoing is established and the arbitrator is empowered to modify penalties, concerns the question of whether the punishment assessed by management should be upheld or modified.

.70. Joint Exh. 6. Correctional Officers cannot be placed in compromising positions and the rules prohibit those actions. Therefore, if Grievant gave and/or received the items to Davila, Turner or Mantulla as attributed by them, then Grievant engaged in misconduct.

Second, but Grievant strenuously denies doing so. Given that denial and given the testimony of Davila, Turner and Mantulla that Grievant engaged in the conduct, this case is entirely determined on credibility resolutions.

Third, the State relies completely on the testimony of convicted inmate felons — certainly not the most trustworthy group of individuals. But like any other testimony, while inmate testimony should be carefully scrutinized, inmate testimony is not unbelievable, per se.[4]

What I have here is the testimony of three inmates who essentially relate the same version of the events — i.e., that Grievant brought them a variety of items (cigars, cigarettes, gum, sunflower seeds, cologne, a watch, pepper, etc.) that they used for bartering or kept for themselves and returned a portion of the receipts or other items to Grievant (cigarettes, gym shoes, boots, a beard trimmer, chewing tobacco, etc.). The Union pointed to inconsistencies in the inmates' testimony and statements and has hypothesized motives for these inmates to fabricate testimony against Grievant. But notwithstanding those technical difficulties with the inmates' testimony, what comes through here is that the overall testimony of Davila, Turner and Mantulla was generally consistent and corroborated. This is not testimony that is so corroborated and so tightly consistent that one becomes suspicious of its veracity. The inmates' testimony is laced with the kinds of discrepancies that one would expect to find from three individuals who were caught with contraband, initially denied their culpability or were reluctant to give up their source, but then after realization of their facing the serious consequences of having those items in their possession and then further realizing that they would only get in

---

[4]  See my awards in *CMS and AFSCME*, Arb. No. 3177 (Amburg, 1998) at 7 where inmate testimony was credited ("... for credibility purposes. I must treat them as any other witness as having a clean slate") and *CMS and AFSCME*, Arb. No. 3193 (Terry, 1998) at 7-9, where inmate testimony was not credited. *See also*, *CMS and AFSCME* (Oest) (Yaeger, 1995) at 11-12 ("Inmate testimony is not per se incredible. Rather their credibility has to be evaluated just like other witnesses.").

deeper by being untruthful, they came forward with their version of the events. The inconsistencies also exist because these three individuals separately related incidents which occurred beginning approximately two years ago. These inconsistencies are understandable. However, these inconsistencies do not make their testimony unbelievable.

One must ask why the inmates would fabricate testimony against Grievant? Grievant did nothing to them which stands out that would cause their coordinated retaliation. To assert that their stories were constructed ahead of time to make Grievant the fall guy and to protect their real source of contraband is possible — but that is really only speculation.

From a demeanor standpoint, Grievant was a very impressive witness. I find it difficult to understand why Grievant would jeopardize his career, pay and benefits by engaging in what was, although extensive, for all purposes trafficking and trading in minor items. But these cases are decided on burdens. And, although furiously attacking the credibility of the inmates, the Union could not overcome their testimony which, in its totality, was credible.

Given what is before me. I am compelled to credit the testimony of Davila, Turner and Mantulla. I find that Grievant engaged in the conduct attributed to him by those inmates. Misconduct has been shown.[5]

### C. Has The State Shown That Discharge Was Appropriate?

The next question is whether the State has shown that discharge was appropriate? I find that it has.

The purpose of discipline is to rehabilitate and to send a corrective message to employees that they must comply with their employer's rules and the common sense expectations of the workplace. That desired result is accomplished through the application of progressively increasing amounts of discipline.[6]

---

[5] The Union asserts that there was no effort by the Department to obtain physical evidence against Grievant and argues that the Department did not really fully attempt to find out what happened. The kinds of goods involved were mostly easily disposed of. But most important, the testimony of the three inmates still stands against Grievant.

[6] *Hyatt Hotels Palo Alto*, 85 LA 11, 15 (Oestreich, 1985):
... [T]he purpose of disciplinary action is rehabilitation of an employee who has gone astray and to correct unacceptable, work related behavior. Its purpose is not punishment motivated by thoughts of revenge or "setting an example" for
*[footnote continued]*

Grievant has a prior record of discipline. While a number of the entries are from the seemingly distant past (1990 and 1991), Grievant does have a fairly recent suspension in 2001. The State has also shown that Grievant engaged in serious misconduct. Trafficking and trading with inmates not only put Grievant at risk, but, if forced by the inmates as a result of his prior cooperation to bring in something more dangerous than the items he did give to the inmates (e.g., drugs or weapons), other employees may have been placed in danger. Under the circumstances, and given Grievant's prior disciplinary record, dismissal is a reasonable discipline for the demonstrated misconduct.

## IV. CONCLUSION

I really have no choice here. I fully appreciate the consequences of this decision on Grievant. But, the State has demonstrated that Grievant engaged in serious misconduct. Notwithstanding the very strong efforts and arguments made by the Union on Grievant's behalf in

an effort to undermine the State's case, the State's position must prevail. Just cause for Grievant's discharge has been shown. The grievance shall be denied.

## V. AWARD

The grievance is denied.

Edwin H. Benn
Arbitrator

Dated: June 29, 2003

[continuation of footnote]
other employees, or to avoid legal liability for past neglects. The principles of progressive discipline demand that the minimum penalty necessary to correct unacceptable conduct be applied.

RECEIVED
JUN 3 0 2003

LABOR RELATIONS
JOLIET CORR. CENTER

EAST MOLINE CORRECTIONAL CENTER.

EMPLOYEE REVIEW HEARING

June 1, 1999

B.17

PRESENT:  Terry Boerema, Employee Review Officer
C.O. Mark Koster, Referred Employee
Assistant Warden Slutz, Referring Employee
C.O. Tony McCubbin, AFSCME Representative
C.O. Mike Dundy, AFSCME Representative
C.O. Steve Slocum, AFSCME Representative



**EXHIBIT**

8

C.O. Mark Koster was referred for violation of Department Rule: Title 20 Corrections, Criminal Justice, and Law Enforcement, Chapter I Department of Corrections, Subchapter a Administration and Rules, Rules of Conduct: **Section 120.30 Conduct of Individuals** (Individuals shall conduct themselves in a manner which will not reflect unfavorably on the Department and shall not engage in conduct which is unbecoming or impairs the operations of the Department.); **Section 120.50 Socializing with Committed Persons** (Individuals shall not knowingly socialize with or engage in business transactions with any committed person, or a relative or known close associate of a committed person, except in the performance of an assignment or as approved in writing by the Director.); **Section 120.70 Trading or Trafficking** (Individuals shall not trade or traffick with, or aid or solicit unauthorized actions by, committed persons.); and **State Laws Regarding Official Misconduct and Unauthorized Use of State Property** (Individuals shall obey all federal, state and local laws applicable court decisions and orders related to the performance of their services to the Department.; Individuals shall comply with departmental rules, written procedures, bulletins and written or verbal orders issued by Department authorities.; and Individuals shall not utilize state equipment, property or services without authorization or for personal use.)

Assistant Warden Slutz read the charges which stated that inmate Scott R. Ducey (K-64368) stated that his job assignment was maintenance and his duties were to repair inmate and state property. Inmate Ducey listed the following staff member and corresponding items that were brought to him to repair: C.O. Mark Koster, weather radio and children's Casio keyboard. Inmate Ducey stated that he received a pack of "Swisher Sweet" cigars from C.O. Koster as personal payment for his services. Inmate Reginald Brown (A-81604) stated that he was assigned to maintenance, television repair, and worked with inmate Ducey. Inmate Brown stated that C.O. Koster had brought inmate Ducey an organ and a weather radio for repair. C.O. Mark A. Koster stated that he worked in vehicle maintenance and that approximately six months ago he noticed inmate Ducey repairing electronic type items. C.O. Koster stated he had a conversation with inmate Ducey concerning a child's Casio keyboard and a weather radio that he (C.O. Koster) owned that did not work. C.O. Koster stated he, subsequently, brought the items in to inmate Ducey for repair. C.O. Koster stated that all that was wrong with them were dead batteries and he took them back home. C.O. Koster stated inmate Ducey wanted a pack of cigars for his labor, but that he (C.O. Koster) did not give him anything. On March 1, 1999 C.O. Mark A. Koster was read his Constitutional Rights before questioning. C.O. Mark A. Koster was re-interviewed and refused to answer any questions without attorney representation. C.O. Scott E. Johnson stated that he was assigned to grounds. C.O. Johnson stated that C.O. Koster did sell a Holley carburetor to C.O. Newberg, but did not know the details of the transaction and that

the carburetor was in C.O. Newberg's office. Inmate Timothy J. Love (N-64118) stated that he was assigned to grounds. Inmate Love stated that approximately one to two weeks prior to this interview, C.O. Koster brought a riding mower to grounds and that C.O. Koster told them to get it running or use it for parts. Inmate Love stated that he and other inmates worked on the mower the next few days and got it running. Inmate Love stated the mower had since disappeared. C.O. Scott H. Newberg stated that he was the supervisor for grounds. C.O. Newberg stated he had a Holley carburetor under his desk on grounds at the time of the interview, purchasing it from C.O. Koster. Approximately one month ago, C.O. Koster had donated a riding mower to the grounds lawn mower repair shop. Inmate Stephen M. Sierzega (B-40708) stated he had been assigned as a mechanic for approximately the last 22 months. Inmate Sierzega stated that when he worked for C.O. Koster, he (Sierzega) took a holley 750 CFM carburetor off of C.O. Koster's privately owned pick-up and replaced the carburetor with a 650 CFM carburetor. Inmate Sierzega stated he rebuilt the 650 CFM carburetor prior to putting it on C.O. Koster's truck. Inmate Sierzega stated that C.O. Koster made a deal with C.O. Newberg concerning the purchase of the carburetor. Inmate Charles D. Lair (N-97907) stated that prior to being assigned to grounds he had been assigned to Vehicle Maintenance under C.O. Koster. Inmate Lair stated while assigned to Vehicle Maintenance, C.O. Koster brought in a log splitter and he (Lair) worked on it in Vehicle Maintenance. Inmate Lair stated that he overheard C.O. Koster order parts for the log splitter under a state order, tax exempt. Inmate Lair stated he was reassigned and did not know what happened to the log splitter. On March 1, 1999 Instructor Clarence Modglin was re-interviewed. Mr. Modglin stated that there were basically two auto repair shops in the Maintenance Building, one called the Vocational Auto Shop (under Black Hawk College) and the other called Vehicle Maintenance. Mr. Modglin stated that C.O. Koster had been responsible for Vehicle Maintenance. Mr. Modglin stated Vehicle Maintenance was responsible for state vehicles only and Vocational Auto was for the repair of approved employee's vehicles. Mr. Modglin stated that he recalled his students working on C.O. Koster's truck on numerous occasions. Mr. Modglin stated C.O. Koster had ordered the parts for the truck. Mr. Modglin stated that he kept no receipts or records of the vehicles he or his students had worked on. Mr. Modglin stated he did not recall which inmates worked on C.O. Koster's truck. Mr. Modglin stated he orders auto parts from three local businesses. Mr. Modglin stated that the three local businesses were Olson's Auto Parts, Claey's Auto Parts, and The Car Shop. Mr. Modglin stated he believed C.O. Koster would have used one of these businesses to order his (C.O. Koster's) parts. Reporting Investigator contacted Manager James Newbanks at Car Quest Auto Parts. Mr. Newbanks stated he was not able to locate any records relating to a Holley carburetor for C.O. Koster or East Moline Correctional Center. Reporting Investigator contacted Manager Greg Claey's at Claey's Auto Parts. Mr. Claey could not locate any records relating to a Holley carburetor for C.O. Koster or East Moline Correctional Center. Reporting Investigator contact Jim Schenk at The Car Shop. Mr. Schenk could not locate any records relating to a Holley carburetor for C.O. Koster or East Moline Correctional Center. Inmate Richard J. Bilik (K-60539) stated that he had worked on grounds for approximately 1-1/2 months. Inmate Bilik stated that approximately five weeks ago he arrived at work and a Craftsman riding lawn mower was there. Inmate Bilik stated he was told by Inmate Ellis the mower was to be used for parts. Inmate Bilik stated he and inmate Ellis tore the mower apart for parts the same day. Inmate Bilik stated recently inmate Ellis told him they had to put the mower back together so that C.O. Koster could get his job back. Inmate Bilik stated he and inmate Ellis then located the parts and put the mower back together. Inmate Edward L. Ellis (B-08878), stated that he had worked on grounds for approximately four months. Inmate Ellis stated approximately one month ago C.O. Koster brought the Craftsman mower on grounds in a truck. Inmate Ellis stated he tore the mower up for parts the same day.

300617

Page 2

Inmate Ellis stated that he had a conversation with C.O. Koster the following day and C.O. Koster asked him why he tore the mower up, that he (C.O. Koster) thought they would get it running to use at East Moline Correctional Center. Inmate Love was re-interviewed and stated that he had previously said the Craftsman mower had "disappeared"; however, it was possible that it got torn apart to be used for parts. Inmate Love stated that he did get the mower running the last time he saw it.

The Union representative asked if this case was going to be prosecuted. Employee Review Officer stated the investigation report had been forwarded to the States Attorney's office for review and possible prosecution. The Union representative then requested a continuance pending judicial outcome. The request for a continuance was denied. The Union representative then advised the referred employee to say nothing.

The Union representative stated that the charges against C.O. Koster were not clear and concise. Other employees listed in the investigation were not charged with official misconduct. C.O. Koster brought in a weather radio and a keyboard. He was told they needed batteries and he took them home. The inmate did not even work on them.

The log splitter that is mentioned in the investigation is at the grounds building. An inmate implied that C.O. Koster had bought a carburetor for his personal vehicle through state purchase order procedures. The Union representative then showed numerous receipts from August 1996 from an auto parts store for a carburetor and related auto parts. The Union representative stated that any work done on C.O. Koster's vehicle was done through the approved procedure for having a personal vehicle repaired by the vocational auto mechanics class. Everything inmate Lair says about C.O. Koster is a lie. C.O. Koster had fired inmate Lair from his job and inmate Lair wanted retribution. The riding lawn mower mentioned in the investigation was very old and was brought in as a donation to be used for spare parts by the workers at grounds. The weather radio and the keyboard C.O. Koster brought in were not contraband and the inmate did not do any work on them. The inmate was not paid for any service because no service was provided.

C.O. Koster is a long time employee with an excellent work record.

C.O. Mark Koster has been employed by East Moline Correctional Center since August 1983 and has incurred the following discipline in the past:

    None In Last 2 Years

The available information indicates that C.O. Mark Koster is not guilty of violating State Laws Regarding Official Misconduct.

The available information indicates that C.O. Mark Koster is guilty of violating Department Rule 120 Conduct of Individuals, Trading or Trafficking, Socializing with Committed Persons.

C.O. Koster admitted he had had a conversation with inmate Ducey about repairing personal items, brought in two items from home and, upon conclusion of the inmate's review of the items, took them home again. The fact that the items required no repair does not change the fact that C.O. Koster solicited unauthorized actions by the inmate.

The riding lawn mower mentioned by inmate Love as having been donated by C.O. Koster

:J00618

was corroborated by the officers that had worked at grounds. Inmate Love's statement implied the mower had been brought in, repaired, and possibly taken out again; however, this implication is negated by the testimony of the grounds officers and other inmates who re-assembled the mower from its parts. It appears the mower was, in fact, an unauthorized donation.

The unauthorized vehicle repair work alleged in the investigation cannot be entirely substantiated. Vocational Instructor Modglin indicated he recalled his class having worked on C.O. Koster's truck, however, no evidence was presented to suggest the repair work in Mr. Modglin's class was not appropriately authorized. The investigation report indicate three auto repair businesses were contacted and none could locate records of a Holley carburetor. The Union, however, produced a number of receipts from an auto parts store. Since C.O. Koster had ordered his own parts, according to Mr. Modglin, there is no way to verify that C.O. Koster had not come by his carburetor legitimately. The fact that C.O. Koster was going to sell a carburetor to C.O. Newberg is, in itself, not an issue. Having had inmate Sierzega work on the carburetor, however, would have been unauthorized activity since inmate Sierzega was not assigned to the vocational auto repair class.

The log splitter mentioned by inmate Lair has been verified to be currently located in the grounds area. The investigation is not clear as to any allegation as to where it originally came from. The Union denied everything claimed by inmate Lair. There is neither a second witness nor polygraph results relating to inmate Lair's claim that C.O. Koster was illegally ordering parts for the log splitter.

The "Swisher Sweets" cigars that inmate Ducey claimed he received from his services was denied by C.O. Koster and is not corroborated by any additional source.

It is therefore recommended that C.O. Mark Koster be issued a 5 Day Suspension.

_Terry Boerema_    6-15-99
Terry Boerema                     Date
Employee Review Officer

_Frank Shaw_    6-22-99
Frank Shaw                        Date
Assistant Warden of Operations

APPROVED: ____

DISAPPROVED: __✓__

cc:    Warden
       Major Wright
       AFSCME
       Personnel File
       Referring Employee
       Referred Employee

COMMENTS: _BASED ON THE AGGRAVATING FACTORS IN THIS MATTER THE DISCIPLINE IS BEING INCREASED TO A 30 DAY SUSPENSION PENDING DISCHARGE._

J00619