RESOLUTION PRIOR TO ARBITRATION

| | |
|---|---|
| Grievance # | 0006-0178-99 (369506) |
| Grievant: | Mark Koster |
| Agency: | Department of Corrections |
| Facility: | East Moline |
| Issue: | DISCHARGE FOR CAUSE |
| Resolution: | In full and complete resolution of the above-captioned matter, the parties agree: |

1. The grievant, Mark Koster, shall return to work on November 15, 1999 with the discharge being reduced to a five (5) day suspension beginning July 13, 1999 and ending July 17, 1999.

2. The grievant, Mark Koster, shall receive back pay from July 18, 1999 through November 14, 1999, minus any applicable taxes and social security payments.

3. The Union and the grievant, Mark Koster, agree to refrain from initiating any grievance, administrative or other judicial proceedings arising out of this discharge action of the circumstances that led to the filing of charges of discharge.

This resolution is made without precedent or prejudice to either party and may not be utilized in any subsequent proceedings except for the enforcement of its terms.

For the Employer

Date  11/10/99

For the Union

Date  11/10/99

rururk.doc

**EXHIBIT**

9

EAST MOLINE CORRECTIONAL CENTER

EMPLOYEE REVIEW HEARING

June 1, 1999                                                                    B.17

PRESENT:  Terry Boerema, Employee Review Officer
          C.O. Robert Huskey, Referred Employee
          Assistant Warden Slutz, Referring Employee
          C.O. Tony McCubbin, AFSCME Representative
          C.O. Mitch Fanning, AFSCME Representative
          C.O. Steve Slocum, AFSCME Representative



**EXHIBIT**
10

C.O. Robert Huskey was referred for violation of Department Rule: Title 20 Corrections, Criminal Justice, and Law Enforcement, Chapter I Department of Corrections, Subchapter a Administration and Rules, Rules of Conduct: **Section 120.30 Conduct of Individuals** (Individuals shall conduct themselves in a manner which will not reflect unfavorably on the Department and shall not engage in conduct which is unbecoming or impairs the operations of the Department.); **Section 120.50 Socializing with Committed Persons** (Individuals shall not knowingly socialize with or engage in business transactions with any committed person, or a relative or known close associate of a committed person, except in the performance of an assignment or as approved in writing by the Director.); **Section 120.70 Trading or Trafficking** (Individuals shall trade or traffick with, or aid or solicit unauthorized actions by, committed persons.); and **State Laws Regarding Official Misconduct** (Individuals shall obey all federal, state and local laws and applicable court decisions and orders related to the performance of their services to the Department; Individuals shall comply with departmental rules, written procedures, bulletins and written or verbal orders issued by Department authorities; and Individuals shall not utilize state equipment, property or services without authorization or for personal use.)

Assistant Warden Slutz read the charges which stated this investigation was conducted at the request of East Moline Correctional Center, Warden Sergio Moline, after he had been informed that C.O. Robert Huskey had found a pornographic video cassette during a routine "shakedown" of the television repair shop on February 12, 1999. Inmate Scott R. Ducey (K-64368) state that his job assignment was maintenance and his duties were to repair inmate and state property, namely televisions, radio cassette players, and VCR's. Inmate Ducey stated that C.O. Huskey usually worked the tool room and was his supervisor. Inmate Ducey stated that he located the videocassette in question, jammed within a television/VCR combination that was brought in for repair by C.O. Whiting. Inmate Ducey stated that he placed the videocassette in a drawer within his work area, where it remained until located by C.O. Huskey on February 12, 1999. Inmate Ducey listed the following staff member and corresponding item that was brought him to repair: C.O. Huskey, a remote car entry. Inmate Ducey stated that the others would buy extra parts to supply his (Ducey's) operations and/or purchase parts for a walk through metal detector that C.O. Huskey had obtained from salvage. Inmate Ducey stated that C.O. Huskey worked with him in ordering the parts needed to repair the items. Inmate Reginald Brown (A-81604) stated that he was assigned to maintenance, television repair, and worked with inmate Ducey. Inmate Brown also stated inmates all over the institution had knowledge of the videotape. Inmate Brown added that inmates would often talk about the videotape in the presence of C.O. Huskey and that C.O. Huskey acted like he did not hear them. Inmate Brown stated that he had heard that C.O. Huskey received a phone call from C.O. Whiting just before C.O. Huskey searched

00621

for and found the videotape. Painter Enrique "Hank" Diaz stated around February 1, 1999, he (Diaz) had a conversation with C.O. Huskey. Mr. Diaz stated that he told C.O. Huskey that he (Diaz) had a broken kareokee machine and that C.O. Huskey had told him to bring it in for inmate Ducey to repair. Mr. Diaz stated that C.O. Huskey told him if it needed parts that he (Diaz) would have to supply them, and if that were the case he (Diaz) would have to buy extra parts that he (C.O. Huskey) needed. Locksmith Joe M. Mascari stated during the month of December 1998, he had a conversation with inmate Ducey and C.O. Huskey concerning his (Mr. Mascari's) broken car stereo. Mr. Mascari stated he, subsequently, brought inmate Ducey his Pioneer car stereo for repairs. Mr. Mascari stated he took the stereo home and it stopped playing within 15 minutes. Mr. Mascari stated the following day C.O. Huskey asked him if he (Mr. Mascari) planned on paying inmate Ducey for the labor. Mr. Mascari stated he told C.O. Huskey "No", and C.O. Huskey then asked if he (Mr. Mascari) could then purchase some parts for the "electronic frisker" (metal detector). Mr. Mascari stated he tried to find some parts for the metal detector, but could not. Mr. Mascari stated that approximately two days later C.O. Huskey told him that he (Mr. Huskey) had gotten the parts for the metal detector and that he (Mr. Mascari) should just pay him (C.O. Huskey) $6.00 for the parts. Mr. Mascari stated he paid C.O. Huskey $6.00 at that time. Mr. Mascari stated the C.O. Huskey had told him that Belinda Rusch had brought in a television for inmate Ducey to repair. C.O. Clifford H. Perry stated that he was usually assigned to the second gate during the 7:00 am to 3:00 pm shift. C.O. Perry had a television that did not work. C.O. Perry stated that he later brought the television in and gave it to inmate Ducey. C.O. Perry stated a few days later C.O. Huskey called him at the second gate and told him that the television was fixed. C.O. Perry stated C.O. Huskey and inmate Ducey then delivered the television to him at the second gate. On March 1, 1999 C.O. Robert V. Huskey was read his Constitutional Rights before questioning. C.O. Robert V. Huskey was re-interviewed and refused to answer any questions without attorney representation. Supply Supervisor II Howard E. Geyer stated that during August 1998, inmate Ducey had asked him about ordering supplies for the television repair shop. Mr. Geyer state that later C.O. Huskey did submit an order for supplies and that these requests were routed through "normal channels" and the supplies were, subsequently, purchased.

The Union representative asked if this case was going to be prosecuted. Employee Review Officer stated the investigation report had been forwarded to the States Attorney's Office for review and possible prosecution. The Union representative then requested a continuance pending judicial outcome. The request for a continuance was denied. The Union representative then advised the referred employee to say nothing.

The Union representative pointed out that page 5 of the investigative report indicates that C.O. Huskey was interviewed but there is no interview report. C.O. Huskey was only interviewed once, when he was read his rights. The Union representative stated he has never before seen anyone referred for discipline that had not even been interviewed.

Inmates Ducey and Brown were put in segregation because C.O. Huskey found a videotape in their area. They wanted revenge. One inmate claiming C.O. Huskey overheard them talking about this videotape is a supposition on the inmate's part and is unproven. The fact that C.O. Whiting was filling in for C.O. Huskey while he was on vacation demonstrates that C.O. Huskey could not have known about C.O. Whiting bringing in a television for repair. C.O. Huskey is the one who found the videotape in the inmate's desk and turned it in to Capt. Small. He is the only employee in the whole investigation to be shown performing his duties correctly. The pages of inmate phone records do not demonstrate any

connection between C.O. Huskey and any inmate, nor do the Trust Fund records. The polygraph tests which produced valid results do not implicate C.O. Huskey in any way. The pages of inmate Ducey's "work orders" show no wrong-doing by C.O. Huskey. It was known that there was some "bad blood" between C.O. Huskey and some of the maintenance workers. The Union representative denied that C.O. Huskey had approved the painter, Mr. Diaz, to bring in a machine to be fixed. The Union contended that some staff members simply did not want to take the heat for their actions so they tried to blame C.O. Huskey. There is no evidence of any inmate being compensated in any way. None of the purchase request in the Investigative Report have C.O. Huskey's name anywhere on them. The conclusion of the Investigative Report is completely inaccurate. There is no physical evidence. The inmates' had a different story every time someone talked to them. C.O. Huskey did not do anything wrong. He is the only one who did his job right. The inmate had a grudge against C.O. Huskey because he would not write a recommendation for him for work release or good time.

C.O. Robert Huskey has been employed by East Moline Correctional Center since August 1983 and has incurred the following discipline in the past:

| | | |
|---|---|---|
| 06/17/96 | Unauthorized Absence | 7 Day Suspension |
| 06/06/96 | No Call/No Show | 7 Day Suspension |
| 01/09/96 | Unauthorized Absence | 3 Day Suspension |
| 07/20/95 | No Call/No Show | 3 Day Suspension |
| 07/20/95 | Unauthorized Absence (2 Days) | 1 Day Suspension |

The available information indicates that C.O. Robert Huskey is guilty of violating Department Rule 120 Conduct of Individuals, Trading or Trafficking, Socializing with Committed Persons, and Official Misconduct.

The Investigation Report indicates C.O. Huskey brought in a remote car entry device for repair by inmate Ducey. The Investigation Report also indicates complicity by C.O. Huskey in arranging for inmate repairs on items brought in by employees Diaz, Mascari and Perry and soliciting payment for the repair work. Statements in other Employee Review Hearing reports substantiate this.

The Purchase Requests in the Investigation Report were submitted and approved through normal channels. There is no way to determine whether the materials ordered were used on unauthorized repairs, although this appears likely, or whether they would have been needed solely in the normal course of repairing state owned and inmate owned televisions.

There is no corroboration to inmate Brown's claim that C.O. Whiting called C.O. Huskey before C.O. Huskey found and turned in the pornographic videotape in inmate Ducey's desk, nor is there any proof that C.O. Huskey had knowledge of its existence.

It is clear that C.O. Huskey was aware of the inmates receiving compensation and, although the Investigation Report does not indicate C.O. Huskey received any personal compensation, it appears he was, in effect, operating an unauthorized repair business.

Based on the serious nature of the offense, it is therefore recommended that C.O. Robert Huskey be issued a 30 Day Suspension Pending Discharge.

00623

_Terry Boerema_    6-15-99

Terry Boerema                    Date
Employee Review Officer

APPROVED: ✓

DISAPPROVED: _____

_Frank Shaw_    6-16-99

Frank Shaw                      Date
Assistant Warden of Operations

cc:    Warden
       Major Wright
       AFSCME
       Personnel File
       Referring Employee
       Referred Employee

COMMENTS: _____

_____

000624

Page 4

## RESOLUTION PRIOR TO ARBITRATION

GRIEVANCE NO:        6-0176-99 (3694960)

ARBITRATION NO:      3582

GRIEVANT:            Robert Huskey

AGENCY/FACILITY:     Department of Corrections/East Moline Correctional Center

ISSUE:               Discharge

RESOLUTION:

In full and complete resolution of the above-captioned matter, the parties agree as follows:

1.  The Union and the grievant, Robert Huskey, agree to withdraw the above-captioned grievance.

2.  The discharge of the grievant, Robert Huskey, is to be rescinded. In its stead, the grievant will receive a thirty (30) day suspension, to be served from July 9, 1999 to August 7, 1999. The grievant shall receive back wages for the period August 8, 1999 to December 8, 1999, minus applicable taxes and deductions, to be paid via the Department of Corrections. The period representing December 9, 1999 to February 15, 2000 shall be considered an unpaid leave of absence. The Grievant shall return to work on February 16, 2000.

3.  The parties agree that the terms of this resolution prior to arbitration will not interrupt or deduct from the Grievant's continuous service date or seniority date.

4.  The Union agrees to refrain from initiating or pursuing against the Employer any other grievance, administrative or other judicial proceedings arising out of the suspension or the circumstances that led to the filing of the instant charges.

5.  This resolution is made without precedent or prejudice in the disposition of other cases or in the resolution of subsequent grievances and may not be utilized in any subsequent proceeding except for the enforcement of its terms.


_Melissa Mlynski_
For the Employer

Dated: _February 15, 2000_


_Walter A. Danae_
For the Union

Dated: _16 February 2000_


EXHIBIT

11

000601

## EAST MOLINE CORRECTIONAL CENTER

## EMPLOYEE REVIEW HEARING

June 1, 1999                                                                                  B.17

PRESENT:   Terry Boerema, Employee Review Officer
LTA Supervisor II Belinda Rusch, Referred Employee
Major Steve Wright, Referring Employee
C.O. Tony McCubbin, AFSCME Representative
C.O. Mike Cosgrove, AFSCME Representative
C.O. Steve Slocum, AFSCME Representative

**EXHIBIT**

12

(Attorney Carol Pentuic present as a witness.)

Ms. Belinda Rusch was referred for violation of Department Rule: Title 20 Corrections, Criminal Justice, and Law Enforcement, Chapter I Department of Corrections, Subchapter a Administration and Rules, Rules of Conduct: **Section 120.30 Conduct of Individuals** (Individuals shall conduct themselves in a manner which will not reflect unfavorably on the Department and shall not engage in conduct which is unbecoming or impairs the operations of the Department.); **Section 120.50 Socializing with Committed Persons** (Individuals shall not knowingly socialize with or engage in business transactions with any committed person, or a relative or known close associate of a committed person, except in the performance of an assignment or as approved in writing by the Director.); **Section 120.70 Trading or Trafficking** (Individuals shall not trade or traffick with, or aid or solicit unauthorized actions by, committed persons.); **Section 120.90 Information to be Reported** (Individuals shall immediately report to the Chief Administrative Officer any information indicating a violation or attempted violation of criminal laws, or a threat to the safety and security of the facility, its property or any person, including information regarding a potential escape.); and **State Laws Regarding Official Misconduct and Unauthorized Use of State Property** (Individuals shall obey all federal, state and local laws applicable court decisions and orders related to the performance of their services to the Department.; Individuals shall comply with departmental rules, written procedures, bulletins and written or verbal orders issued by Department authorities.; and Individuals shall not utilize state equipment, property or services without authorization or for personal use.)

Major Wright read the charges which stated inmate Scott R. Ducey (K-64368) that his job assignment was maintenance and his duties were to repair inmate and state property. Inmate Ducey listed the following staff member and corresponding item that was brought in to repair: Leisure Activity Specialist II Belinda Rusch, state-loan Zenith color television. Inmate Reginald Brown (A-81604) stated that he was assigned to maintenance, television repair, and worked with inmate Ducey. Inmate Brown stated that Belinda Rusch had brought in a television for repair and that the television needed parts and that Ms. Rusch later purchased the parts, as well as extra parts from Radio Shack. Leisure Activity Specialist II Belinda L. Rusch stated that she did have a conversation with inmate Ducey concerning the repair of her television, but that she did not recall when this took place. Ms. Rusch stated after her conversation with inmate Ducey she brought in the television and dropped it off to inmate Ducey. Ms. Rusch stated that inmate Ducey told her she needed a part for the repair and that she (Ms. Rusch), subsequently, purchased a part at Radio Shack for the television. Ms. Rusch stated that she returned the part to inmate Ducey and

later picked up the television and took it back home. Ms. Rusch was questioned regarding information received that her television was a state loan television, Ms. Rusch replied it was not and that she had purchased the television at a garage sale two to three years prior. Ms. Rusch was asked to bring the television back to the institution for examination and responded that she would. Ms. Rusch then left to pick up the television in question. Ms. Rusch returned approximate five minutes later and stated that the television in question was not purchased at a garage sale. Ms. Rusch explained that she had acquired the television from a dumpster behind the Leisure Activity Specialist Building. Ms. Rusch stated the television had belonged to an inmate "Cryp" Smith (number unknown). Ms. Rusch then departed and returned with a Zenith 13-inch color television. Upon inspection, Reporting Investigator observed "Smith, N-16149" engraved on the television. Ms. Rusch stated that inmate Smith had been an inmate assigned to her area several years ago. Ms. Rusch stated that inmate Smith had told her he had spilled water on the television and it was broken and that he had thrown it in the dumpster behind her (Ms. Rusch's) office. Ms. Rusch stated that she had then retrieved the television from the dumpster and took it home. Ms. Rusch stated she did not inform or get approval from anyone concerning these events. On March 10, 1999 Leisure Activity Specialist II Belinda L. Rusch was read her Constitutional Rights before questioning. Leisure Activity Specialist II Belinda L. Rusch was re-interviewed and refused to answer any questions without attorney representation.

The Union representative asked if this case was going to be prosecuted. Employee Review Officer stated the investigation report had been forwarded to the States Attorney's office for review and possible prosecution. The Union representative then requested a continuance pending judicial outcome. The request for a continuance was denied. The Union representative then advised the referred employee to say nothing. The Union representative requested that Major Wright excuse himself as the reporting officer since his name is mentioned in the investigation. The Employee Review Officer denied this request since Major Wright neither conducted the investigation, prepared the investigation report, nor was charged with any infraction stemming from or relating to the investigation. The Union representative asked what law Belinda Rusch supposedly violated. The Employee Review Officer stated that the information was included in the investigation. The Union contended that the charges against Belinda Rusch were not clear and concise. The investigation report attachments which include Trust Fund and telephone records demonstrate no connection between Ms. Rusch and anyone else. The Union representative pointed out that the majority of the pages included in the investigation report have nothing to do with Ms. Rusch and asked why her name was listed at the top of every page. The Employee Review Officer suggested that concerns over the written style of the report be addressed at a different level.

The Union then requested the name of the confidential source mentioned in the investigation. The Employee Review Officer indicated that this request had been previously denied and that the Employee Review Officer had no access to additional information on the matter.

The Union representative stated that inmate Ducey was a liar. The inmate said the television had the words "state loan" written on it. In fact, the television did not have the words "state loan" written on it. The Union then requested to have the television set brought into the hearing as evidence and asked where it was. The Employee Review Officer indicated not knowing the location of the television, and denied the request to have it brought into the hearing. The Union contended the television did not exist if they did not get to see it, and that chain of evidence procedures had not been followed by the investigator.

:)00612

The Union representative then stated inmate Ducey had stated he was paid for the television repair work by Ms. Rusch purchasing 500 transistors and a television alignment tool set for him, but this television set was seven or eight years old and probably not worth more than $50.00. It does not make any sense to think that Ms. Rusch would have spent money on getting an old television fixed. The Union representative then pointed out attachments in the investigation report which were copies of institutional purchase orders and showed previous institutional purchases of television repair tools. The Union representative stated that inmate Ducey got caught with a contraband videotape and in an effort to save himself had started blaming everyone else and fabricating information about employees.

The Union representative then stated that it has been a long-standing institutional practice for inmates to work on things for employees. He cited the examples of the car wash, shoe shine, and ceramics. This was an activity that was promoted by the Administration.

In the investigation report only one employee makes mention of Belinda Rusch. Joe Mascari had stated he heard that Ms. Rusch brought a television in for repair. This statement by Mr. Mascari, however, is hearsay and unsubstantiated.

The Union representative indicated this was the worst investigation they had ever seen.

LTA Supervisor II Belinda Rusch has been employed by East Moline Correctional Center since July 1992 and has incurred the following discipline in the past:

| | | |
|---|---|---|
| 07/04/95 | Disobeying Order | 1 Day Suspension |

The available information indicates that LTA Supervisor II Belinda Rusch is guilty of violating Department Rule 120 Conduct of Individuals, Trading or Trafficking, Failure to Report Offense or Incident, Socializing with Committed Persons, and state laws regarding Official Misconduct (Theft Under $300.00) and Unauthorized Use of State Property.

Belinda Rusch admitted during the investigation interview that she had discussed television repair with inmate Ducey, brought in a television, purchased a part, and took the television home again. She also admitted the television had belonged to an inmate and that she took it home without authorization; whether the television ever had the words "state loan" written on it is irrelevant. If inmate Smith discarded it, it would be considered state property. The payment claimed by inmate Ducey, 500 transistors and a tool set, cannot be verified and was not addressed in the polygraph examination; however, there still was clearly a premeditated action on Belinda Rusch's part to arrange an unauthorized repair on her television, including repair parts. The Union's reference to the car wash, shoe shine, and ceramics programs neglects to mention that these were all approved institutional programs, and television repair for employees was not.

Based on the very serious nature of the offenses, it is therefore recommended that LTA Supervisor II Belinda Rusch be issued a 30 Day Suspension Pending Discharge.

Terry Boerema    6-15-99

Terry Boerema                          Date
Employee Review Officer

J00613

APPROVED: __✓__

DISAPPROVED: _____

cc:    Warden
       Major Wright
       AFSCME
       Personnel File
       Referring Employee
       Referred Employee

COMMENTS: _____

_____

Frank Shaw                                    Date
Assistant Warden of Operations

300614.

BEFORE THE ARBITRATOR

In the Matter of the Arbitration
of a Dispute Between

AFSCME, COUNCIL 31, AFL-CIO

and

STATE OF ILLINOIS, CENTRAL
MANAGEMENT SERVICES, DEPARTMENT OF
CORRECTIONS, EAST MOLINE
CORRECTIONAL INSTITUTION

Arbitration No. 3584

Appearances:
    Mr. Martin Duncan, Legal Counsel, AFSCME, Council 31, AFL-CIO,
        29 North Wacker Drive, #800, Chicago, Illinois 60606,
        appearing on behalf of the Union.
    Ms. Melissa Mlynski, Labor Relations Counsel, Central Manage-
        ment Services, 503 Stratton Office Building, 401 South
        Spring Street, Springfield, Illinois 62706, appearing on
        behalf of the Employer.

## ARBITRATION AWARD

Pursuant to the provisions of the collective bargaining agree-
ment between the parties, AFSCME, Council 31, AFL-CIO, hereinafter
referred to as the Union, and State of Illinois, Central Management
Services, Department of Corrections, East Moline Correctional
Institution, hereinafter referred to as the Employer, the under-
signed was selected to serve as arbitrator of Arbitration No. 3584.
A hearing was held on February 16, 2000, in East Moline, Illinois,
at which time the parties presented such testimony, exhibits and
other evidence as was relevant to the dispute. The parties made
closing arguments instead of filing written briefs. The record was
closed on February 16, 2000.

**EXHIBIT**

13

000631

000C

STIPULATED ISSUE:

Was the grievant's discharge effective August 8, 1999, for just cause?

If not, what is the appropriate remedy?


PERTINENT CONTRACT PROVISION:

ARTICLE IX

Discipline

Section 1.  Definition

A.    The Employer agrees with the tenets of progressive and corrective discipline.    Disciplinary action or measures shall include only the following:
   a)    Oral reprimand (RC-10 excluded);
   b)    Written reprimand;
   c).    Suspension (notice to be given in writing); and
   d)    Discharge (notice to be given in writing).
Disciplinary action may be imposed upon an employee only for just cause.  An employee shall not be demoted for disciplinary reasons. Discipline shall be imposed as soon as possible after the Employer is aware of the event or action giving rise to the discipline and has a reasonable period of time to investigate the matter.


Section 7.  Removal of Discipline

Any written warning or discipline imposed for tardiness or absenteeism shall be removed from an employee's record if, from the date of the last warning or discipline, two (2) years pass without the employee receiving an additional warning or discipline for such offense. Any reprimand for other causes shall be removed from the employee's record based on the above criteria. Such removal shall be at the request of the employee but in any case shall not be used against the employee.

- 2 -

000632

PERTINENT RULES:

### ILLINOIS DEPARTMENT OF CORRECTIONS RULES

. . .

### Section 120.30  Conduct of Individuals

Individuals shall conduct themselves in a manner which
will not reflect unfavorably on the Department and shall
not engage in conduct which is unbecoming or impairs the
operations of the Department.

. . .

### Section 120.50  Socializing with Committed Persons

Individuals shall not knowingly socialize with or engage
in business transactions with any committed person, or a
relative or known close associate of a committed person,
except in the performance of an assignment or as approved
in writing by the Director.  However, individuals shall
be permitted to purchase products of committed persons,
such as arts, crafts, books, etc. which are offered
through the institutional commissaries or offered to the
general public in a public market place or forum.  In
determining whether to grant approval, the Director shall
consider factors such as whether the individual has
direct custodial responsibility for the committed person;
the nature of the business activity to be conducted; the
nature of the relationship or association; the criminal
and behavioral history of the committed person; and
employee history and conduct.

. . .

### Section 120.70  Trading or Trafficking

Individuals shall not trade or traffick with, or aid or
solicit unauthorized actions by, committed persons.

. . .

### Section 120.90  Information to be Reported

a)  Individuals shall immediately report to the
    Chief Administrative Officer any information
    indicating a violation or attempted violation
    of criminal laws, or a threat to the safety
    and security of the facility, its property or
    any person, including information regarding a
    potential escape.

- 3 -

00633

b)   Reports shall be made verbally, and if
requested by the Chief Administrative Officer
or if required by other applicable rules,
reports shall be made in writing in the manner
directed by the Chief Administrative Officer.

. . .

## EAST MOLINE CORRECTIONAL CENTER
## EMPLOYEE GENERAL RULES

19)  Employees may not purchase or bring in items for an
inmate without permission of the Warden.    An
employee may not knowingly hire an inmate to
perform any service and may not accept gifts,
bribes, or gratuities from inmates, their relatives
or friends, or from anyone who has, or expects to
have, business dealings with the Department of
Corrections. Employees shall not accept or request
anything of value as an inducement to perform or =:
not to perform any act related to their employment.

### FACTS:

East Moline Correctional Center is a minimum security facility
for males.   Most inmates have been transferred from other
facilities and are within four to five years from being paroled
out.

The grievant was employed at the East Moline Center from
October, 1983 until her discharge on August 8, 1999. She began as
a Correctional Officer (CO), but at the time of her discharge, she
held the classification Leisure Activities Specialist II.  Her
responsibilities included running inmate sports activities and the
Jaycee program. As such, she had a great deal of contact with the
inmate population.

In winter 1995, the grievant was told by an inmate under her
supervision, Smith, that one of the other inmates had spilled water

- 4 -

౬00634

on his television set and damaged it and that he had thrown the TV away in the LTS dumpster. Without any further discussion with Smith, the grievant retrieved the TV from the dumpster and, without reporting same to her supervisor, took it home. She had the TV repaired for approximately $90 - $100, but after about three years it needed further repairs. Sometime in late 1998, she took the TV to the Center's electronics department where inmate Scott Ducey worked repairing inmate and State-owned property. It was the grievant's understanding that it was common for staff to take their private property there for repair. 1/ Ducey advised the grievant that he needed a part from radio shack in order to repair the TV. Accordingly, the grievant purchased and presented the part to Ducey who repaired and returned the TV to her.

In early 1999, sometime after the above events, officials at East Moline became aware of a pornographic video found hidden in an employee owned TV/VCR found in the electronics department. This led to a full scale outside investigation by the DOC Internal Investigation Unit, headed by Internal Security Investigator, Scott Dempsey. After interviewing 40 inmates and staff, it became known that employees at the facility were utilizing the services of inmates Ducey and Reginald Brown in the electronics department to repair personal electronic-type items.

---

1/   The grievant first became aware of the electronics department
     when she visited the tool room and noticed it located across
     the way.

:]00635

Inmate Ducey named eight employees, 2/ including the grievant, who brought in items for repair. Additionally, three other employees, Johnson, Newberg and Jackson, were also involved.

Investigator Dempsey, during his investigation, interviewed the grievant. The report of the interview is consistent with the testimony of the grievant at the hearing and is as follows:

> Union Representative TONY MCCUBBIN was present during the interview. RUSCH stated that she did have DUCEY repair her television that she had brought in from home. RUSCH explained that on the second Tuesday of each month she would check out tools, next to the area where DUCEY worked. RUSCH stated she asked DUCEY if he fixed televisions and he responded that he did. RUSCH stated that she then dropped her television off to him (DUCEY) at some point after their conversation. RUSCH stated that she returned on the same date that she dropped her television off and DUCEY informed her that she needed a part for the television, and told her to pick the part up at a Radio Shack. RUSCH stated that DUCEY gave her a part number to assist her. RUSCH stated she thought the part was a transistor. RUSCH stated she went to Radio Shack after work hours and purchased the part, then returned it to DUCEY during work hours. RUSCH stated the television was a 13-inch color television that she had purchased from a yard sale a couple of years ago. RUSCH stated she would bring the television to Internal Affairs. At that point the intervewed (sic) was stopped. RUSCH returned to Internal Affairs approximately 5 minutes later. RUSCH stated that she had not been truthful concerning the acquisition of the television at a garage sale. RUSCH stated she got the television from a dumpster on grounds at East Moline Correctional Center, and that the television had belonged to an inmate by the name of SMITH. nicknamed "CRYP". RUSCH stated that she knew Inmate SMITH, they worked in the same area and spoke often. RUSCH stated that SMITH told her he had spilled water on the television and thrown it in the dumpster behind the Leisure Time Activity Building. RUSCH stated that she then removed the television from the dumpster and took it home to find it didn't work. RUSCH stated she then took the television to Mars Electronics in

---

2/  Named were the grievant, Diaz, Huskey, Koster, Mascari, Policha. Perry and Whiting.

- 6 -

000636

East Moline to get the television fixed and it had cost
her approximately $100.00  RUSCH stated that was why she
had brought the television to DUCEY, as she could not
afford another large repair bill.

Dempsey, in his final report submitted on April 21, 1999,

concluded as follows:

Based on physical evidence, witness statements and their
own admissions, supported by polygraph results,
Correctional Officers ROBERT V. HUSKEY and MARK A. KOSTER
have violated the Department Rules regarding Conduct of
Individual, Trading or Trafficking and Socializing and
have committed the statutory offense regarding Official
Misconduct.

Leisure Activity Specialist BELINDA L. RUSCH has violated
the Department Rules regarding Conduct of Individual,
Trading or Trafficking, Failure to Report an Offense or
Incident, Socializing and Unauthorized Use of State
Property and committed the statutory offenses regarding
Official Misconduct and Theft Under $300.

Correctional Officers ALAN R. WHITING and CLIFFORD F.
PERRY and Locksmith JOE M. MASCARI have violated Conduct
of Individual, Trading or Trafficking and Socializing.

Instructor MICHAEL A. POLICHA and Supply Supervisor II
HOWARD E. GEYER have violated the Department Rules
regarding Conduct of Individual and Trading or
Trafficking.

Painter ENRIQUE DIAZ has violated the Department Rules
regarding Conduct of Individual, Socializing, Trading or
Trafficking, Failure to Report an Offense or Incident and
Negligence.

Instructor CLARENCE W. MODGLIN and Correctional Officers
SCOTT E. JOHNSON, SCOTT H. NEWBERG and TIMOTHY J. JACKSON
have violated the Department Rules regarding Conduct of
Individual and Negligence.

A final copy of this report will be forwarded to the
Rock Island County States Attorney's Office for review
and possible prosecution.

A report of administrative action taken regarding HUSKEY,
KOSTER, RUSCH, WHITING, PERRY, MASCARI, POLICHA, GEYER,
DIAZ, MODGLIN, JOHNSON, NEWBERT (sic) and JACKSON is

- 7 -

00637

> required. Information from this investigation has been
> entered into the Department's computerized retrieval
> system and it is essential you forward a copy of such
> action taken (including dismissal of any or all charges)
> to this office within 60 days of receipt of this
> correspondence.
>
> A report of action taken is not required and this case is
> considered closed.

Based on the report, seven employees received five-day suspensions, one a one-day suspension, and three were discharged. The only one who remained discharged is the grievant. 3/ A grievance was filed in August, 1999, alleging that there was no just cause basis for the grievant's discharge. In the processing of the grievance, one of the Union's arguments was the Employer's alleged disparate treatment of the grievant.

## POSITIONS OF THE PARTIES:

### Employer

The Employer contends that there really is no dispute over what happened because the grievant admits to the conduct alleged by the Employer. Thus, the issue is whether the grievant violated the work rules cited and if there was just cause for discharge.

In this regard, the Employer argues that, clearly, the grievant was aware of DOC Rules 120.30, 120.50, 120.70 and 120.90 as well as Rule 19 of the General Rules, all of which prohibit the conduct of the grievant in this case. The grievant certified that upon hire she received an employee handbook and rules and that

---

3/    Sergio Molina, who was Warden until June, 1999, testified that
       two of the three who were terminated came back.

:)00638

annually, as part of her training, she attended a refresher in "employee conduct and standards of conduct." Finally, it is argued, the grievant had notice that her conduct was prohibited from her involvement in a previous similar incident.

It is the Employer's position that the grievant was well aware that removal of property (equipment) from the dumpster, such as a TV set, was in violation of established rules and her so doing was a violation of DOC rules 120.30, Conduct of Individuals, and 120.90, Information to be Reported. The Employer argues that once the grievant discovered the TV in the dumpster it was incumbent upon her to report same for security reasons. Further, since equipment and items in the dumpster are State property, any removal of same for personal use requires prior authorization which the grievant failed to obtain. The Employer contends that the fact that said equipment or property once belonged to an inmate makes no difference, because once it is placed in the dumpster it becomes State property.

It is the Employer's position that the grievant again violated DOC and East Moline Center work rules when she brought inmate Smith's TV in for repair sometime late in 1998. It is argued that employees know exactly what inmate services are allowed, such as car washes, haircuts, purchase of crafts and that inmate repair of personal items was not one of them. Said services are made known to employees and a coupon method is used for utilizing the services. Under the circumstances, it is argued there was no reason for the grievant to believe that she could have a TV

- 9 -

000639

repaired by an inmate and if there was any doubt, she should have asked her supervisor. Therefore, her conduct, the Employer avers was a violation of Section 120.50, Socializing with Committed Persons; Section 120.70, Trading or Trafficking; and Rule 19 which prohibits bringing in items for an inmate and hiring an inmate to perform services.     The Employer argues that the grievant's interaction with inmate Ducey constituted "socializing" and her soliciting the repair of the TV constituted "Trading or Trafficking." Said conduct, it is argued, also violated Rule 19 because in a prison setting requiring an inmate to perform a service is a "hire" within the meaning of Rule 19.

Based on the above, it is the Employer's position that the grievant's discharge was for just cause. The violations were very serious because they raised security and safety concerns and undermined the grievant's authority over inmate Ducey and possibly others.   She put herself in a compromising situation. For said reasons, the Employer argues that the discharge of the grievant should be upheld.

### Union

It is the Union's position that the grievant did not violate any of the rules cited by the Employer and that in fact there is no rule that prohibits the conduct complained of in this case.

Further, the Union claims, the grievant was not placed on notice that her conduct was not tolerable and was dischargeable. In this regard, the Union argues that any reference to a previous

- 10 -

;]00640

incident relied on by the Employer (Employer Exhibit 5) cannot be considered, under Article IX, Section 7 of the contract, because it occurred more than two years prior to the instant matter.

To begin with, the Union contends that the grievant did not take "State property" as alleged because the TV in the dumpster was inmate property and not State property. As such, the removal of the damaged TV was not prohibited.

Further, the Union argues, there is no specific rule against inmates repairing the personal items of employees. This, it is argued, was commonly done. The Union argues that it cannot be considered a violation of Rule 19 because inmate Ducey was not "hired" and it cannot be considered a violation of Section 120.70 because the grievant did not trade or traffick with inmate Ducey. Further, the Union claims, the grievant did not socialize with inmate Ducey within the meaning of Section 120.50 and there was nothing for her to report as required by Section 120.90.

Here, it is argued, the grievant simply removed non-State owned, damaged, and worthless property from the dumpster (without inmate Smith's knowledge or agreement), and some had it repaired by an inmate. The Union claims this was done with no payment and was consistent with the practice among employees and staff. Yet, it is argued, the grievant was discharged for something no one else was, and that in fact, when all is said and done, the most severe discipline received by some ten other employees involved was a five-day suspension. This, it is argued, constitutes disparate treatment and as such undermines the Employer's claim of just cause.

- 11 -

Based on the above, the Union urges the Arbitrator to sustain

the instant grievance and make the grievant whole.

DISCUSSION:

The facts surrounding the grievant's case are really not in

dispute. She did in fact remove a previously owned TV of inmate

Smith from a dumpster and after approximately three years had it

repaired by inmate Ducey in the electronics department. What is in

dispute is (1) whether the grievant's conduct is prohibited by any

rule (2) or if the grievant, otherwise, had notice of same, and

(2) the appropriate remedy.

After a thorough review of the testimony of the witnesses and

the record as a whole, the Arbitrator views this case as primarily.

one of remedy: This is so because in the final analysis the

grievant knew or should have known that her conduct was at the very

least questionable and in need of clarification. It is true, as

argued by the Union, that there is no specific rule prohibiting the

removal of objects from the dumpsters located on the Center's

grounds. While every specific potential situation may not be

covered by a specific rule, this much is known by employees

employed in a correctional center: whatever goes in and out of a

correctional facility is closely monitored for obvious security

reasons. Thus, employees know they cannot bring in and take out

whatever they believe, in their judgment, to be permissible. 4/

---

4/   The Arbitrator does not agree with the Union's apparent.
     contention that the fact that the TV was the property of an
     inmate (and not State loaned) relieved the grievant from
     seeking authorization before its removal.

- 12 -

300642

Further, the Arbitrator is convinced the grievant knew she was not allowed to retrieve items from the dumpster for her own personal use without authorization because, as the Employer argues, she lied about how she got the TV when questioned about it during her investigatory interview. She at first claimed she purchased the TV at a garage sale, but when asked to produce it, she admitted that she had removed it from a dumpster. There would have been no need for the grievant to try and hide the true facts had she believed that what she did was permissible and consistent with the rules of the facility.

With respect to bringing the TV in for repair, the grievant should have also known that this was activity that, at the very least, was questionable. In this regard, Section 120.70, DOC Rules, prohibits ". . . soliciting unauthorized actions by committed persons." Notwithstanding the fact that other employees were engaged in the same activity, there was no reason for the grievant to believe that having inmates work on the personal property of employees was an approved service. She knew there were certain services specifically allowed, like haircuts, car washes and purchase of crafts, and that said services were specifically made known and provided for. This one was not. In engaging inmate Ducey to repair her TV, 5/ the grievant was interacting with an

---

5/ This is similar to an employee assuming that the equipment, material and resources of his/her employer are available for personal use without prior authorization. Such an assumption is simply not reasonable.

- 13 -

inmate outside of the performance of an assignment and as such "socializing" in violation of Section 120.50.

Given the above, was the grievant's discharge for just cause? In deciding same, the Arbitrator notes that as a result of Dempsey's investigation and findings the Employer took action against eleven employees. Seven were given five-day suspensions, one a one-day suspension and three discharged. The grievant is the only one who remains discharged. Especially noteworthy is the treatment of employees Whiting, Perry, Geyer, Mascari and Diaz, all of whom received five-day suspensions. They all brought in personal electronic items for repair by inmate Ducey. Whiting a TV/VCR, Perry a TV, Geyer a digital voice box, Mascari a car stereo, and Diaz a Kareokee machine. Also, Mascari, like the grievant, brought in a part for Ducey from the outside for the repair. None of the five employees were discharged; they all received five-day suspensions. The offenses committed by said employees and the grievant are the same except that the personal property of the grievant had been obtained from a dumpster on the Center's premises. This difference, however, in the opinion of the Arbitrator, is not sufficiently serious to justify the disparate treatment received by the grievant. 6/ Presumably, the grievant would not have been treated any differently but for her removal of the TV from the dumpster. In this regard, as discussed earlier,

---

6/  A key element in determining just cause is the equal treatment of employees for the similar offenses.

- 14 -

:100644

the grievant's reclamation of the TV did not involve a gift or a "deal" with inmate Smith or any other type of interaction. Smith was not aware that the grievant had removed the TV.

Nevertheless, the Arbitrator recognizes that, even though the TV was damaged trash, the grievant was obligated to seek authorization before taking property off the premises. This additional violation, however, is simply not enough to elevate an otherwise five-day suspension to the termination of a sixteen-year employee who, at least since May, 1993, has consistently met or exceeded expectations in her annual evaluations 7/and is considered a good employee. 8/

Based on the above facts and discussion thereon, the Arbitrator renders the following

### AWARD

1. That the grievant's discharge effective August 8, 1999, was not for just cause; 9/ and

2. That said discharge be reduced to a ten (10) day suspension; and

---

7/ See Joint Exhibit 5.

8/ The grievant's work record consists of a one-day suspension for purchasing an appliance for one of her inmate programs without prior authorization.

9/ In reaching this conclusion the Arbitrator has taken into consideration a 1987 arbitration award of Arbitrator Draznin involving the instant parties, but the "socializing" in that case was far more serious than here and, importantly, that case did not involve the issue of disparate treatment.

- 15 -

000645

3.  That the grievant be made whole by restoring her benefits and paying her an amount of money equal to the difference between what she received and what she would have received had she been suspended for ten (10) days.

Dated at Madison, Wisconsin, this 28th day of February, 2000.

Herman Torosian, Arbitrator

HTILMOLI.00                         - 16 -

'i0^646