**E-FILED**
Friday, 08 July, 2005  03:15:11 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| MARK JENNINGS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 03-4087 |
| | ) |
| STATE OF ILLINOIS, by its | ) |
| Departmental Unit, THE ILLINOIS | ) |
| DEPARTMENT OF CORRECTIONS, | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFF MARK JENNINGS' RESPONSE TO DEFENDANT
STATE OF ILLINOIS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ................................................................... 3

II.  RESPONSE TO ALLEGEDLY UNDISPUTED MATERIAL FACTS ........................................ 5

    A.  **Undisputed Material Facts** ................................................ 5

    B.  **Material Facts Claimed To Be Disputed** ................................. 6

    C.  **Facts Claimed To Be Immaterial To The Motion** ........................ 7

    D.  **Additional Material Facts Which Defeat The Motion For
Summary Judgment** ........................................................... 7

III.  APPLICABLE LAW .............................................................. 15

IV.  ARGUMENT ..................................................................... 19

    A.  **DIRECT METHOD** ......................................................... 19

2

**B. MIXED MOTIVES**................................................................................... 27

**C. CIRCUMSTANTIAL EVIDENCE -** ......................................................... 28

**D. INDIRECT EVIDENCE** ......................................................................... 30

    **(A) National Origin Discrimination -** *Prima Facie Case* ................... 30

    **(B) Pretext - Race Discrimination** ..................................................... 38

**CONCLUSION**................................................................................................ 40

**CERTIFICATION** ........................................................................................... 42

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)(2)**................42

3

Pursuant to F.R.C.P. 56 and Local Rule 7.1, plaintiff, Mark Jennings provides the following response to defendant Ameritech Corporation's Motion for Summary Judgment.

## I.

## __INTRODUCTION__

As will be shown throughout this Memorandum of Law, Mark Jennings has demonstrated that by both the direct and indirect methods of proof that he has been discriminated against on the basis of his national origin as a Hispanic-American in that he has been treated differently in his discharge from the Department of Corrections than other similarly situated Caucasian employees who engaged in the same misconduct yet were not discharged but, rather, were given last chance agreements by Warden Gary Wyant and Major Steve Wright or were not disciplined at all.

As the evidence will show, both Warden Wyant and Major Wright have made direct discriminatory statements towards Hispanics in general and Hispanic employees at Hill Correctional Center and Mr. Jennings in particular. In early 2002, Mr. Wright, the person who spearheaded Mr. Jennings' investigation leading to his discharge, shortly before the investigation into the allegations made by inmates and called Mark Jennings to his face a lazy Mexican. Subsequently, Mr. Wright becomes the person who spearheads the investigation into Mark's alleged misconduct and is the referring managerial employee who recommended that Mark be discharged and lied about the fact when he

4

claimed that there were employees who could substantiate the charges against Mark,

when there were not.

In addition to this direct evidence, plaintiff will show that Warden Wyant harbored

a discriminatory animus towards Hispanics in general and Mark and other Hispanic

employees in particular.  Warden Wyant, the person who approved the discharge of Mr.

Jennings and refused to give Mr. Jennings a last chance agreement returning him to work

with a suspension, as he had previously done for two white correctional officers, Robert

Huskey and Mark Koster, had made it known when union representatives told him that

Hispanic employees such as Mark Jennings were being denied opportunities for training

and education and thereby restricting their promotional opportunities that Wyant stated

that he believed that affirmative action for Hispanics was simply reverse discrimination

and that what goes around comes around.  Further, Mr. Wyant informed Rick Lind, the

union representative that he had hated talking to Mexicans and that they should be

required to pass English tests in writing and speech before they be allowed to come into

the county.  He referred to Mexicans as "damn beaners" and stated that where he came

from in the South they had ways of dealing with "those people. "

As will be shown below, Warden Wyant when dealing with one of "those people,"

namely Mark Jennings, treated Mark more harshly than similarly situated white

correctional officers who either received less discipline or no discipline at all for

engaging in socialization with inmates, trading and trafficking and misconduct of an

5

individual.  Moreover, in the event that court finds that the evidence introduced is not

direct evidence of discrimination, plaintiff has established through the record that his

*prima facie* case of national origin discrimination and that the reasons given for

termination was pretextual by his submitting evidence that (1) the charges against him

were factually baseless; (2) his misconduct was not the actual motivation for the

discharge since white employee who had engaged in similar or worse misconduct were

not discharged for this type of conduct; (3) that Mark's misconduct was insufficient to

motivate the discharge.  As will be demonstrated throughout this resistance, there are a

plethora of material facts when viewed in the light most favorable to Mark Jennings that

makes summary judgment improper in this case.

## II.

### RESPONSE TO ALLEGEDLY UNDISPUTED MATERIAL FACTS.

#### A.  **Undisputed Material Facts**.

Plaintiff admits the following facts from defendant's "Material Facts Claimed to be

Undisputed."

1. Admits.

2. Admits.

3. Admits.

5. Admits.

6. Admits.

6

7.  Admits.

8.  Admits and affirmatively states that Mr. Koster was also charged with socializing with committed persons in violation of state laws regarding official misconduct and unauthorized use of state property.  (Defendant's Exhibit 8.)

9.  Admits that Assistant Warden Frank Shaw increased the discipline into a 30 day suspension pending discharge, but denies the Employee Review Board issued that discipline since Review Board officer Terry Boerema recommended that Correctional Officer Mark Koster be issued a five day suspension.  (Exhibit 8, at p. 619.)

10.  Admits and affirmatively states that the suspension was a five day suspension. (Exhibit 9, p. 597.)

11.  Admits and affirmatively states that Mr. Huskey was further charged with violation of misconduct of individuals, socializing with committed persons in violation of state laws regarding official misconduct.  (Exhibit 10, p. 621.)

12.  Admits.

13.  Admits.

**B.  Material Facts Claimed To Be Disputed**.

4.  Denies that there were polygraph test results of the inmates that supported the charges against plaintiff as claimed by Anita Emrick in paragraph 4 of Exhibit 2; Exhibit 3, Deposition testimony of Mark Jennings, pp. 50-51 and Exhibit 2, pp. 53, 61, 70, 77.

7

    **C.**  <u>**Facts Claimed To Be Immaterial To The Motion**</u>.

Not applicable.

    **D.**  <u>**Additional Material Facts Which Defeat The Motion For Summary**</u>
<u>**Judgment**</u>.

    1.  Mark Jennings is a Hispanic-American.  (Plaintiff's Exhibit 3, p. 21.)

    2.  That in the nine years prior to Mr. Jennings' termination, he had performance
reviews which generally stated he met the Department of Corrections reasonable
expectations as a correctional officer.  (Exhibit A, a true and correct copy of Mark
Jennings performance reviews from September 1, 1993 through September 1, 2001, are
attached hereto and made a part of this Memorandum.)

    3.  That Major Stephen Wright, Chief of Security, was one of the referring
managerial employees of Mark Jennings for discipline in August 2002.  (Exhibit B, a true
and correct copy of a memorandum referring plaintiff for discipline, is attached hereto
and made a part of this Memorandum.)

    4.  That Warden Gary Wyant was an additional referring managerial employee
who referred Mark Jennings for discipline in August 2002.  (Exhibit B, <u>Id</u>.)

    5.  That Chief of Security Major Stephen Wright repeatedly referred to another
Hispanic managerial employee, Lieutenant Anthony Gonzales, as "Token Tony."
(Exhibit 3, p. 84.; Exhibit C, Affidavit of Rick Lind, ¶ 17; and Exhibit E, Affidavit of
Harry Hitchcock, ¶ 6.)

    6.  Major Stephen Wright hated plaintiff.  (Exhibit 3, p. 84.)

8

7.   Occasionally, Mr. Wright, when he was scrutinizing plaintiff's work area, accused plaintiff of sleeping while at work without any facts to support it and called plaintiff a "lazy Mexican."  (Exhibit 3, pp. 89-90.)

8.   Mr. Jennings reported this incident in 2001 or early 2002 to Union Representative Harry Hitchcock.  (Exhibit E, Affidavit of Harry Hitchcock, ¶ 4.)

9.   That Warden Gary L. Wyant in May 2002 stated that he hated talking to Mexicans on the phone, had referred to Mexican-Americans as "damn beaners" and further stated that they should have to undergo testing in English to determine if they can read and speak in English before they would be let into the country.  Warden Wyant also stated that he was from the South and in the old days they had ways of dealing with those people.  (Exhibit C, Affidavit of Rick Lind, ¶ 19.)

10.   In the summer of 2001 Mark Jennings had requested additional education and training classes in order to assist him in being able to perform his duties as a correctional officer and in order to be eligible for further promotion opportunities within the Department of Corrections.  Mr. Jennings was turned down in his request for additional training and education.  (Exhibit E, Affidavit of Harry Hitchcock, ¶ 5; Exhibit 3, p. 61.)

11.   Mr. Hitchcock discussed the issue of why Mr. Jennings was being turned down for training with Major Stephen Wright in the summer of 2001.  (Exhibit E, Affidavit of Harry Hitchcock, ¶ 6.)

9

12.   Stephen Wright stated that he believed that the East Moline Correctional Center already had enough token Mexicans in managerial positions and referred to Lieutenant Anthony Gonzales, a Hispanic managerial employee, as "Token Tony." (Exhibit E, Affidavit Harry Hitchcock, ¶ 6; Exhibit C, Affidavit of Rick Lind, ¶ 17; Exhibit 3, p. 84.)

13.   Stephen Wright told Harry Hitchcock that he would never recommend Mark Jennings for further training because he does not like Mr. Jennings.  (Exhibit E, Affidavit of Harry Hitchcock, ¶ 6.)

14.   Mr. Hitchcock went to Warden Gary L. Wyant about the fact that Hispanic employees of the East Moline Correctional Center were being turned down for additional training and education by Steve Wright.  He stated to Mr. Wyant that the continuing education and training for the employees resulted in the ability of these employees to compete for promotional opportunities.  (Exhibit E, Affidavit of Harry Hitchcock, ¶ 7.)

15.   Warden Wyant stated to Harry Hitchcock in response that it was Wyant's belief that affirmative action is nothing less than reverse discrimination and that what goes around comes around.  (Exhibit E, Affidavit of Harry Hitchcock, ¶ 7.)

16.   That after the termination of plaintiff, Warden Gary Wyant apologized to plaintiff for terminating him.  (Exhibit 3, p. 58.)

10

17.  That Warden Wyant and Stephen Wright claimed that there were admissions of staff employees that supported the discipline of Mark Jennings.  (Exhibit B, August 13, 2002 memo.)

18.  In fact, there was no testimony or facts provided by any employee at the East Moline Correctional facility which supported charges against plaintiff.  (Exhibit 3, p. 40; Exhibit C, Affidavit of Rick Lind, ¶ 14; Exhibit D, Affidavit of Steve Slocum, ¶ 14.)

19.  That Warden Gary L. Wyant noted that when the investigation of Mark Jennings began in February 2002, that additional DOC employee, supply supervisor John Krup, engaged in the same conduct, trading and trafficking with inmates Peples and Krodel and socializing in violation of internal policies when Krup provided inmates with pornographic magazine and five packs of black and mild cigars.  (Exhibit F, Memorandum of Gary L. Wyant, dated February 26, 2002.)

20.  Krup, a Caucasian employee, was the supply supervisor and was accused by the same inmate of misconduct, yet was not interviewed by management and was not disciplined for this misconduct.  (Exhibit C, Affidavit of Rick Lind, ¶ 15; Exhibit D, Affidavit of Steve Slocum, ¶ 15; Exhibit 3, pp. 32-33 and 738.)

21.  The union officials, Rick Lind and Steven Slocum, questioned how Mr. Jennings could be discharged for misconduct based solely upon the testimony of inmates when management did not take discipline against John Krup for engaging in the same misconduct as Mr. Jennings based solely upon the testimony of an inmate (Inmate John

11

Turner, the same inmate who made allegations against Mark Jennings).  Neither Warden

Gary Wyant nor Major Steve Wright had an answer to that inquiry.  (Exhibit C, Affidavit

of Rick Lind, ¶ 15; Exhibit D, Affidavit of Steve Slocum, ¶ 15.)

    22.   That Correctional Officer Mark Koster was found guilty of the same offenses

that plaintiff was found guilty of, namely, misconduct of individuals, trading and

trafficking and socializing with committed persons in June 1999 and had the same

employee review officer, Terry Boerema, who recommended a five day suspension.

(Exhibit 8, p. 619.)

    23.   Mark Koster, a Caucasian correctional officer, was offered a last chance

agreement by Warden Gary L. Wyant and Major Steve Wright and was returned to work

with a reduction in his discharge to a five day suspension. (Exhibit C, Affidavit of Lind, ¶

8; Exhibit D, Affidavit of Steven Slocum, ¶ 8.)

    24.   That in 1999 Correctional Officer Robert Huskey was found to have engaged

in trading, trafficking, misconduct of individuals and socializing with committed persons

in that he was operating an unauthorized repair business and had inmates do the repair

work for other correctional officers at the East Moline Correctional Center, and Huskey

had more discipline than the plaintiff comparably since Huskey had previously had

disciplinary actions resulting in a total of 21 days of suspension time.  (Exhibit 10, pp.

621-623.)

12

25.   That despite the fact that Mr. Huskey had a greater disciplinary record than the plaintiff and had been a person who was running an illegal and unauthorized repair business, Warden Gary Wyant and Chief of Security Stephen Wright granted Huskey a last chance agreement to return to work with a 30 day suspension.  (Exhibit 11; Exhibit D, Affidavit of Steven Slocum, ¶ 11; Exhibit C, Affidavit of Rick Lind, ¶ 11.)

26.   That Belinda Rursch is an African-American Leisure Activity Specialist II who was issued a thirty day suspension pending discharge for violation of department rules concerning conduct of individuals, trading and trafficking, failure to report an offense or incident, socializing with committed persons and state laws concerning official misconduct and unauthorized use of state property in June 1999.  (Exhibit 11.)

27.   That Warden Gary L. Wyant and Chief of Security Major Stephen Wright would not offer to Rursch, a minority employee, a last chance agreement similar to that offered to the Caucasian correctional officers, Koster and Huskey.  (Exhibit C, Lind Affidavit, ¶ 12; Exhibit D Slocum Affidavit, ¶ 12.)

28.   That Officer Rursch in arbitration was reinstated and her discharge was reduced to a 10 days suspension on the finding that her conduct was no different than other employees, such as Correctional Officers Whiting, Perry, Geyer, Mascari and Diaz, who received  five day suspensions for the similar misconduct of bringing in personal electronic items for repair by Inmate Ducey.  (Exhibit 13, p. 643-645.)

13

29.   That in the course of attempting to negotiate a last chance agreement for plaintiff to return him to work, Union Representatives Steven Slocum and Rick Lind both pointed out to Warden Gary Wyant and Major Stephen Wright the past precedent of discipline for engaging in these offenses of trading and trafficking and socialization with committed persons and violation of professional conduct was at best a suspension and that it appeared that management required minority employees to go to arbitration to contest their discharges when Caucasian correctional employees were offered by Caucasian managerial employees last chance agreements prior to going to arbitration. (Exhibit D, Affidavit of Steven Slocum, ¶ 14; Exhibit C, Affidavit of Rick Lind, ¶ 14.)

30.   In addition, Steven Slocum and Rick Lind pointed out to Warden Wyant and Stephen Wright that this was the first time that management had ever disciplined an employee solely on the basis in inmate testimony.  (Exhibit D, Affidavit of Steven Slocum; ¶14; Exhibit C, Affidavit of Rick Lind, ¶ 14.)

31.   In attempting to get Mark Jennings a last chance agreement, Rick Lind pointed out to Warden Wyant and Major Wright that in 2001 Craig Hart, a Caucasian correctional officer, had been caught bringing into the prison controlled contraband, whisky, and providing it to inmates, and that neither Terry Boerema, the hearing review officer, nor Stephen Wright, the referring officer, took discipline against him for this, despite proof from staff employee testimony that Hart had done this.  (Exhibit C, ¶ 16.)

14

32.  After Mr. Jennings attended a Hispanic employee workshop, Stephen Wright saw him there and asked him why he was attending, and when Mark told him he was Hispanic, that is when problems started between he and Mr. Wright.  (Exhibit 3, p. 85.)

33.  As the referring managerial employee, Chief of Security Stephen Wright spearheaded the investigation and decided that other Caucasian correctional officers would not be investigated.  (Exhibit 3, p. 85.)

34.  According to the 1993 to 2001 performance reviews for Mark Jennings, plaintiff was meeting the Department of Corrections legitimate expectations as a correctional officer.  (Exhibit A.)

35.  Mark Jennings was aware of an Hispanic correctional officer by the name of Alex Rangel who had received a 15 day suspension discipline from Major Stephen Wright for failing to wear a tie, whereas a white correctional officer whom Mr. Wright told to put on a tie, and in response used an obscenity towards Mr. Wright did not even receive a verbal counseling or warning from Wright.  (Exhibit 3, pp. 72, 94.)

36.  Warden Wyant and his command staff of assistant wardens and majors on a routine and common occurrence basis used the terms "spic" and "taco" when referring to Hispanics, especially when mad at the inmates.  (Exhibit 3., pp. 58, 59.)

15

## III.

## APPLICABLE LAW

### Summary Judgment Standards

Very briefly, as recognized by this court in <u>Citizens for a Better Environment</u> v.

<u>Caterpillar, Inc.</u>, 30 F.Supp.2d 1053, 1056 (C.D. Ill. 1998):

> "A motion for summary judgment will be granted where there are no
> genuine issues of material fact. ... Any doubt as to the existence of a genuine issue
> for trial is resolved against the moving party.  See *Anderson v. Liberty Lobby, Inc.*,
> 477 U.S. 242, 255 (1996)."

### Direct Evidence

What constitutes direct evidence of discrimination by decision makers has been a

muddled area of the law under Seventh Circuit case authority.

In <u>Troupe</u> v. <u>May Department Stores Co.</u>, 20 F.3d 734, 736-37 (7th Cir. 1994), the

Seventh Circuit took the opportunity to "clarify the circuit's position" that the analysis

was not that simple.

> "Different kinds and combinations of evidence can create a triable issue of
> intentional discrimination ... .  One kind of evidence that can be interpreted as an
> acknowledgement of discriminatory intent by the defendant or its agents, ... .  Such
> evidence is indeed direct evidence as distinct from circumstantial; ... .  But
> circumstantial evidence is admissible too, to provide a basis for drawing an
> inference of intentional discrimination.

> Three types of circumstantial evidence of intentional discrimination can be
> distinguished.  The first consists of suspicious timing, ambiguous statements oral
> or written, behavior toward or comments directed at other employees in the
> protected group, and other bits and pieces from which an inference of
> discriminatory intent might be drawn. ... This is the most common type of
> evidence in an intentional discrimination case, now that employers have taught

16

their supervisory employees not to put discriminatory beliefs or attitudes into words oral or written.  Second is evidence, ... that employees similarly situated to the plaintiff other than in the characteristic ... on which an employer is forbidden to base a difference in treatment received systematically better treatment.  ... And third is evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination. ...

          ... defendant argues, the plaintiff was required to present evidence that the defendant had acknowledged that it discriminates against pregnant women.  This is wrong.  It merges what we called direct evidence of discriminatory intent with the first kind of circumstantial evidence, the kind that consists of ambiguous statements, suspicious timing, discrimination against other employees, and other pieces of evidence none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff.  For it is not true that to get over the hurdle of summary judgment a plaintiff must produce the equivalent of an admission of guilt by the defendant.  All that is required is evidence from which a rational trier of fact could reasonably infer that the defendant had fired the plaintiff because the latter was a member of a protected class."  (Emphasis added.)

Once plaintiff introduces direct evidence of discriminatory animus by one of the decision makers, then it is a question of fact for the jury to decide and summary judgment is not appropriate.  Venters v. City of Delphi (7th Cir. 1997), 123 F.2d 956, 973, 74 Fair Empl. Prac. Cas., 1095, 149 ALR 727, 38 Fed.R.Serv. 364.

          See also Rogers v. City of Chicago, 320 F.3d 748, 754 (7th Cir. 2003):

          "The City argues, simply because Rogers lacks direct evidence, that the direct method is unavailable to her, and that she must therefore proceed under the indirect method.  This contention is incorrect as a matter of law because, as discussed above, plaintiffs may proceed under the direct method provided that they adduce *either* direct evidence or circumstantial evidence that would entitle a jury to conclude that the employer acted because of a forbidden animus."  (Emphasis added.)

17

### (a)  Mixed-Motive

In 2003, the Supreme Court in <u>Desert Palace, Inc.</u> v. <u>Costa</u>, 539 U.S. 90, 123 S.Ct. 2148, 156 L.E.2d 84 (2003), cut through years of confusing differences of opinions of the Circuit Courts and held that direct evidence of discrimination is not required to prove employment discrimination in mixed-motive cases under Title VII:  "We hold that direct evidence is not required."  The Seven Circuit has not yet had occasion to decide how <u>Desert Palace</u> will affect summary judgment proceedings in Title VII cases, but at least one district court has directly faced the issue.  In <u>Dare</u> v. <u>Wal-Mart Store, Inc.</u>, 267 F.Supp.2d 987, 991-92 (D. Minn. 2003), the court reasoned:

> "The dichotomy produced by the <u>McDonnell-Douglas</u> framework is a false one.  In practice, few employment decisions are made solely on basis of one rationale to the exclusion of all others.  Instead, most employment decisions are the result of the interaction of various factors, legitimate and at times illegitimate, objective and subjective, rational and irrational.  The court does not see the efficacy in perpetuating this legal fiction implicitly exposed by the Supreme Court's ruling in *Desert Palace*.  When possible, this court seeks to avoid those machinations of jurisprudence that do not comport with common sense and basic understandings of human interaction.
>
> Even putting the concerns of reality aside, however, a plaintiff's unsuccessful challenge to the defendant's non-discriminatory rationale should not automatically allow the defendant to escape liability.  Instead, it should merely subject the defendant to the mixed-motive analysis dictated by the Civil Rights Act of 1991.  The pretext phase of <u>McDonnell-Douglas</u> scheme sets one allegedly illegitimate rationale against a second, allegedly legitimate reason for the employment action.  However, a defendant could have illegitimately considered a plaintiff's race, gender, or other enumerated classification in making its employment decision and, at the same time, legitimately considered other factors, one of which it proffered to the court in satisfaction of its productive burden.  Similarly, a plaintiff can fail to prove that the defendant's proffered reason is false without automatically or necessarily failing to prove that another motivating factor

18

was illegitimate. In other words, when a defendant prevails under <u>McDonnell-Douglas</u> scheme, the court is left with a classic mixed-motive scenario, in which both alleged motives could have factored into the defendant's ultimate employment decision. This is clearly impermissible under the Civil Rights Act of 1991, which holds an employer liable for considering a discriminatory motive, even when other, legitimate and sufficient motives were also considered."

### (b) <u>Pretext</u>

In supplement to the defendant's section on pretext, even if this court rejects plaintiff's offer of direct evidence and/or mixed-motives, the State is still not entitled under the classic <u>McDonnell-Douglas</u> framework to all the presumptions it urges. <u>Stalter</u>, <u>supra</u>, citing <u>Testerman</u> v. <u>EDS Technical Products Corp</u>., 98 F.3d 297, 303 (7th Cir. 1996), held that a plaintiff may show pretext simply by showing that a defendant's ostensible justification for an employment decision is unworthy of credence were not the actual motivation for the discharge, or that they were insufficient to motivate discharge.

"A plaintiff may accomplish this showing [of pretext] with evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge. These formulations are simply different ways of recognizing that when the sincerities of an employer's asserted reasons for discharging an employee is cast into doubt, a fact finder may reasonably infer the unlawful discrimination is the true motivation."

Here, in the case at bar, it will be established that the reason for motivation for dismissal is the discriminatory bias that the decision makers, Wyant and Wright, held against Mark Jennings due to his national origin and that his alleged misconduct was not sufficient to motivate discharge when compared to treatment by Wyant and Wright of non-Hispanic employees.

19

## IV.

## ARGUMENT

### A.  DIRECT METHOD

In this case there exists direct evidence that the two key decision makers, Warden Gary Wyant and Major Stephen Wright, harbored a prejudice against Hispanics in general and Mark Jennings in particular.

As summarized in <u>Rothman v. Emory University</u>, 123 F.3d 446, 451 (7th Cir. 1997):

> "Direct evidence of discrimination is evidence that one can interpret as an acknowledgment of the employer's discriminatory intent. *See Hill v. Burrell Communications Group, Inc., 67 F.3d 665, 667 (7th Cir.1995)*. To constitute direct evidence of discrimination, in other words, "a statement must relate to the motivation of the decisionmaker responsible for the contested decision." *Cheek v. Peabody Coal Co., 97 F.3d 200, 203 (7th Cir.1996)*.

Here, plaintiff testified that shortly before the investigation into his alleged misconduct occurred, one of the decision makers on his termination, Major Stephen Wright, called him a "lazy Mexican."  In his Affidavit, (Exhibit E, paragraph 4) Harry Hitchcock substantiates that plaintiff complained to him about this:

> "In late 2001 or early 2002, Mark Jennings, after completing work on third shift, approached me to make a complaint about the Chief of Security, Major Stephen Wright.  Mr. Jennings had informed me that Major Wright had confronted him during his work shift and had called Mr. Jennings a 'lazy Mexican.'"

20

Mr. Hitchcock also affirmed that Major Wright made additional statements

demonstrating an discriminatory animus toward Hispanics when discussing why plaintiff

was turned down for training:

> "I subsequently discussed this issue with Major Stephen Wright.  Mr.
> Wright stated to me that he knew nothing about Mr. Jennings' request for
> additional training.  He also stated that the East Moline Correctional Facility
> already had enough token Mexicans in managerial positions at the Department of
> Corrections.  Specifically, at that time, he referenced Lieutenant Anthony
> Gonzales and referred to him as "Token Tony."  Mr. Wright stated that he would
> never recommend Mr. Jennings for further training.  I asked him why and he told
> me he does not like Mr. Jennings."  (Exhibit E, ¶ 6)

Mr. Jennings also provided direct evidence that Mr. Wright disliked him for no apparent

reason.  (Exhibit 3, p. 84.)  Mark stated that his problems with Mr. Wright began when

Wright learned that Mark was Hispanic.  (Exhibit 3, p. 85.)   Likewise, Rick Lind, a

correctional officer at East Moline since 1984 and the union representative, confirmed

that he "observed Mr. Wright making derogatory statements about Hispanic/American

employees at the East Moline Correctional Center prior to the time in which he

participated in the decision to discipline Mark Jennings."  (See Exhibit C, Affidavit of

Rick Lind, ¶ 17.)

> "Specifically in the year 2001, I heard Mr. Wright on more than one dozen
> occasions refer to Lt. Tony Gonzales, a Hispanic/American employee at the East
> Moline Department of Corrections as 'Token Tony.'  Mr. Gonzales at the time was
> the only Hispanic/American employee above a sergeant's level at the time in East
> Moline."  (Id.)

Lind further affirms that the other ultimate decisionmaker in this case, Warden Gary

Wyant, also demonstrated a discriminatory animus toward Hispanic employees:

4:03-cv-04087-MMM-JAG    # 14    Page 21 of 42

21

"Also in the year 2001, the union brought the attention of Warden Gary Wyant the fact that it appeared that Hispanic employees such as and including Rick Jennings were being passed up or ignored on their requests for additional training and education. At this time Warden Wyant in 2001 made the statement to us that it was his belief that affirmative action is nothing less than reverse discrimination and that what goes around comes around. Mr. Wyant then denied the union's request for additional training for Hispanic employees, including Mr. Jennings." (Id. at par. 18)

Harry Hitchcock verifies that Warden Wyant made this statement to him, as well:

"Later in 2001 after my conversation with Mr. Wright, I approached Warden Gary Wyant about the fact that Mr. Jennings and other Hispanic employees at the East Moline Correctional Center were being turned down by managers, such as Steve Wright, for additional training and education. I informed Warden Wyant that this type of training and continuing education results in the ability of these employees to compete for promotional opportunities. Warden Wyant stated to me that it was his belief that affirmative action is nothing less than reverse discrimination and that what goes around comes around." (Exhibit E, Hitchcock Affidavit at ¶ 7)

Based upon these existing facts and relevant case authority, there must be a question of fact whether these statements constitute direct evidence. First, they were clearly "made by a decision maker" Stopka v. Alliance of American Insurers, 141 F.3d 681, 688 (7th Cir. 1998), or by one who "provides input into the decision." Hunt v. City of Marckham, 219 F.3d 649 , 652 (7th Cir. 2000). Both Wyant and Wright made the decision not to offer Mark Jennings a last chance agreement to reduce the discharge to a suspension, and Wright was the manager who spearheaded the investigation and referred Mark for discipline in the first place.

Second, the statements were clearly "related to the employment decision at hand (Id.) and are "contemporaneous with the discharge or causally related to the discharge

22

decision making process."  Wichmann v. Board of Trustees of Southern Illinois

University, 180 F.3d 791, 801 (7th Cir. 1999).  Here in the case at bar, , right before

Wright begins the process of disciplinary inquiry on Mark Jennings in February 2002, in

early 2002 he called Mark a "lazy Mexican."  Likewise, Warden Wyant demonstrated his

opposition to affirmative action for Hispanic employees in late 2001, and then during the

course of the investigation in May 2002 told Rick Lind that he hated talking to Mexicans,

called Mexicans "damn beaners," said that Mexicans should be required to take tests in

English before they can enter the country, and that he was from the South where they had

a way of dealing with "those people."

Third, they are not some "stray remarks" but instead are directly related to a

discriminatory animus toward Hispanic employees.  Not only did Wyant and Wright

show their bias and prejudice towards Hispanics in general, Wright's derogatory

reference to Lieutenant Anthony Gonzales as "token Tony" and that the East Moline

Correctional Center did not need any more Hispanic managers, demonstrates an

atmosphere of bias existing at the East Moline Correctional Center.  Further, supporting

this is the fact that Warden Wyant told both Rick Lind and Harry Hitchcock that it was

his belief that affirmative action was simply reverse discrimination and what goes around

comes around, when Lind and Hitchcock told Wyant that Hispanics, such as Mark

Jennings, were not receiving additional training or educational opportunities.  More

telling than the fact that Wyant doesn't believe in affirmative action, is his additional

23

statement to Lind and Hitchcock that, "what goes around comes around." A reasonable

interpretation of that statement indicates that not only will Hispanics not get promotional

opportunities under Wyant's command, but that he will see to it that they will be

disciplined harshly and get what's coming to them. Under very similar facts in Felix v.

Boeing , 229 F.3d 1227, 2000 WL 959940 (9th Cir. 2000):

> "Patricia Felix has established a prima facie case of discrimination by
> presenting direct evidence that the individual responsible for making the ultimate
> hiring decision, David Melton, decided not to hire her on the basis of her
> race/national origin. See *Cordova v. State Farm Ins. Co.,* 124 F.3d 1145, 1148-49
> (9th Cir.1997) (holding that a plaintiff can meet the prima facie burden either by
> producing direct evidence of discrimination or by satisfying the four prong
> *McDonnell Douglas* test). Felix met her burden by producing evidence that when
> another employee inquired as to why Felix was not hired, Melton replied 'Why
> would I want another one of *them* ?' Melton has frequently referred to Hispanics as
> 'them' or 'those people.' Felix also presented evidence that Melton has referred to
> Hispanics as 'lazy,' called one individual a 'smart ass Mex' and a 'typical lazy
> Mexican,' labeled the three Hispanics in his department the 'three amigos,' and
> stated that Hispanics 'have poor work ethics and are basically lazy.' This direct
> evidence is amply sufficient to meet Felix's 'minimal' burden of establishing a
> prima facie case of discrimination."

The Felix court further found this sufficient direct evidence of discrimination based on

race/national origin, making summary judgment inappropriate:

> "Furthermore, because Felix has produced direct evidence of discrimination
> based on her race/national origin, she has raised a triable issue as to Melton's
> motivation, making summary judgment inappropriate."

Here, when one decision maker, Wright, calls Jennings a "lazy Mexican," and the

other decision maker, Wyant, states he hates talking to Mexicans and pejoratively refers

to them as "damn beaners," Mark also has raised sufficient evidence of direct

24

discrimination.  See also the case of <u>Roberts v. Swift and Co.</u>, 198 F.Supp.2d 1049, 1064-65 (S.D. Iowa 2002), where direct evidence of discrimination against Hispanic employees were shown when:

> "Mr. Roberts testified that on more than a dozen occasions between June 1997 and July 1998 he witnessed Mitch Fricke, Mr. Chavarria's immediate supervisor, refer to Mexicans as 'wetbacks,' 'sorry or lazy' and 'over here just to be given things.'  To determine whether this evidence is sufficient under the *Price Waterhouse,* the Court must first determine whether Mr. Fricke was a decisionmaker. This determination only requires that the adverse employment decision 'involved' Mr. Fricke; he need not have made the final decision…
>
> Next, the Court turns to the content of the alleged discriminatory comments. To constitute direct evidence under the *Price Waterhouse* analysis, evidence must be 'sufficient for a fact finder to find that a discriminatory attitude was more likely than not a motivating factor in the employer's decision.' *Gagnon, 284 F.3d 839, 848*. The disparaging derogatory epithets attributed to Mr. Fricke clearly depict a discriminatory attitude toward Mexicans. *LaRocca v. Precision Motorcars, Inc.,* 45 F.Supp.2d 762, 770 (D.Neb.1999) (holding that co-workers' repetitive reference to employee as 'wetback' or 'spic' was 'discriminatory conduct sufficiently severe or pervasive ... to create a hostile work environment'). These alleged comments are directly related to Mr. Chavarria's abilities as an employee and are far from 'innocuous' statements unrelated to Mr. Chavarria's employment. For this reason, these alleged statements by Mr. Fricke are direct evidence of discriminatory animus by a person involved in the decision to terminate Mr. Chavarria.
>
> The Court need not reach the final inquiry in the direct evidence test. The inquiry whether there was a causal link between the alleged discriminatory comments need only be made where comments are not 'close in time' to the employment decision. *Simmons,* 174 F.3d at 916. According to Mr. Roberts, Mr. Fricke made derogatory comments frequently for several months immediately preceding Mr. Chavarria's termination. A causal link can be assumed because of Mr. Fricke's ability to evaluate Mr. Chavarria's performance, his animus directly related to the abilities of Mexican employees, and the fact that he was in a position to report to Mr. Weber on the performance of his underling, Mr. Chavarria."

25

In this case, the causal link exists between Wright and Wyant's statements since within the year prior to his termination, both of these decision makers made known their discriminatory animus against Hispanic employees and Mr. Jennings in particular as set forth in the above referenced facts.

The Seventh Circuit has recognized that terms such as those directed at plaintiff are the most "offensive to someone of Hispanic descent" in <u>Cerros v. Steel Technologies</u>, 398 F.3d 944, 950-51 (7th Cir. 2005) {"<u>Cerros</u> II", following the court's earlier opinion in "<u>Cerros</u> I" at 288 F.3d 1040, 1042 (7th Cir. 2002), in which the court detailed the following epithets:

> "The district court found that some of the supervisors as well as other employees overtly espoused the offensive philosophy 'if it ain't white it ain't right.' Cerros himself was frequently subjected to verbal harassment. During 1996 and 1997, employees, including supervisors, referred to him by such racialized derogatory names as 'brown boy,' 'spic,' 'wetback,' 'Julio' and 'Javier' (these are not Cerros's given or nicknames)."

The Court in "<u>Cerros</u> II" concluded:

> "We emphasized in *Cerros I* that '[w]hile there is no 'magic number' of slurs that indicate a hostile work environment, we have recognized before that an unambiguously racial epithet falls on the 'more severe' end of the spectrum.'288 F.3d at 1047 (citing *Rodgers v. Western-Southern Life Ins. Co.,* 12 F.3d 668, 675 (7th Cir.1993)). Indeed, **we find it difficult to imagine epithets more offensive to someone of Hispanic descent than those directed at Cerros**. See, *e.g., Torres v. Pisano,* 116 F.3d 625, 632- 33 (2d Cir.1997)* ("[A] reasonable Puerto Rican would find a workplace in which her boss repeatedly called her a 'dumb spic' and told her that she should stay home, go on welfare, and collect food stamps like the rest of the 'spics' to be hostile.").

26

So too in the case at bar. To be called a "lazy Mexican" by Major Stephen Wright shortly

before Wright spearheads an investigation into Mark's alleged misconduct can hardly be

categorized as anything but hostile. Warden Wyant likewise demonstrated his hostility

toward Mexicans by calling them "damn beaners," stating he hated to talk to Mexicans

and that Mexicans should have to pass an English test and that from where he was from

in the South that they had ways of dealing with "those people." Further, it was a common

occurrence for the Warden and command staff to refer to Hispanics as "spics" and "tacos"

especially when mad at inmates.

In <u>Wahi</u> v. <u>Northern Trust Corp.</u>, 2002 WL 31133205 (N.D. Ill. 2002), plaintiff

testified that the direct decision maker had made a statement three months prior to his

termination. "You Indians, you act smart, I'll make sure you're out." (<u>Id</u>. at *1.)

> "Schneider's alleged statement satisfies even the stricter direct evidence
> standard. Scheider, a decision maker in Wahi's termination, virtually admitted that
> he would fire Wahi because of his Indian origin. Although his comments were
> made almost three months before Wahi's termination, they were directly related to
> it. NTC next argues that even if Wahi has produced direct evidence of
> discriminatory intent, the evidence of Wahi's poor work performance is so 'one
> sided that the defendant must prevail as a matter of law.' *Sanghvi*, 258 F.3d at
> 575. ... The *Sanghvi* court suggested in this rare situation, even where the plaintiff
> has provided direct evidence of discrimination, summary judgment may be
> granted 'at least where the purportedly direct evidence is not an actual admission.'
> (<u>Id</u>.) Unlike the evidence in *Sanghvi*, in this case, Schneider's statement that 'you
> Indians, you act smart ... I'll make sure you're out' is tantamount to an actual
> admission. Assuming Wahi's testimony is true, despite all of NTC's evidence of
> Wahi's poor performance, a reasonable jury could find in his favor based on this
> statement alone." (<u>Id</u>. at *5.)

27

The statement by Wright made within two months of beginning the investigation, making derogatory comments about the way Mark works, constitutes a direct admission or evidence that Wright was out to get rid of Mark because of his national origin.

## B.  MIXED MOTIVES

Even if this court construes this testimony is not direct evidence, that still does not preclude the "direct method" or mixed motives method of analyzing this case as established in plaintiff's "applicable law" section.  That is, the statements must at least be considered part of the "circumstantial evidence" which can consist of "ambiguous statements, suspicious timing, discrimination against other employees, and other pieces of evidence ... together composing a convincing mosaic of discrimination against the plaintiff."  (Troupe, supra, 20 F.3d at 736-37.)

Here, plaintiff has shown that the decision makers have a general dislike for Hispanic employees.  Under Wyant's tenure, Hispanics were denied training and educational opportunities because Wyant believed affirmative action is simply reverse discrimination, and Wright was of the opinion that the East Moline Correctional Center already had enough (one) Hispanics in management, and derisively calling that Hispanic employee, Lt. Anthony Gonzales, "token Tony."  While Wyant's May 2002 statements to Rick Lind were not directed toward Mark Jennings specifically, to have a Warden state he hated talking to Mexicans, call Mexicans "damn beaners", state they should have to pass English tests for admission into the United States and state that in the South they had

28

ways of dealing with "them," clearly constitutes circumstantial evidence of discrimination under the mosaic analysis called for in <u>Troupe</u>.  This is especially true when additional facts outlined below are also considered.

## C.  CIRCUMSTANTIAL EVIDENCE

As noted in the Applicable Law section, the Seventh Circuit has yet to analyze the effect of the Supreme Court's decision in <u>Desert Palace</u>, <u>supra</u>, that "direct evidence is not required" in mixed-motive cases under Title VII.  Although one Northern District case has disagreed in dicta with the Minnesota District Court in <u>Dare</u> v. <u>Wal-Mart Store, Inc.</u>, <u>supra</u>, it is hard to argue with Dare's characterization that "in practice, few employment decisions are made solely on the basis of one rationale to the exclusion of all others.  Instead, most employment decisions are the result of the interaction of various factors, legitimate and at times illegitimate."  (267 F.Supp.2d at 991.)  In this case, while the conduct that Mark allegedly engaged in[1] was sufficient under Department rules for discharge, the following facts, considered with the above cited discriminatory statements by these decisions makers, establish strong circumstantial evidence of discriminatory treatment:

> (1) this is the first time an employee has been disciplined based solely upon inmate statements;

---

[1]/  Plaintiff does not concede that he was guilty of the activities that he was accused.  Because the Union presented his case at arbitration plaintiff had no control over the presentation of all the facts set forth herein which support his portion that he did not engage in the misconduct.

29

(2) Wyant and Wright lied alleging that there were employee statements to support the charges when there were not;

(3) Wyant and Wright gave two Caucasian employees, Koster and Huskey, last chance agreements to return to work after engaging in the same misconduct;

(4) Wyant and Wright would not give another minority employee, Belinda Rursch, a last chance agreement, making her win her job back in arbitration despite the fact that she engaged in the same conduct that Huskey and Koster did;

(5) past precedent at the East Moline Correctional Center established that the discipline for these offenses were suspensions, not discharge;

(6) Wyant and Wright did not discipline John Krup, a Caucasian correctional officer, for the same alleged misconduct when the same inmate who accused Mark of the acts, John Turner, likewise implicated Krup in trading and trafficking black and mild cigars and pornographic magazines and socializing with inmates;

(7) In 2001, Wyant, Wright and Terry Boerema did not discipline Craig Hart, a Caucasian correctional officer, when Hart provided controlled contraband, whiskey, to inmates in the prison; and

(8) The Warden and his command staff referred to Hispanics as "spics" and "tacos."

30

All of these circumstantial facts, coupled with and considered in conjunction with the discriminatory statements of Wright and Wyant, establish that there were illegitimate factors involved in not offering Mark a last chance agreement.

### D.  INDIRECT EVIDENCE

### (A) National Origin Discrimination –*Prima Facie Case*

In the event that the court holds that there is insufficient direct evidence of discrimination, plaintiff has presented sufficient facts under the indirect method of proof. Under the indirect method, as again summarized in Rothman v. Emory University, 123 F.3d 446, 451 (7th Cir. 1997):

> "If (direct) evidence is not available--which will often be the case because such remarks are rarely found, *see Mills v. First Fed. Sav. & Loan Ass'n,* 83 F.3d 833, 841 (7th Cir.1996)*--*a plaintiff can prove his discrimination claim via indirect or circumstantial evidence by employing the burden-shifting method originally established under *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this method, a plaintiff must first demonstrate a prima facie case for discrimination by proving that he is a member of a protected class, that he was performing to the legitimate expectations of the defendant, that he suffered an adverse action, and that others not in the protected class were treated more favorably than him. *See DeLuca,* 53 F.3d at 797. If the plaintiff can demonstrate his prima facie case, the defendant bears the burden of articulating a legitimate, nondiscriminatory reason for any alleged adverse action towards the plaintiff. *See id.* If the defendant meets this burden, the plaintiff then has the opportunity to show that the defendant's articulated reason was merely a pretext for its discriminatory action. *See id.*"

### (1) Performing to the Legitimate Expectations

It is not disputed that Jennings is a member of a protected class and suffered an adverse action termination, as to whether he was performing to the legitimate

31

expectations, the plaintiff's burden of proof at the summary judgment stage is a slight

one.  As stated in the case of  *Barnhart v. Mack Trucks, Inc.,* 157 F.R.D. 427, 431 n. 4

(N.D.Ill.1994) ("The satisfactory performance standard necessary to establish a *prima*

*facie* case is fairly easy to satisfy....".)  As this court noted in Jorden v. Walmart Stores,

Inc., 332 F.Supp. 2d 1172, 1178 (C.D. Ill. 2004):

> "Jorden must demonstrate that he was meeting Walmart's legitimate
> expectations in an attempt to meet this burden, he states:
>
> Plaintiff received adequate employee evaluations from the time he was
> hired up to the time preceding the confrontational meeting and the filing of his
> complaint for racial discrimination with the EEOC; in fact the evaluator provided
> laudatory comments with each prior evaluation....
>
> … As the only evidence identified in the record indicating the state of
> Jorden's performance as of April 30, 2001, consists of performance evaluations
> that contain both positive and negative comments, the Court cannot find as a
> matter of law that at the time Bevilacqua denied Jorden's request for pay equal to
> that received by Sisco, Jorden was not performing in accordance with Walmart's
> expectations."

See also Polk-Henderson v. Illinois Nurses Association, 2002 WL 31300411 (N.D. Ill.

2002):

> "Here, Polk-Henderson received ratings mostly between 3 and 4 on all her
> work evaluations, indicating that her performance fell somewhere between
> Satisfactory and Excellence. Furthermore, Hayward's written comments on the
> most recent evaluation indicate that Polk-Henderson was meeting, if not
> exceeding, INA's expectations. As in *Johnson v. Zema Systems Corp.,* 170 F.3d at
> 743, in which the plaintiff's positive employment evaluations indicated that the
> plaintiff met the employer's legitimate work expectations, Polk-Henderson has
> suggested that she met INA's legitimate work expectations."

As concluded in Johnson v. Zema Systems Corp., 170 F.3d 734, 743 (7th Cir. 1999):

32

"To show he was meeting Zema's legitimate expectations, Johnson relies on his 1993 and 1994 performance evaluations and the letter of recommendation company President Reyes prepared for Johnson after his termination in which he called Johnson 'a serious and dedicated worker' who was 'highly recommend [ed].'…

Zema agrees that Johnson received strong yearly employment evaluations and a high recommendation from President Reyes when terminated, but contests whether Johnson was in fact meeting its legitimate expectations. In Johnson's 1993 performance review, Zema argues, Johnson was warned to spend more time with managers on the south side of Chicago. In April 1994, Vice President Doney admonished Johnson to divide his time more equally among the various sales managers and required Johnson to fill out weekly itinerary forms to improve his allocation of time among the sales managers. Taken together, Zema argues, this evidence shows Johnson failed to produce sufficient evidence that he was meeting his employer's legitimate expectations.

In contesting whether Johnson met Zema's legitimate expectations, we think Zema skips a few steps. Johnson bears a burden only of producing some evidence that he was meeting Zema's legitimate expectations. In coming forward with consistently positive employment evaluations and President Reyes' recommendation, Johnson has met his burden."

Here, plaintiff has introduced into the record evidence that he was meeting his

employer's legitimate expectations through nine years of performance reviews (Exhibit

A) in which he in the majority of all job performance categories was meeting the

expected performance of the Department of Corrections.  Because these facts show that

Mark met the Department's legitimate expectations, he has met the burden of proof on

this issue.

### (2) Others not in the protected class were treated more favorably than Jennings

To show that other employees were similarly situated for either a *prima facie* case

or pretext, plaintiff "need only establish that he or she was treated differently than other

33

employees whose violations were of 'comparable seriousness.'"  See <u>Lynn</u> v. <u>Deaconess</u> <u>Medical Center - West Campus</u>, 160 F.3d 484, 488 (8th Cir. 1998); <u>McAlester</u> v. <u>United</u> <u>Airlines, Inc.</u>, 851 F.2d 1249, 1261 (10th Cir. 1998).

> "To require that employees always have to engage in the exact same offense as a prerequisite for finding them similarly situated would result in a scenario where evidence of favorable treatment of an employee who has committed a different but more serious, perhaps even criminal offense, could never be relevant to prove discrimination.  Common sense as well as our case law dictate that we reject such an approach.."  (<u>Lynn</u>, 160 F.3d at 488.)

See also <u>Curry</u> v. <u>Menard, Inc.</u>, 270 F.3d 473, 479 (7th Cir. 2001), citing <u>Lynn</u> with approval, summarizing its holding "male employee produced sufficient evidence of pretext to survive summary judgment, where he showed that employer disciplined similarly situated female employee less severely for more egregious conduct."  Also see <u>Flores</u> v. <u>Preferred Technical Group</u>, 182 F.3d 512, 515 (7th Cir. 1999), where an employee was not required to show that he was meeting his employer's legitimate expectations when he is claiming he was disciplined more harshly because of his race or national origin.

As shown in the following analysis, all of the following non-Hispanic employees were given more favorable treatment by the decision makers, namely, Koster, Huskey, Krup and Hart, all Caucasian correctional officers, despite engaging in the same or more egregious misconduct.

**(1) Mark Koster**

As shown in Steven Slocum's Affidavit, paragraphs 6-9:

34

     "That in 1999, Correctional Officer Mark Koster, a Caucasian, was discharged for misconduct of individuals, socializing with committed persons, trading and trafficking, violation of state laws regarding official misconduct and the unauthorized use of state property.  He had inmates do repair work on his personal property in the Spring and Summer of 1999.  Mr. Koster was found to have engaged in this conduct and was found on June 22, 1999 to have been guilty of the offenses and was recommended for removal from employment with the Department of Corrections by Assistant Warden Frank Shaw.

     The Employee Review Officer, Terry Boerema (a Caucasian manager), recommended that Mr. Koster only receive a five day suspension for all of these offenses.

     That I, as a member of the union team, filed a grievance of Mr. Koster's dismissal before arbitration, and negotiated a settlement with management who had as their representatives Warden Gary L. Wyant and Chief of Security Major Steve Wright, both Caucasian managerial employees.  Management agreed to return Mr. Koster to work and reduce the discipline to a five day suspension.

     …Warden Wyant's decision to return Mr. Koster from termination and a reduction of discipline to a five day suspension was approved by the director at the Department of Corrections, Donald M. Snyder, Jr."

See also Exhibit C, Affidavit of Rick Lind, ¶¶ 6-9 which corroborates the above facts.

### (2) Robert Huskey

In addition to Mr. Koster, both Slocumb and Lind affirm that another Caucasian male employee, Correctional Officer Robert Huskey, "was found in the Summer of 1999 to have engaged in violation of Department of Correction rules concerning conduct of individuals, socializing with committed persons, trading and trafficking in violation of state laws regarding official misconduct and he was found to have had an inmate repair personal property for him and also arranged for the repairs of other correctional officers' personal property by inmates and solicited payment from those correctional officers for

35

the inmates' services." (Id. par. 10; Lind Affidavit at 10)  As Slocumb details in

paragraphs 10-11:

> "Terry Boerema, Employee Review Officer, and Frank Shaw, Assistant Warden, recommended Mr. Huskey for a 30 day suspension pending discharge.
>
> On behalf of the Union I was part of the team involved in filing a grievance over Mr. Huskey's termination and again negotiated with management including Warden Gary Wyant and Chief of Security, Major Steven Wright, that the discipline of Mr. Huskey be reduced.  In February 2000, on behalf of Mr. Huskey, the union reached a resolution of Mr. Huskey's grievance prior to arbitration in which Mr. Huskey for his actions of trading and trafficking, conduct of individuals, socializing with committed persons and violation of state laws regarding official misconduct, whereby Huskey received a 30 day suspension and was reinstated.  Gary L. Wyant and Major Steven Wright approved the resolution of the grievance in this matter and Mr. Wyant then recommended that the reinstatement and reduction of discipline to a 30 day suspension be approved by the Illinois Department of Corrections Director, Donald Snyder, and it was so approved in March, 2000."

Also, it is important to note that Huskey, while not only being the ringleader of

this misconduct, also had a more severe disciplinary record than Mark, having had 21

days of suspensions prior to this incident when compared to Mark's disciplinary time off

totaling 13 days.  (Exhibit 7, p. 606.)

### (3)  John Krup

Here, John Krup, a white correctional officer who served as supply supervisor at

the time, had been identified by the same inmate, John Turner, as having engaged in

trading and trafficking black and mild cigars and providing pornographic magazines to

inmates, and yet Wyant and Wright fail to discipline him at all despite Wyant knowing

36

that Krup had been implicated in this activity as shown in Wyant's February 2002 memo.

(Exhibit B.)

Slocum Affidavit paragraph 15:

"Also during our negotiations to convince management that Mr. Jennings should not be terminated and should be given a last chance agreement similar to that given to Huskey and Koster, we pointed out the fact that John Krup, a Caucasian correctional officer, had also been accused by inmate John Turner (the same inmate who had accused Mark Jennings of this misconduct) of engaging in the same misconduct that Mark Jennings had purportedly done in February 2002, namely, trading and trafficking and, improper solicitation, and improper socializing with inmates, and that neither Mr. Wright or Warden Wyant had referred Mr. Krup for discipline despite Krup having allegedly engaged in this conduct. Mr. Krup was the supply store supervisor who had access to order forms for the facility and who could have been the supplier of black and mild cigars, but yet when this was alleged by inmate Turner, no one from management even interviewed John Krup, nor did they institute discipline against him. Neither Warden Wyant nor Steven Wright could explain how Mr. Jennings could be disciplined based upon inmate testimony when John Krup was not."

See also Lind Affidavit, Exhibit C, paragraph 16.

### (4) Greg Hart

In Greg Hart's case, this Caucasian correctional officer was caught by Department

of Correction employees bringing whiskey into the prison and providing it to inmates.

In support, see Rick Lind's Affidavit, Exhibit C, paragraph 16:

""In addition, we raised the issue of the fact that Greg Hart in calendar year 2001 had been caught by management bringing in to the prison a controlled contraband, namely, whiskey, and providing it to inmates. Greg Hart is a Caucasian correctional officer. Both Terry Boerema, the hearing review officer, and Steve Wright, the referring officer, did not recommend discipline taken against Mr. Hart despite proof from staff employee testimony that he had done this. Mr. Boerema and Mr. Wright were both involved as management in taking disciplinary action against Mark Jennings. When asked about all these past

37

precedent and the different more favorable disciplinary treatment that appeared to be provided by Warden Wyant and Mr. Wright to Caucasian male officers, neither Major Wright nor Warden Wyant provided any information to show that Mr. Jennings' alleged misconduct was substantially different than these Caucasian officers who were not ultimately discharged for such similar conduct."

Clearly, having a correctional officer provide whiskey to inmates so that they can become intoxicated presents a far more dangerous situation in a prison setting than having inmates spit out sunflower seed shells and leave cigar butts around the facility. The same persons who decided to fire Mark Jennings, Stephen Wright, Terry Boerema and Warden Wyant, didn't even impose discipline on this white correctional officer for more egregious misconduct. Therefore, a question of fact must exist on whether Mark Jennings' conduct was the actual motivation for or insufficient to motivate the discharge.

### (B)  Pretext - National Origin Discrimination

This court also cannot ignore plaintiff's direct evidence, which has been set out in the preceding sections of this Brief, in analyzing where he has established pretext.  In Herrerra v. Computer Sciences Corp., 1997 WL 642561 (E.D. La. 1997) the court found:

"In further support of his argument that CSC's motivation was racial/national origin bias, plaintiff maintains that James Templet, his immediate supervisor and the initial decisionmaker with regard to the buoy specialist position, made racial slurs against plaintiff. Specifically, plaintiff contends that sometime prior to or during 1991, Templet referred to plaintiff as a 'wetback' …

…the evidence concerning plaintiff's qualifications for the buoy specialist position, when considered in conjunction with evidence of Templet's admitted use of racial slurs against plaintiff, creates a genuine dispute of fact on the issue of whether defendant's proffered reason was pretextual and/or the true motivation was racial discrimination."

38

Here, the decision maker referring Mark for discipline, Wright, had just before the

investigation began in February 2002 referred to Mark as a lazy Mexican.  See also

Johnson v. Kroger Co., 319 F.3d 858, 862 (6th Cir, 2003):

> "With respect to Roberts, Johnson avers that he once overheard Roberts
> calling African-American men 'black boys.' Similarly, when Newman learned that
> Johnson was going to be transferred to the Wheelersburg store, Newman told
> Portsmouth Senior Comanager Gaines that assigning an African-American male as
> the comanager of the Wheelersburg store would hurt its business because African-
> Americans did not shop there."

The Court held that these comments could not be viewed in isolation: "we do not view

each discriminatory remark in isolation, but are mindful that the remarks buttress one

another as well as any other pretextual evidence supporting an inference of

discriminatory animus."( Id. at 868).

> "Moreover, the record supports a finding that Newman treated Johnson less
> favorably than he had treated Caucasian comanagers. Johnson and other
> employees testified by deposition that Newman refused to mentor or train
> Johnson, and instead ignored him. They also said that Newman did not introduce
> Johnson to department heads, criticized him in public, and blamed him for errors
> that occurred in areas that were the responsibility of other employees.

> Kroger seeks to minimize this evidence by emphasizing that Noyes was the
> decisionmaker, so that any bias exhibited by Newman was irrelevant. Although
> remarks made by an individual who has no authority over the challenged
> employment action are not indicative of discriminatory intent, the statements of
> managerial-level employees who have the ability to influence a personnel decision
> are relevant. *Ercegovich,* 154 F.3d at 354-55 (concluding that the plaintiff
> presented a genuine issue of material fact as to whether the manager in question
> was involved in the employer's decision to eliminate the plaintiff's position
> without giving him the opportunity to transfer elsewhere). Newman not only
> supervised Johnson on a daily basis, but also spoke with Noyes about the problems
> she identified during her store visits in late 1995, assisted Noyes in preparing
> Johnson's performance review in January of 1996, and consulted with Noyes prior

39

to her ultimate decision to offer Johnson a new but diminished position. Based upon these facts, we conclude that a jury could reasonably find that Newman played a significant role in Noyes's decisionmaking process.

Kroger also contends that Newman's concern about having an African-American comanager was an isolated statement that cannot support a finding of racial discrimination. *See id.* at 355 ("Isolated and ambiguous comments are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination.") (internal quotation marks and citation omitted). But Newman's comment does not stand alone. Instead, the manner in which several employees observed him behave towards Johnson--behavior that was claimed to be distinct from his interaction with Caucasian comanagers-- reinforces the possibility that Newman's comment might have reflected racial animus. *Id.* at 356 ('[W]hen assessing the relevancy of an allegedly biased remark where the plaintiff presents evidence of multiple discriminatory remarks or other evidence of pretext, we do not view each discriminatory remark in isolation, but are mindful that the remarks buttress one another as well as any other pretextual evidence supporting an inference of discriminatory animus.').

Newman's statement must also be viewed in connection with the evidence concerning racial jokes and slurs prior to Johnson's arrival at the Wheelersburg store. Kroger emphasizes that Newman did not listen to racial jokes, but instead told the department heads not to tell them, and that he never heard the racial slurs that other employees reportedly heard. A reasonable juror, however, could infer that Newman's awareness of racial jokes prior to Johnson's arrival at the store indicates that he harbored racially discriminatory views." (319 F.3d at 868-69)

Here, both Wyant and Wright, managers who had the decision making authority on both the decision to discharge and the decision to decline to offer Mark a last chance agreement similar to those offered to Huskey and Koster, had made disparaging statements about Hispanics, generally, and Warden Wyant made clear his opposition to advancement of Hispanics at the East Moline Correctional Center, as did Wright in stating that they had enough Mexicans in management. Wright repeatedly referred to Anthony Gonzales, another Hispanic employees, as "token Tony" and Wright called

40

Mark a lazy Mexican.  Both Wright and Wyant lied about the fact that there were

Department of Corrections employees who could support the charges against Mark. when

in fact there were not.  Neither Wyant nor Wright disciplined two white officers who

engaged in the same conduct even though Krup was implicated by the same inmate who

claimed Mark socialized and traded and trafficked with inmates, and there was

Department of Corrections employees who had actually caught Hart bringing in whiskey

to inmates.

Finally, Warden Wyant later apologized to Mark Jennings in a church service.  If

the termination was legitimate, what reason did Wyant have to apologize?  All these

above facts could lead the reasonable trier of fact to find that the misconduct was not the

actual motivation for the discharge when white employees either got last chance

agreements or, in the cause of Krup and Hart, are not disciplined at all, or that Mark's

actions were insufficient to motivate discharge since a white correctional officer can get

inmates drunk and escape discipline for socializing and trading and trafficking with

inmates in violation of the rules of conduct.

## CONCLUSION

Mark Jennings has demonstrated by direct evidence that the decision makers

involved in the decision to terminate him and not offer him a last chance agreement made

discriminatory statements against Hispanics and directly at Mark by calling him a lazy

Mexican.  Because discriminatory animus by the decision makes exists herein, summary

41

judgment is inappropriate in this direct evidence case. Plaintiff has also established a

*prima facie* case of national origin discrimination and has shown that the reason given to

terminate is pretextual when compared to the treatment afforded white correctional

officers for the same or more egregious misconduct, coupled with the facts that plaintiff

has shown that the decision makers had made prejudicial and discriminatory statements

about Hispanics, and Mark Jennings in particular, creates a factual issue for the jury in

this case. For these reasons, summary judgment is inappropriate and the Motion should

be denied.

MARK JENNINGS, Plaintiff

By: /s/ Stephen T. Fieweger

For:
KATZ, HUNTOON & FIEWEGER, P.C.
Attorneys for Plaintiff
200 Plaza Office Building
P.O. Box 3250
Rock Island, IL  61204-3250
Telephone:  309-788-5661
Fax:  309-788-5688

42

## CERTIFICATION

I hereby certify that on July 8, 2005, I electronically filed plaintiff's Resistance to Motion for Summary Judgment with the clerk of court using the CM/ECF system which will send notification of such filings to the following:

> William E. Jarvis
> James F. Ehrenberg, Jr.
> Assistant Attorneys General
> 500 South Second Street
> Springfield, IL  62706
> E-Mail wjarvis@atg.state.il.us

and I hereby certify that on July 8, 2005, I mailed by United States Postal Service, the documents(s) to the following non-registered participants:  None.

/s/Stephen T. Fieweger

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)(2)

The undersigned cannot certify pursuant to Local Rule 7.1(B)(2) that Plaintiff's Response to Defendant State of Illinois' Motion for Summary Judgment contains fewer than 7,000 words [The counting feature on plaintiff's Counsel's word processing package (Word 2000) counted 8,447 words.]   (This includes the Introduction and Applicable Law through Conclusion.)  Plaintiff has moved for leave to file an overlength brief.

/s/Stephen T. Fieweger

s:\wp\worddoc\11065001.11R