UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| MARK JENNINGS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 03-4087 |
| | ) |
| STATE OF ILLINOIS, by its | ) |
| Departmental Unit, THE ILLINOIS | ) |
| DEPARTMENT OF CORRECTIONS, | ) |
| | ) |
| Defendant. | ) |

**AFFIDAVIT OF STEVEN SLOCUM**

| | |
|---|---|
| STATE OF ILLINOIS | ) |
| | ) ss. |
| COUNTY OF ROCK ISLAND | ) |

Steven Slocum, being first duly sworn, upon oath, states as follows:

1. I, Steven Slocum, am of legal age and am competent and have personal knowledge of the facts set forth in this Affidavit.

2. That I am employed as a correctional officer for the State of Illinois, Department of Corrections and have so been employed since November 1984 at the East Moline Correctional Center.

3. In addition to my duties as a correctional officer, I have been a union representative for the American Federal, State County and Municipal Employees at the East Moline Correctional Center. I have held a union representative lead steward position during the calendar years 2002 through 2005. I have also served as union President from January 1997 to December 2001 and am presently, since January 2005, serving as union President.

EXHIBIT D

2

4. That during the same time period, the other union representatives for American Federal, State County and Municipal Employees at the East Moline Correctional Center were myself, as Lead Steward; Tony McCubbin, as President, Harry Hitchcock and Jeff Papish.

5. As union officers, Papish, Hitchcock, Lind, McCubbin and I were all involved in negotiations in management at the East Moline Correctional Center concerning issues of discipline relating to Department of Correction Employees who were members of our union.

6. That in 1999, Correctional Officer Mark Koster, a Caucasian, was discharged for misconduct of individuals, socializing with committed persons, trading and trafficking, violation of state laws regarding official misconduct and the unauthorized use of state property. He had inmates repair work on his personal property in the Spring and Summer of 1999. Mr. Koster was found to have engaged in this conduct and was found on June 22, 1999 to have been guilty of the offenses and was recommended for removal from employment with the Department of Corrections by Assistant Warden Frank Shaw. (Exhibit A, a true and correct copy of the Employee Review Hearing, is attached hereto and made a part of this Affidavit.)

7. The Employee Review Officer, Terry Boerema (a Caucasian manager), recommended that Mr. Koster only receive a five day suspension for all of these offenses.

8. That I, as a member of the union team, filed a grievance of Mr. Koster's dismissal before arbitration, and negotiated a settlement with management who had as their representatives Warden Gary L. Wyant and Chief of Security Major Steve Wright, both Caucasian managerial employees. Management agreed to return Mr. Koster to work and reduce the discipline to a five day suspension. (Exhibit B, a true and correct copy of the Resolution Prior to Arbitration Agreement, is attached hereto and made a part of this Affidavit.)

3

9. That Warden Wyant's decision to return Mr. Koster from termination and a reduction of discipline to a five day suspension was approved by the director at the Department of Corrections, Donald M. Snyder, Jr.. (Exhibit C, a true and correct copy of Mark Koster's Central Management Personnel Position Action Form, is attached hereto and made a part of this Affidavit.)

10. In addition to Mr. Koster, another Caucasian male employee, Correctional Officer Robert Huskey was found in the Summer of 1999 to have engaged in violation of Department of Correction rules concerning conduct of individuals, socializing with committed persons, trading and trafficking in violation of state laws regarding official misconduct and he was found to have had an inmate repair personal property for him and also arranged for the repairs of other correctional officers' personal property by inmates and solicited payment from those correctional officers for the inmates' services. Terry Boerema, Employee Review Officer, and Frank Shaw, Assistant Warden, recommended Mr. Huskey for a 30 day suspension pending discharge. (Exhibit D, a true and correct copy of the Employee Review Hearing of June 1, 1999, of Terry Boerema, is attached hereto and made a part of this Affidavit.)

11. On behalf of the Union I was part of the team involved in filing a grievance over Mr. Huskey's termination and again negotiated with management including Warden Gary Wyant and Chief of Security, Major Steve Wright, that the discipline of Mr. Huskey be reduced. On February 2002, on behalf of Mr. Huskey, the union reached a resolution of Mr. Huskey's grievance prior to arbitration in which Mr. Huskey for his actions of trading and trafficking, conduct of individuals, socializing with committed persons and violation of state laws regarding official misconduct, whereby Huskey received a 30 day suspension and was reinstated. Gary L.

4

Wyant and Major Steve Wright approved the resolution of the grievance in this matter and Mr. Wyant then recommended that the reinstatement and reduction of discipline to a 30 day suspension be approved by the Illinois Department of Corrections Director, Donald Snyder, and it was so approved in March, 2000. (Exhibit E, a true and correct copy of the Resolution prior to Arbitration, is attached hereto; Exhibit F, a true and correct copy of the Reinstatement of the Personnel Position Action Form for Reinstating Mr. Huskey signed by Gary Wyant and signed by Donald Snyder, Jr., is attached hereto and made a part of this Affidavit.)

12. In addition, at the same time, in the Summer of 1999, Ms. Belinda Rursch , a leisure time specialist II at the Illinois Department of Corrections Facility at East Moline Correctional Center, found to have engaged in violation of administrative rules during conduct of individuals socializing with committed persons, trading and trafficking and having personal property repaired by an inmate. Ms. Rursch received a suspension pending discharge. Ms. Rursch, an African-American female employee, was not reinstated pursuant to our request prior to arbitration with management, including Warden Gary Wyant and Major Steve Wright representing management, despite the fact that she engaged in the same conduct as Mr. Huskey and Mr. Koster. The Arbitrator reduced Ms. Rursch discharge to a ten day suspension in February 2000 and she was reinstated.

13. That in August 2002, Correction Officer Mark Jennings was given a 30 day suspension pending discharge, was found to have violated rules concerning conduct of an individual, compliance with laws and regulations, socializing with committed persons, trading and trafficking and failure to report an offense or incident. Warden Gary Wyant, Chief of Security Major Steve Wright and William Cox (a Caucasian managerial employee) were the

5

referring employees for discipline and Warden Gary Wyant was the manager who approved Mr. Jennings' discipline as a thirty day suspension pending discharge. A referring managerial employee has the discretion under Illinois Department of Corrections rules and internal policies to decide whether an employee should be referred for discipline based upon facts submitted.

14.   That in light of past precedent in which Warden Wyant and Major Wright, on behalf of management, had agreed to enter into last change agreements with the male Caucasian correctional officers, Koster and Huskey and in light of the fact that prior arbitration for Belinda Rursch, an African-American employee, had resulted in a ten day suspension for her, I as part of the union negotiation team sought to have management enter into a last chance agreement similar to that of Mr. Huskey and/or Koster. Warden Wyant and Major Wright expressed that they would not agree to offer the same last c\Chance Agreement that they had offered to Caucasian correctional officers. We, as the Union pointed out that this is the first time in which management had ever disciplined an employee at the East Moline Correctional Center solely upon the word of inmates, requested that they reconsider their position and that it appeared that they were requiring minority employees to go through arbitration rather than give the same last chance agreements given to the Caucasian employees. Ultimately Warden Wyant stated that he would not agree in Mr. Jennings case to the proposed last chance agreement despite the fact that no objective proof that Mr. Jennings engaged in the conduct. We also pointed out to Warden Wyant and when he and Mr. Wright referred Mr. Jennings to discipline, that in their charge they claimed that there were admissions of the staff employees that Mark Jennings had engaged in this conduct. We pointed out that the investigation done by Internal Affairs had shown that no staff member of the East Moline Correctional Center had personal knowledge of facts which

6

would indicate that Mr. Jennings had engaged in this acts of misconduct. Despite this, Mr. Wright and Mr. Wyant both stood by their allegation that there were facts supporting the claim that there were admissions of staff that Mr. Jennings had engaged in this conduct, which was an allegation that was not true.

15. Also during our negotiations to convince management that Mr. Jennings should not be terminated and should be given a last chance agreement similar to that given to Huskey and Koster, we pointed out the fact that John Krup, a Caucasian correctional officer, had also been accused by inmate John Turner (the same inmate who had accused Mark Jennings of this misconduct) of engaging in the same misconduct that Mark Jennings had purportedly done in February 2002, namely, trading and trafficking and, improper solicitation, and improper socializing with inmates, and that neither Mr. Wright or Warden Wyant had referred Mr. Krup for discipline despite Krup having allegedly engaged in this conduct. Mr. Krup was the supply store supervisor who had access to order forms for the facility and who could have been the supplier of black and mild cigars, but yet when this was alleged by inmate Turner, no one from management even interviewed John Krup, nor did they institute discipline against him. Neither Warden Wyant nor Steve Wright could explain how Mr. Jennings could be disciplined based upon inmate testimony when John Krup was not.

7

Further affiant sayeth naught.

_____
Steven Slocum

Subscribed and sworn to before me, a Notary Public, this 6th day of July, 2005.

_____
Notary Public

**OFFICIAL SEAL**
**STEPHEN T. FIEWEGER**
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 2-24-2008

s:\wp\worddoc\11065001.09A

EAST MOLINE CORRECTIONAL CENTER

EMPLOYEE REVIEW HEARING

B.17

June 1, 1999

PRESENT: Terry Boerema, Employee Review Officer
C.O. Mark Koster, Referred Employee
Assistant Warden Slutz, Referring Employee
C.O. Tony McCubbin, AFSCME Representative
C.O. Mike Dundy, AFSCME Representative
C.O. Steve Slocum, AFSCME Representative



EXHIBIT A

C.O. Mark Koster was referred for violation of Department Rule: Title 20 Corrections, Criminal Justice, and Law Enforcement, Chapter I Department of Corrections, Subchapter a Administration and Rules, Rules of Conduct: **Section 120.30 Conduct of Individuals** (Individuals shall conduct themselves in a manner which will not reflect unfavorably on the Department and shall not engage in conduct which is unbecoming or impairs the operations of the Department.); **Section 120.50 Socializing with Committed Persons** (Individuals shall not knowingly socialize with or engage in business transactions with any committed person, or a relative or known close associate of a committed person, except in the performance of an assignment or as approved in writing by the Director.); **Section 120.70 Trading or Trafficking** (Individuals shall not trade or traffick with, or aid or solicit unauthorized actions by, committed persons.); and **State Laws Regarding Official Misconduct and Unauthorized Use of State Property** (Individuals shall obey all federal, state and local laws applicable court decisions and orders related to the performance of their services to the Department.; Individuals shall comply with departmental rules, written procedures, bulletins and written or verbal orders issued by Department authorities.; and Individuals shall not utilize state equipment, property or services without authorization or for personal use.)

Assistant Warden Slutz read the charges which stated that inmate Scott R. Ducey (K-64368) stated that his job assignment was maintenance and his duties were to repair inmate and state property. Inmate Ducey listed the following staff member and corresponding items that were brought to him to repair: C.O. Mark Koster, weather radio and children's Casio keyboard. Inmate Ducey stated that he received a pack of "Swisher Sweet" cigars from C.O. Koster as personal payment for his services. Inmate Reginald Brown (A-81604) stated that he was assigned to maintenance, television repair, and worked with inmate Ducey. Inmate Brown stated that C.O. Koster had brought inmate Ducey an organ and a weather radio for repair. C.O. Mark A. Koster stated that he worked in vehicle maintenance and that approximately six months ago he noticed inmate Ducey repairing electronic type items. C.O. Koster stated he had a conversation with inmate Ducey concerning a child's Casio keyboard and a weather radio that he (C.O. Koster) owned that did not work. C.O. Koster stated he, subsequently, brought the items in to inmate Ducey for repair. C.O. Koster stated that all that was wrong with them were dead batteries and he took them back home. C.O. Koster stated inmate Ducey wanted a pack of cigars for his labor, but that he (C.O. Koster) did not give him anything. On March 1, 1999 C.O. Mark A. Koster was read his Constitutional Rights before questioning. C.O. Mark A. Koster was re-interviewed and refused to answer any questions without attorney representation. C.O. Scott E. Johnson stated that he was assigned to grounds. C.O. Johnson stated that C.O. Koster did sell a Holley carburetor to C.O. Newberg, but did not know the details of the transaction and that

000440

the carburetor was in C.O. Newberg's office. Inmate Timothy Love (N-64118) stated that he was assigned to grounds. Inmate Love stated that approximately one to two weeks prior to this interview, C.O. Koster brought a riding mower to grounds and that C.O. Koster told them to get it running or use it for parts. Inmate Love stated that he and other inmates worked on the mower the next few days and got it running. Inmate Love stated the mower had since disappeared. C.O. Scott H. Newberg stated that he was the supervisor for grounds. C.O. Newberg stated he had a Holley carburetor under his desk on grounds at the time of the interview, purchasing it from C.O. Koster. Approximately one month ago, C.O. Koster had donated a riding mower to the grounds lawn mower repair shop. Inmate Stephen M. Sierzega (B-40708) stated he had been assigned as a mechanic for approximately the last 22 months. Inmate Sierzega stated that when he worked for C.O. Koster, he (Sierzega) took a holley 750 CFM carburetor off of C.O. Koster's privately owned pick-up and replaced the carburetor with a 650 CFM carburetor. Inmate Sierzega stated he rebuilt the 650 CFM carburetor prior to putting it on C.O. Koster's truck. Inmate Sierzega stated that C.O. Koster made a deal with C.O. Newberg concerning the purchase of the carburetor. Inmate Charles D. Lair (N-97907) stated that prior to being assigned to grounds he had been assigned to Vehicle Maintenance under C.O. Koster. Inmate Lair stated while assigned to Vehicle Maintenance, C.O. Koster brought in a log splitter and he (Lair) worked on it in Vehicle Maintenance. Inmate Lair stated that he overheard C.O. Koster order parts for the log splitter under a state order, tax exempt. Inmate Lair stated he was reassigned and did not know what happened to the log splitter. On March 1, 1999 Instructor Clarence Modglin was re-interviewed. Mr. Modglin stated that there were basically two auto repair shops in the Maintenance Building, one called the Vocational Auto Shop (under Black Hawk College) and the other called Vehicle Maintenance. Mr. Modglin stated that C.O. Koster had been responsible for Vehicle Maintenance. Mr. Modglin stated Vehicle Maintenance was responsible for state vehicles only and Vocational Auto was for the repair of approved employee's vehicles. Mr. Modglin stated that he recalled his students working on C.O. Koster's truck on numerous occasions. Mr. Modglin stated C.O. Koster had ordered the parts for the truck. Mr. Modglin stated that he kept no receipts or records of the vehicles he or his students had worked on. Mr. Modglin stated he did not recall which inmates worked on C.O. Koster's truck. Mr. Modglin stated he orders auto parts from three local businesses. Mr. Modglin stated that the three local businesses were Olson's Auto Parts, Claey's Auto Parts, and The Car Shop. Mr. Modglin stated he believed C.O. Koster would have used one of these businesses to order his (C.O. Koster's) parts. Reporting Investigator contacted Manager James Newbanks at Car Quest Auto Parts. Mr. Newbanks stated he was not able to locate any records relating to a Holley carburetor for C.O. Koster or East Moline Correctional Center. Reporting Investigator contacted Manager Greg Claey's at Claey's Auto Parts. Mr. Claey could not locate any records relating to a Holley carburetor for C.O. Koster or East Moline Correctional Center. Reporting Investigator contact Jim Schenk at The Car Shop. Mr. Schenk could not locate any records relating to a Holley carburetor for C.O. Koster or East Moline Correctional Center. Inmate Richard J. Bilik (K-60539) stated that he had worked on grounds for approximately 1-1/2 months. Inmate Bilik stated that approximately five weeks ago he arrived at work and a Craftsman riding lawn mower was there. Inmate Bilik stated he was told by Inmate Ellis the mower was to be used for parts. Inmate Bilik stated he and inmate Ellis tore the mower apart for parts the same day. Inmate Bilik stated recently inmate Ellis told him they had to put the mower back together so that C.O. Koster could get his job back. Inmate Bilik stated he and inmate Ellis then located the parts and put the mower back together. Inmate Edward L. Ellis (B-08878), stated that he had worked on grounds for approximately four months. Inmate Ellis stated approximately one month ago C.O. Koster brought the Craftsman mower on grounds in a truck. Inmate Ellis stated he tore the mower up for parts the same day.

000441

Inmate Ellis stated that he had a conversation with C.O. Koster the following day and C.O. Koster asked him why he tore the mower up, that he (C.O. Koster) thought they would get it running to use at East Moline Correctional Center. Inmate Love was re-interviewed and stated that he had previously said the Craftsman mower had "disappeared"; however, it was possible that it got torn apart to be used for parts. Inmate Love stated that he did get the mower running the last time he saw it.

The Union representative asked if this case was going to be prosecuted. Employee Review Officer stated the investigation report had been forwarded to the States Attorney's office for review and possible prosecution. The Union representative then requested a continuance pending judicial outcome. The request for a continuance was denied. The Union representative then advised the referred employee to say nothing.

The Union representative stated that the charges against C.O. Koster were not clear and concise. Other employees listed in the investigation were not charged with official misconduct. C.O. Koster brought in a weather radio and a keyboard. He was told they needed batteries and he took them home. The inmate did not even work on them.

The log splitter that is mentioned in the investigation is at the grounds building. An inmate implied that C.O. Koster had bought a carburetor for his personal vehicle through state purchase order procedures. The Union representative then showed numerous receipts from August 1996 from an auto parts store for a carburetor and related auto parts. The Union representative stated that any work done on C.O. Koster's vehicle was done through the approved procedure for having a personal vehicle repaired by the vocational auto mechanics class. Everything inmate Lair says about C.O. Koster is a lie. C.O. Koster had fired inmate Lair from his job and inmate Lair wanted retribution. The riding lawn mower mentioned in the investigation was very old and was brought in as a donation to be used for spare parts by the workers at grounds. The weather radio and the keyboard C.O. Koster brought in were not contraband and the inmate did not do any work on them. The inmate was not paid for any service because no service was provided.

C.O. Koster is a long time employee with an excellent work record.

C.O. Mark Koster has been employed by East Moline Correctional Center since August 1983 and has incurred the following discipline in the past:

    None In Last 2 Years

The available information indicates that C.O. Mark Koster is not guilty of violating State Laws Regarding Official Misconduct.

The available information indicates that C.O. Mark Koster is guilty of violating Department Rule 120 Conduct of Individuals, Trading or Trafficking, Socializing with Committed Persons.

C.O. Koster admitted he had had a conversation with inmate Ducey about repairing personal items, brought in two items from home and, upon conclusion of the inmate's review of the items, took them home again. The fact that the items required no repair does not change the fact that C.O. Koster solicited unauthorized actions by the inmate.

The riding lawn mower mentioned by inmate Love as having been donated by C.O. Koster

000442

was corroborated by the officers that had worked at ground. Inmate Love's statement implied the mower had been brought in, repaired, and possibly taken out again; however, this implication is negated by the testimony of the grounds officers and other inmates who re-assembled the mower from its parts. It appears the mower was, in fact, an unauthorized donation.

The unauthorized vehicle repair work alleged in the investigation cannot be entirely substantiated. Vocational Instructor Modglin indicated he recalled his class having worked on C.O. Koster's truck, however, no evidence was presented to suggest the repair work in Mr. Modglin's class was not appropriately authorized. The investigation report indicate three auto repair businesses were contacted and none could locate records of a Holley carburetor. The Union, however, produced a number of receipts from an auto parts store. Since C.O. Koster had ordered his own parts, according to Mr. Modglin, there is no way to verify that C.O. Koster had not come by his carburetor legitimately. The fact that C.O. Koster was going to sell a carburetor to C.O. Newberg is, in itself, not an issue. Having had inmate Sierzega work on the carburetor, however, would have been unauthorized activity since inmate Sierzega was not assigned to the vocational auto repair class.

The log splitter mentioned by inmate Lair has been verified to be currently located in the grounds area. The investigation is not clear as to any allegation as to where it originally came from. The Union denied everything claimed by inmate Lair. There is neither a second witness nor polygraph results relating to inmate Lair's claim that C.O. Koster was illegally ordering parts for the log splitter.

The "Swisher Sweets" cigars that inmate Ducey claimed he received from his services was denied by C.O. Koster and is not corroborated by any additional source.

It is therefore recommended that C.O. Mark Koster be issued a <u>5 Day Suspension.</u>

_Terry Boerema_ 6-15-99
Terry Boerema          Date
Employee Review Officer

APPROVED: _____

DISAPPROVED: ✓

_Frank Shaw_ 6-22-99
Frank Shaw              Date
Assistant Warden of Operations

cc: Warden
    Major Wright
    AFSCME
    Personnel File
    Referring Employee
    Referred Employee

COMMENTS: BASED ON THE AGGRAVATING FACTORS IN THIS MATTER THE DISCIPLINE IS BEING INCREASED TO A 30 DAY SUSPENSION PENDING DISCHARGE.

Page 4                                                        000443