ILLINOIS DEPARTMENT OF CORRECTIONS
EMPLOYEE GRIEVANCE HEARING
THIRD LEVEL

Date of Hearing
November 25, 2002

**GRIEVANCE NO:**     371184

**GRIEVANT:**     Mark Jennings, Correctional Officer

**LOCATION:**     East Moline Correctional Center

**ISSUE**     Discharge

The Union is grieving a discharge. The grievant was discharged on September 24, 2002, for violating Employee Rules #1; D.R. 120, Conduct of an Individual; Section 120.40, Compliance with Laws and Regulations, c; Section 120.30, Conduct of Individuals; D.R. 120.50, Socializing with Committed Persons; 120.70, Trading and Trafficking; D.R. 120.100, Violation of Rules; A.D. 03.02.108, Standards of Conduct; and Failure to Report an Offense of Incident, A.D. 01.12.105.

Management contends the grievant has been employed at East Moline Correctional Center since June 27, 1988. The grievant has incurred discipline in the last two years; on September 14, 2001, unprofessional conduct. Based on direct evidence, admission of staff, and inmates' testimonies, the grievant brought items of contraband into East Moline Correctional Center from approximately August 1, 2001 through February 24, 2002, with the intent to trade and traffic this contraband with inmates. Additionally, Inmate Turner, B11090, provided substantial information regarding the grievant's involvement in trading and trafficking contraband with numerous inmates. Inmate

EXHIBIT 5

Mark Jennings/E. Moline C.C./Page 2

Turner's testimony was found to be truthful when he submitted to a polygraph examination. In addition, items found on inmates were consistent with items reported to be given by the grievant, i.e. black and mild cigars. Management considers the seriousness of the events leading up to discharge to be dangerous and most likely would lead to eventual future occurrences in breaches of security. The discharge and facts surrounding this case, as well as previous discipline in the grievant's personnel history, suggest a comprehensive picture of re-occurring unprofessional conduct. The grievant's past history of discipline for unprofessional conduct and inability to perform has not been corrected and Management supports the discharge for cause.

The Union contends the investigation is untimely. The Union alleges that, on every shift, it is not uncommon for an inmate to be called to go to another dorm. The Union disputes the testimony about an inmate going to a dorm on one particular date. There was no contraband found or reported relating to that event. The Union states that, if Management is looking for violations, they should apply the rules the same for everyone, i.e. Correctional Officer Workman. Why didn't Correctional Officer Workman shake down Inmate Turner when the inmate requested to talk with the grievant May 6, 2002, on dorm numbers 3 and 4 at 11:00 p.m., after the count had cleared. The Union contends "Disparity in Treatment". Inmate Mantulla mentions employee Krup's and Correctional Officer Bea's involvement. The Union raises the question, "Why wasn't there an investigation?" The Union alleges that Management is relying solely on inmates' testimonies, and inmates are known to lie. They are sometimes pressured to say what investigators want to hear. Polygraphs are not admissible in Court. They are unreliable.

Mark Jennings/E .Moline C.C./Page 3

The Union states that inmate testimony can't be used against an officer without staff corroboration. The Union requests the grievant be returned back to work and be made whole.

It is this hearing officer's recommended decision that the grievance be denied. This hearing officer has looked into the Union's allegation of "Disparity in Treatment regarding Krup and Bea. The allegations were not pursued, based on the fact that the allegations were not substantiated by more than one source. This hearing officer finds that the investigation was conducted in a timely manner; six months is not untimely considering all of the interviews that were conducted during that time period. The grievant is guilty of violating Employee Rules #1, D.R. 120 and A.D. 01.12.105, in that Inmate Turner, B11090, provided substantial information regarding the grievant's involvement in trading and trafficking contraband items with himself and other numerous inmates. The stories of each inmate were verified and were found to be truthful when they submitted to a polygraph test. Additionally, the information provided by the inmates correspond to the record of dorm assignments for the grievant. The information provided by the inmates also correspond to the contraband items seized from some of them (sunflower seeds, chewing gum, black and mild cigars, cigarettes, shaving cream, Skoal, red crushed pepper, cologne, boots and a watch). It is this hearing officer's opinion that the grievant conducted himself in a manner that reflected unfavorably upon the Department and impaired his ability to perform the duties and responsibilities of a Correctional Officer.

Mark Jennings/ E. Moline C.C./Page 4

                          Signature redacted pursuant to
                          USDC-CDIL Adm.Proc. Rule II(I)(1)(f)

                                  Todd Creviston
                                  Labor Relations Administrator

                  Signature redacted pursuant to
                    USDC-CDIL Adm.Proc. Rule II(I)(1)(f)

Concurred:_____
                Donald N. Snyder, Jr.
                Director


TC: bab

Cc: Director Donald N. Snyder, Jr.
     Associate Director George DeTella
     Chief of Staff Andrew Walter
     Assistant Deputy Director Jesse Montgomery
     Warden Gary Wyant
     Mr. Don Keeling
     Mr. Dino Leone
     Mr. Tony McCubbin
     Mr. Mark Jennings
     Assistant Chief of Labor Relations Justin Smock
     Ms. Nanci Bounds
     Ms. Nancy Pittman

MAR-05-2003 12:09    CENTRAL MANAGEMENT SER    217 524 0836    P.01/01

# RESOLUTION PRIOR TO ARBITRATION

| | |
|---|---|
| Grievance #: | 0006-0001-03, 371184 |
| Grievant: | Mark Jennings |
| Agency: | Department of Corrections |
| Facility: | East Moline Correctional Center |
| Issue: | Discharge |
| Resolution: | Arbitrate (Regular) |

Signature redacted pursuant to USDC-CDIL Adm.Proc. Rule II(I)(1)(f)

Signature redacted pursuant to USDC-CDIL Adm.Proc. Rule II(I)(1)(f)

For the Union

For the Employer

Date: 2/10/03

Date: 2.10.03

**EXHIBIT 6**

TOTAL P.01

815/721-0134

BEFORE
EDWIN H. BENN
ARBITRATOR

In the Matter of the Arbitration

between

ILLINOIS DEPARTMENT OF CENTRAL
MANAGEMENT SERVICES

and

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO

GRIEVANT: M. Jennings

DEPARTMENT: Corrections

CASE NOS.: Arb. No. 4405
6-0001-03
371184
Arb. Ref. 02.08S
(Discharge)

## OPINION AND AWARD

RECEIVED
JUN 3 0 2003
LABOR RELATIONS
JOLIET CORR. CENTER

APPEARANCES:

 For the State:   Gregory P. Newton, Esq.

 For the Union:   Thomas J. Edstrom, Esq.

Place of Hearing:   East Moline, Illinois

Date of Hearing:   June 12, 2003

Date of Award:   June 29, 2003

RECEIVED
JUN 3 0 2003
Labor Relations

Arb. No. 4405, 6-0001-03 (371184)
Corrections — M. Jennings
Page 2

# CONTENTS

I. ISSUE ............................................................................. 1

II. FACTS ........................................................................... 1

    A. Background ............................................................ 1

    B. The Evidence .......................................................... 1

    C. Grievant's Prior Record .......................................... 4

III. DISCUSSION ................................................................. 4

    A. The Standard And Burden ...................................... 4

    B. Has The State Shown That Grievant Engaged In Misconduct? ......................................................... 4

    C. Has The State Shown That Discharge Was Appropriate? ........ 6

IV. CONCLUSION ............................................................... 7

V. AWARD ........................................................................ 7

Arb. No. 4405, 6-0001-03 (371184)
Corrections — M. Jennings
Page 1

## I. ISSUE

Did the State have just cause to discharge Grievant Mark Jennings? If not, what shall the remedy be?

## II. FACTS

### A. Background

Grievant was an employee of the Department of Corrections for approximately 14 years. At the relevant time, Grievant was a Correctional Officer at the East Moline Correctional Center ("EMCC").

Grievant was discharged in October, 2002 for allegedly bringing items of contraband into EMCC during the period August 1, 2001 through February 24, 2002 in order to trade and traffic that contraband with inmates. Joint Exh. 3 at 2.

The Union grieved the discharge. Joint Exh. 2. The parties were unable to resolve the dispute. This proceeding followed.

### B. The Evidence

During varying periods in late 2001 and early 2002, Jose Davila, John Turner and Steve Mantulla were inmates at EMCC.[1] During their careers, Davila had been incarcerated for aggravated battery; Turner for drug possession, arson, burglary and parole violations; and Mantulla for burglary, forgery, and theft.

Black & Mild cigars are contraband at EMCC. However, because a number of the inmates favor those cigars, inmates were willing to trade packs of cigarettes for individual cigars. A potential market therefore existed.

Davila testified that he asked Grievant if Grievant could get him Black & Milds. According to Davila, approximately one week later, Grievant gave Davila five boxes of Black & Milds, which Davila gave to Turner to trade for packs of cigarettes with Turner sharing the profits of the trades with Davila. Davila testified that this arrangement with Grievant went on for approximately one month. In return for providing the Black & Milds, according to Davila, he gave Grievant packs of cigarettes which Turner was able to obtain from his trading efforts. Further, according to Davila, Grievant gave him gum and sunflower seeds.

Turner testified that he observed Davila with the Black & Milds and told Davila that he could trade those cigars for cigarettes at a

---

[1] Mantulla states that his real name is Mantucca.

Arb. No. 4405, 6-0001-03 (371134)
Corrections — M. Jennings
Page 2

profit. According to Turner, Davila was able to supply the Black & Milds and Turner was able to trade those for cigarettes and shared the profits with Davila. Turner testified that this arrangement began in August, 2001 and lasted for about one to one and one-half months.

Further, according to Turner, when he was in the segregation unit, Grievant asked Turner why he was there. After they talked, according to Turner, Grievant asked Turner if there was anything he could do for Turner. Although he was not supposed to have cigarettes in segregation, Turner replied that he would like a couple of cigarettes, which Grievant gave to him and Turner smoked. The next night, according to Turner, Grievant gave him two packs of cigarettes, which Turner again smoked.

Turner also testified that after he was released from segregation, he began receiving Black & Milds from Grievant and, after trading with other inmates, gave Grievant cigarettes in return. Turner testified that Grievant advised him that he had too many cigarettes and could not get rid of them and asked Turner for other items that Grievant had seen in the commissary. Turner states that he bought gym shoes, boots, a beard trimmer and chewing tobacco through another inmate and gave those items to Grievant. Turner further states that on occasion, Grievant also gave him gum and sunflower seeds. Turner also states that he observed Grievant give Mantulla cologne, a black faced wrist watch, coffee creamer and red crushed pepper.

Turner testified that the transactions came to a halt after he was searched by Officer Mathis who found about a dozen packs of cigarettes on him in the yard which raised the question of trafficking. Turner was then taken to segregation.

Mantulla testified that after Turner told him that he had Black & Milds, he began trading with Turner. Mantulla testified that Turner once told him that he owed Grievant cigarettes and, as a result, Mantulla spoke with Grievant and told Grievant that Turner was a good friend and wanted to pay Grievant. According to Mantulla, Grievant told him to tell Turner to forget about the debt.

Mantulla further testified that on one occasion, Grievant gave him five boxes of Black & Milds and told him to give them to Turner, which Mantulla did. The Black & Milds

Arb. No. 4105, 6 C001-03 (S71184)
Corrections — M. Jennings
Page 3

were then traded and Mantulla gave Grievant cigarettes in return. This arrangement continued. According to Mantulla, he would get as many as 10 boxes of Black & Milds and, after conducting business with the other inmates, gave Grievant 25 packs of cigarettes in return.

Mantulla testified that his trading arrangement with Grievant went beyond cigars and cigarettes. According to Mantulla, he asked Grievant for a watch, cologne, coffee creamer and crazy glue to repair Turner's television case. Mantulla testified that a few weeks later he received a black face watch, cologne and glue. According to Mantulla, Grievant told him that those items would cost him 12 packs of cigarettes. Mantulla states that he offered Grievant 10 packs and Grievant agreed.[2] Further, according to Mantulla, he also received chewing tobacco from Grievant.

Mantulla further testified that his trading ended after he was discovered with cigars and he gave other cigars to another inmate Melvin Rogers to hold. A shakedown of the cells yielded the results of Mantulla's trading and, he gave up the information on Grievant's activities.

By stipulation, the parties agreed that if called to testify, Rogers would have stated that he received Black & Milds from Mantulla on February 24, 2002 and was asked to hold them for Mantulla; Rogers cell was searched and the cigars were found and Rogers disclosed that he received the cigars from Mantulla.

Grievant testified that he had no trading arrangements with Davila, Turner or Mantulla and denied all of the conduct attributed to him by those inmates. According to Grievant, he had no relationship with Mantulla; Mantulla never asked him to return cigarettes to Turner; his conversations with Turner were limited to small talk while Turner was a porter, discussions concerning the Bible and the fact that Turner's father was suffering from ALS, and two further occasions when Turner requested to speak with another officer on a different level; and his contact with Davila was limited to Davila's frequent requests to go to Dietary at night and on one occasion Davila spoke in a negative fashion about a nurse and Grievant threatened to write him up if he said anything

---

[2] Mantulla testified that he poured the cologne from a glass bottle into an empty plastic bottle of Visine.

Arb. No. 4405, 6-0001-03 (371184)
Corrections — M. Jennings
Page 4

bad. Grievant was emphatic that he did not engage in the charged misconduct.

### C. Grievant's Prior Record

Grievant's prior disciplinary record shows a September 14, 2001 three day suspension for unprofessional conduct; a February 27, 1991 one day suspension for striking another employee while off duty; a February 17, 1991 three day suspension for refusal of mandatory overtime; a February 7, 1991 one day suspension for refusal of mandatory overtime; and a March 9, 1990 five day suspension for a miscount. Joint Exh. 3, at 2.

Grievant's evaluations are mixed, with mostly supervisor ratings in the "meets expectations" category, but also receiving ratings in the "exceeds" and "needs improvement" categories. Joint Exh. 9.

### III. DISCUSSION

#### A. The Standard And Burden

Because this is a discipline case, the burden rests with the State to demonstrate the existence of just cause for Grievant's discharge. That burden requires the State to make two showings. First, the State must demonstrate that Grievant engaged in the charged misconduct. Second, if the State makes that showing of misconduct, the State must then demonstrate that the amount of discipline — in this case discharge — was appropriate.[3]

#### B. Has The State Shown That Grievant Engaged In Misconduct?

The State has shown that Grievant engaged in misconduct.

First, for obvious reasons, in their relationships with inmates, Correctional Officers are prohibited by the Department's rules from socializing, receiving gifts or gratuities, or trading and trafficking. See DR 120 at Sections 120.50, .60 and

---

[3] *The Common Law of the Workplace* (BNA, 1998), 50, 177:

> In a discipline case the employer best knows why it penalized an employee, often with grave repercussions for the individual. For these reasons the burden of proof in such cases traditionally has been placed on the employer.
>
> * * *
>
> The employer bears the burden of proving just cause for discipline. That includes proof that the level of discipline imposed was appropriate.

See also, Elkouri and Elkouri, *How Arbitration Works* (BNA, 5th ed.), 905 [footnote omitted]:

> There are two areas of proof in the arbitration of discharge and discipline cases. The first involves proof of wrongdoing; the second, assuming the guilt of wrongdoing is established and the arbitrator is empowered to modify penalties, concerns the question of whether the punishment assessed by management should be upheld or modified.

Arb. No. 4405, 6-0001-03 (371184)
Corrections — M. Jennings
Page 5

.70. Joint Exh. 6. Correctional Officers cannot be placed in compromising positions and the rules prohibit those actions. Therefore, if Grievant gave and/or received the items to Davila, Turner or Mantulla as attributed by them, then Grievant engaged in misconduct.

Second, but Grievant strenuously denies doing so. Given that denial and given the testimony of Davila, Turner and Mantulla that Grievant engaged in the conduct, this case is entirely determined on credibility resolutions.

Third, the State relies completely on the testimony of convicted inmate felons — certainly not the most trustworthy group of individuals. But, like any other testimony, while inmate testimony should be carefully scrutinized, inmate testimony is not unbelievable, per se.[4]

What I have here is the testimony of three inmates who essentially relate the same version of the events — i.e., that Grievant brought them a variety of items (cigars, cigarettes, gum, sunflower seeds, cologne, a watch, pepper, etc.) that they used for bartering or kept for themselves and returned a portion of the receipts or other items to Grievant (cigarettes, gym shoes, boots, a beard trimmer, chewing tobacco, etc.). The Union pointed to inconsistencies in the inmates' testimony and statements and has hypothesized motives for these inmates to fabricate testimony against Grievant. But notwithstanding those technical difficulties with the inmates' testimony, what comes through here is that the overall testimony of Davila, Turner and Mantulla was generally consistent and corroborated. This is not testimony that is so corroborated and so tightly consistent that one becomes suspicious of its veracity. The inmates' testimony is laced with the kinds of discrepancies that one would expect to find from three individuals who were caught with contraband, initially denied their culpability or were reluctant to give up their source, but then after realization of their facing the serious consequences of having those items in their possession and then further realizing that they would only get in

---

[4] See my awards in *CMS and AFSCME*, Arb. No. 3177 (Amburg, 1996) at 7 where inmate testimony was credited ("... for credibility purposes, I must treat them as any other witness as having a clean slate") and *CMS and AFSCME*, Arb. No. 3133 (Terry, 1998) at 7-9, where inmate testimony was not credited. See also, *CMS and AFSCME (Oest)* (Yaeger, 1996) at 11-12 ("Inmate testimony is not per se incredible. Rather their credibility has to be evaluated just like other witnesses.").

deeper by being untruthful, they came forward with their version of the events. The inconsistencies also exist because these three individuals separately related incidents which occurred beginning approximately two years ago. These inconsistencies are understandable. However, these inconsistencies do not make their testimony unbelievable.

One must ask why the inmates would fabricate testimony against Grievant? Grievant did nothing to them which stands out that would cause their coordinated retaliation. To assert that their stories were constructed ahead of time to make Grievant the fall guy and to protect their real source of contraband is possible — but that is really only speculation.

From a demeanor standpoint, Grievant was a very impressive witness. I find it difficult to understand why Grievant would jeopardize his career, pay and benefits by engaging in what was, although extensive, for all purposes trafficking and trading in minor items. But these cases are decided on burdens. And, although furiously attacking the credibility of the inmates, the Union could not overcome their testimony which, in its totality, was credible.

Given what is before me, I am compelled to credit the testimony of Davila, Turner and Mantulla. I find that Grievant engaged in the conduct attributed to him by those inmates. Misconduct has been shown.[5]

### C. Has The State Shown That Discharge Was Appropriate?

The next question is whether the State has shown that discharge was appropriate? I find that it has.

The purpose of discipline is to rehabilitate and to send a corrective message to employees that they must comply with their employer's rules and the common sense expectations of the workplace. That desired result is accomplished through the application of progressively increasing amounts of discipline.[6]

---

[5] The Union asserts that there was no effort by the Department to obtain physical evidence against Grievant and argues that the Department did not really fully attempt to find out what happened. The kinds of goods involved were mostly easily disposed of. But most important, the testimony of the three inmates still stands against Grievant.

[6] *Hyatt Hotels Palo Alto*, 85 LA 11, 15 (Oestreich, 1985):
    ... [T]he purpose of disciplinary action is rehabilitation of an employee who has gone astray and to correct unacceptable, work related behavior. Its purpose is not punishment motivated by thoughts of revenge or "setting an example" for
                             [footnote continued]

Arb. No. 4405, 6-0001-03 (371184)
Corrections — M. Jennings
Page 7

Grievant has a prior record of discipline. While a number of the entries are from the seemingly distant past (1990 and 1991), Grievant does have a fairly recent suspension in 2001. The State has also shown that Grievant engaged in serious misconduct. Trafficking and trading with inmates not only put Grievant at risk, but, if forced by the inmates as a result of his prior cooperation to bring in something more dangerous than the items he did give to the inmates (*e.g.*, drugs or weapons), other employees may have been placed in danger. Under the circumstances, and given Grievant's prior disciplinary record, dismissal is a reasonable discipline for the demonstrated misconduct.

## IV. CONCLUSION

I really have no choice here. I fully appreciate the consequences of this decision on Grievant. But, the State has demonstrated that Grievant engaged in serious misconduct. Notwithstanding the very strong efforts and arguments made by the Union on Grievant's behalf in an effort to undermine the State's case, the State's position must prevail. Just cause for Grievant's discharge has been shown. The grievance shall be denied.

## V. AWARD

The grievance is denied.

Signature redacted pursuant to USDC-CDIL Adm.Proc. Rule II(I)(1)(f)

Edwin H. Benn
Arbitrator

Dated: June 29, 2003



RECEIVED JUN 3 0 2003
LABOR RELATIONS
JOLIET CORR. CENTER

---

*[continuation of footnote]*
other employees, or to avoid legal liability for past neglects. The principles of progressive discipline demand that the *minimum* penalty necessary to correct unacceptable conduct be applied.