**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**ROCK ISLAND DIVISION**

| | |
|---|---|
| MARK JENNINGS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case No.  03-4087 |
| | ) |
| STATE OF ILLINOIS DEPARTMENT | ) |
| of CORRECTIONS, | ) |
| | ) |
| | ) |
| Defendant. | ) |

## O R D E R

This case is before the court on Defendant's Motion for Summary Judgment [#11] and its

related Motion to Strike Plaintiff's Affidavits and/or Accompanying Statements of Additional Facts

in Opposition to Summary Judgment [#18].  For the following reasons, Defendant's Motion to Strike

is GRANTED IN PART AND DENIED IN PART and Defendant's Motion for Summary Judgment

is GRANTED.

## BACKGROUND

Plaintiff Mark Jennings was employed by the Defendant, the Illinois Department of

Corrections ("IDOC"), as a correctional officer at the East Moline Correctional Center ("EMCC")

in East Moline, for approximately 14 years.  Beginning in February 2002, Jennings came under

investigation for allegedly smuggling cigars into the EMCC and trading them with prisoners for

goods that prisoners obtained through the prison commissary.  Such conduct is, not surprisingly,

prohibited by IDOC's regulations and can, according to those regulations, result in termination.

An investigation was initiated by Warden Gary Wyant after Black & Mild cigars were found

in the possession of at least one prisoner.  Though Black & Mild Cigars are a sought after

commodity within the prison, they are not available at the EMCC commissary. The investigation into how the prisoners obtained the cigars was conducted by Investigator Anita Emrich, who concluded, based on interviews with eight inmates and Jennings, that Jennings had been involved in the conduct alleged. One of the inmate's statements was supported by a polygraph test. Jennings, at all times, has vehemently maintained his innocence.

In August 2002, after receiving Emrich's report, Major Steve Wright recommended a hearing before the EMCC Employee Review Board. The Board, after hearing evidence and argument from by both sides (Jennings was represented by union representative, Steve Slocum), recommended a 30 day suspension pending discharge in September 2002.[1] Jennings' discharge was approved by the Illinois Department of Central Management Services in October 2002.

Jennings filed a grievance through his union alleging that he had been terminated without cause. The grievance was submitted to an independent arbitrator who determined that Jennings had engaged in trading and trafficking, and that the discipline was appropriate in light of the severity of the misconduct and Jennings' recent disciplinary history. Although the record indicates that Jennings had received a variety of disciplinary actions throughout his tenure with IDOC, IDOC's policy of only considering disciplinary actions within the previous two years of the most recent incident resulted in the Employee Review Board only considering Jennings' September 2001 three day suspension for unspecified unprofessional behavior in its review of Jennings' performance.

After going through the requisite EEOC administrative steps, Jennings filed this Complaint

---

[1] Neither party has ever explained exactly what it means for a corrections officer to be given a 30 day suspension pending discharge; however, the court assumes that this is a shorthand way of saying that an employee is placed on a thirty day suspension, during which time the Warden and the Illinois Department of Central Management will make a decision regarding whether or not the employee will be discharged.

alleging that he had been recommended for discipline and ultimately terminated, not because of the violations that he was falsely accused of, but because he is Mexican-American. In his Response to Defendant's Motion for Summary Judgment, Jennings alleges a rich history of bias on the part of Warden Wyant and Major Wright.

First, Jennings claims that Wright called him a "lazy Mexican" shortly before the initiation of the trading and trafficking investigation. Jennings' claim is substantiated by the affidavit of Harry Hitchcock, who served as a union representative, correctional officer, and sergeant during 2001 and 2002. Hitchcock states that Jennings told him that Wright had called him a "lazy Mexican" but that Jennings elected not to pursue a grievance charge against Wright because Jennings did not want to create trouble for himself. Hitchcock also states that when he confronted Wright about the fact that Jennings had been repeatedly turned down for additional education and training, that Wright stated that the EMCC "already had enough token Mexicans in managerial positions." Hitchcock also claims that Wright stated that he would never recommend Jennings for additional training or education because he did not like him. When Hitchcock approached Warden Wyant about Wright's attitude, Wyant allegedly stated that it was his belief that affirmative action was nothing less than reverse discrimination and that what goes around comes around.

Second, Rick Lind, a corrections officer at EMCC and union representative from 1999 through 2002, states in his affidavit that he observed Wright refer to Lieutenant Tony Gonzales, the only Hispanic-American employee above the level of sergeant at the EMCC at the time, as "Token Tony" more than a dozen times during 2001. Lind also states that when he approached Warden Wyant about the seeming lack of opportunity for upward mobility for Hispanic employees, including Jennings, Wyant gave the same response as he did to Hitchcock — "affirmative action is nothing

more than reverse discrimination and what goes around comes around." Further, according to Lind, while Lind was in Wyant's office for a meeting, Wyant took a telephone call, during which Wyant was apparently having difficulty understanding the person with whom he was speaking. After the call was completed Wyant allegedly told Lind that he hated talking to Mexicans on the telephone, and then stated that "those 'damn beaners' [referring to Mexicans] should have to pass a test in English to show they can properly write and speak English before they come into the country." Finally, Wyant allegedly stated that where he was from in the South "they had different ways of handling those types of people," referring to Mexican-Americans.

In addition to these alleged statements, Jennings believes that other similarly situated, non-Mexican-American employees were treated more favorably because they were not discharged for engaging in similar violations. He cites three examples. Mark Koster, Robert Huskey, and Belinda Rusch. All three are non-Mexican-American employees who were found by the Board to have engaged in trading and trafficking. However, unlike Jennings, these individuals did not trade contraband with inmates but rather brought personal electronic equipment to inmates to have them repaired. According to the record, this conduct is also considered trading and trafficking under IDOC rules. For Koster, the Board recommended only a five day suspension; however, that recommendation was not accepted by Assistant Warden Frank Shaw and Koster was given a 30-day suspension pending discharge. Before Koster's case came before the arbitrator, however, Koster was offered a last-chance agreement allowing Koster to enter into a settlement whereby Koster and the union gave up their right to pursue a claim against IDOC in return for Koster receiving a lesser punishment of five days suspension. In Huskey's case, the Employee Review Board and Assistant Warden Shaw recommended a thirty day suspension pending discharge. However, Huskey was then

-4-

given the option of entering into a last-chance agreement where he agreed to forgo arbitration in return for the reduced punishment of a thirty day suspension. Belinda Rusch, an African-American woman, was originally given a thirty day suspension pending discharge for violating IDOC rules. Unlike Koster and Huskey, Rusch was not given the option of entering into a last-chance agreement and her case proceeded to arbitration. After considering all of the evidence, the arbitrator determined that Rusch's discipline should be reduced to a 10 day suspension.

Basing his claim on allegations of national origin discrimination, Jennings filed a Complaint in this court on December 18, 2003. IDOC has now filed a Motion for Summary Judgment and a Motion to Strike portions of Jennings' Response in July. In an attempt to clarify the issues, the Court held two conference calls with the parties and extended the discovery deadline to allow the parties to supplement their initial summary judgment briefs. As the issues are now fully briefed, this Order follows.

## ANALYSIS

### A. IDOC's Motion to Strike Plaintiff's Affidavits and/or Accompanying Statements of Additional Facts in Opposition to Summary Judgment

IDOC filed a Motion to Strike Plaintiff's Affidavits and/or Accompanying Statements of Additional Facts in Opposition to Summary Judgment. For the reasons that follow, the Court denies IDOC's motion.

#### 1. Standard of Review

A pleading will be stricken upon motion of a party where the pleading contains "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike are not favored, and "will only be granted if 'the language in the pleading has no possible relation to the controversy and is clearly prejudicial.'" *Gonzalez v. City of Chicago*,

888 F. Supp. 887, 890–91 (N.D. Ill. 1995) (quoting *Simmons v. John F. Kennedy Med. Ctr.*, 727 F.

Supp 440, 442 (N.D. Ill. 1989)).

### 2.    Discussion

IDOC first argues that "[t]he affidavits of Lind, Slocum, and Hitchcock, in so far as they

relate to alleged racially derogatory comments made by either Major Wright of [sic] Warden Wyant

should be stricken because they were not previously disclosed during discovery."  IDOC further

argues that "Mr. Lind has never been disclosed as a potential witness through discovery."  In

response, Jennings argues that the affidavits of these individuals should not be stricken because the

names of all three individuals were disclosed during discovery.  Specifically, Jennings' Response

brief to IDOC's Motion to Strike includes a copy of a letter sent from Jennings' counsel to the

Assistant Attorney General representing IDOC in this matter.  The letter, dated May 3, 2005, over

one month before IDOC filed their Motion for Summary Judgment, is a list of additional "witnesses

besides those who were identified in Mr. Jennings' deposition."  The list includes the names of Rick

Lind and Steve Slocum.  IDOC claims that it never received the letter and asks the Court to strike

the affidavits of these individuals insofar as they relate to allegedly racially derogatory comments.

The Court will address each individual affidavit in turn

With respect to Rick Lind, IDOC argues that his affidavit should be stricken because he was

never disclosed as a potential witness during discovery.  However, the letter dated May 3, 2005,

clearly states that Mr. Lind was a potential witness.  Additionally, the letter states "Mr. Lind has

knowledge concerning the disparate treatment of Mark Jennings based on his union representative

position."  Although IDOC claims that it never received this letter, the Court has no reason to

believe that Jennings' counsel did not actually send the letter.  Accordingly, the Court declines to

strike the affidavit of Rick Lind on this basis.

IDOC alternatively argues that paragraphs 7, 8, 9, 11, 12, 14, 15, 16, 17, 18, and 19 of Rick Lind's affidavit should be stricken because they are immaterial. Each of these paragraphs contains information regarding how IDOC treated other IDOC employees who allegedly engaged in trading and trafficking. These statements address the question of whether other similarly situated employees were treated more favorably than Jennings and therefore are material to the question of whether IDOC treated Jennings less favorably based on his national origin.

IDOC then argues that many of Rick Lind's statements are not based on personal knowledge. However, each of these statements are knowledge that Rick Lind gained in his position as union representative. Additionally, these statements were made in his presence and therefore are based on personal knowledge. IDOC's final argument is that paragraphs 14, 15, 16, 17, 18, and 19 are statements containing hearsay or are predicated on hearsay. However, each of the statements in these paragraphs are statements that were allegedly made by Warden Wyant or Steven Wright. As employees of IDOC, these statements are admissions of party opponents and therefore are not hearsay. *See* Fed. R. Evid. 801(d)(2)(D). As a result of the above, the Court declines to strike any portion of Rick Lind's affidavit.

Moreover, the Court does not find IDOC's argument persuasive with respect to Steve Slocum's affidavit because Steve Slocum was disclosed during discovery. Specifically, Jennings mentioned Steve Slocum in his deposition on November 8, 2004. (*See* Pl.'s Dep., at 71.) IDOC had ample opportunity to depose Slocum. IDOC argues, in the alternative, that certain paragraphs of Slocum's affidavit should be stricken because they are immaterial and that some of them are not based on personal knowledge. However, each of the paragraphs in the affidavit discuss what

Slocum personally observed as to how IDOC treated other similarly situated employees and therefore are material and based on personal knowledge.

IDOC makes similar arguments regarding individual paragraphs in Steve Slocum's affidavit. IDOC argues that paragraphs 14 and 15 of Slocum's affidavit should be stricken because they are hearsay. Paragraphs 14 and 15 contain allegations regarding statements that Warden Wyant and Steven Wright made with respect to disciplinary action taken against other IDOC employees. However, Warden Wyant and Steven Wright are both IDOC employees and therefore any statements that they made are not hearsay because they are admissions of party opponents. *See* Fed. R. Evid. 801(d)(2)(D).

Finally, IDOC argues that the affidavit of Harry Hitchcock should be stricken because he was not disclosed as a witness during discovery. Unlike Rick Lind, Harry Hitchcock's name was not included in the letter dated May 3, 2005; however, Hitchcock was mentioned during Plaintiff's deposition. Additionally, IDOC admits that Harry Hitchcock was listed as a witness in Plaintiff's answer to IDOC's third interrogatory, but IDOC argues that the interrogatory only states that Hitchcock would testify about the alleged disparate treatment of Plaintiff compared to other similarly situated IDOC employees and the alleged pretextual reason for Mr. Jennings' termination. IDOC argues that the affidavit should be stricken because the affidavit includes statements about derogatory statements allegedly made by Major Wright or Warden Wyant and is not confined to the topics listed in the interrogatory response. The Court disagrees.

The statements included in Hitchcock's affidavit are clearly statements regarding the alleged disparate treatment of Jennings or statements that support Jennings' argument that IDOC used Jennings' alleged involvement in trading and trafficking as a pretext for IDOC's discriminatory

behavior in terminating Jennings.  Specifically, Hitchcock swears that Jennings came to Hitchcock, a Union representative at the time, to make a complaint about Major Wright and that Jennings told Hitchcock that Mr. Wright called Jennings a "lazy Mexican."  Furthermore, the affidavit states that Hitchcock approached Wright about Jennings' request for additional training, that Wright had told Jennings that the EMCC already had enough Mexicans in managerial positions, that Wright had referred to another Mexican as "Token Tony" because he was the only Mexican in a managerial position, and that Wright told Hitchcock that he did not like Jennings.  The Court believes that these statements are material because they go to show whether Major Wright had a negative animus towards Mexican-Americans.  Furthermore, Hitchcock's affidavit includes allegations regarding when Hitchcock informed Warden Wyant that Jennings and other Mexicans were being turned down for additional training. Warden Wyant allegedly responded that it was "his belief that affirmative action is nothing less than reverse discrimination and that what goes around comes around."  All of these allegations go to whether Jennings suffered disparate treatment while working at IDOC and Jennings' argument that IDOC relied on the trading and trafficking allegations as a pretext to hide their true animus against Mexican-Americans.  Accordingly, the Court finds that these statements are material to the allegations.

However, the Court recognizes, as IDOC contends, that some of Hitchcock's statements may be inadmissible hearsay.  Specifically, IDOC argues that paragraphs 4, 5, 6, and 7 are hearsay. Paragraphs 4 states that Mark Jennings told Harry Hitchcock that Steven Wright had confronted Jennings and called him a "lazy Mexican."  Mr. Hitchcock then asked Jennings if he wanted to pursue grievance charges against Mr. Wright but Jennings informed him that he did not want to because he didn't want to create problems for himself.  Jennings argues that these statements are not

hearsay because they are not offered for the truth of the matter asserted but rather are offered to show that Jennings reported that Steve Wright called him a lazy Mexican. The Court disagrees and finds that this statement is hearsay and therefore Defendant's Motion to Strike this statement from Hitchcock's affidavit is granted. However, since Jennings himself stated that Wright called him a lazy Mexican during his deposition, *see* Pl.'s Dep., at 90–92, this statement is an admission and is properly before the Court.

Paragraph 5 of Hitchcock's affidavit states that Jennings had told him that he had asked for additional training but was turned down and asked him if Hitchcock could inquire as to why. This is inadmissible hearsay and therefore is stricken.

In contrast, paragraphs 6 and 7 of Hitchcock's affidavit describe what Steven Wright and Warden Wyant told him about the failure to offer Jennings additional training. These statements are not hearsay because they are admissions of a party opponent. *See* Fed. R. Evid. 801(d)(2)(D). Accordingly, the Court declines to strike any part of Rick Lind or Steve Slocum's affidavit and finds that only paragraphs 4 and 5 should be stricken from Harry Hitchcock's affidavit.

**B.     Motion for Summary Judgment**

**1.       Summary Judgment Standard**

A motion for summary judgment will be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may meet its burden of showing an absence of material facts by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Any doubt

as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Cain v. Lane*, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the nonmoving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Federal Rule of Civil Procedure 56(e) requires the nonmoving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex Corp.*, 106 S.Ct. at 2553. This Court must then determine whether there is a need for trial — whether, in other words, there are any genuine factual issues that can properly be resolved only by a finder of fact because they may be reasonably resolved in favor of either party. *Anderson*, 447 U.S. at 249; *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995). Finally, "[w]here a party bears the burden of proof on an issue, he or she must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact requiring trial." *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1041 (7th Cir. 1993).

**2.      Discussion**

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate against an employee on the basis of national origin. 42 U.S.C. § 2000e-2(a). To make out such a claim, Jennings must show that he has been the victim of intentional discrimination. *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). He can make this showing using the direct or indirect method. The indirect method is also known as the *McDonnell Douglas* burden-shifting method. *Huff v. UARCO, Inc.*, 122 F.3d 374, 380 (7th Cir. 1997).

###### a.    Direct Method

Under the direct method, employees may use direct or circumstantial evidence.  Direct evidence is evidence that "without reference or explanation, ties the illicit motive with the adverse employment action." *Lucas v. Chicago Transit Authority* 367 F.3d 714, 728 n.12 (7th Cir. 2004). Direct evidence is generally not available in employment discrimination cases because it is limited to the employer's admission of discriminatory intent.  There is no direct evidence of discrimination in this case; thus Jennings must proceed with circumstantial evidence under the direct method or under the indirect method.

Circumstantial evidence is "evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 599 (7th Cir. 2003). Using circumstantial evidence under the direct method allows an employee to present a "convincing mosaic" of circumstantial evidence that permits the trier of fact to infer intentional discrimination. *Rhodes*, 359 F.3d at 504.   However, such circumstantial evidence "must point directly to a discriminatory reason for the employer's action." *Id.*; *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).    Additionally, a plaintiff "must come forward with evidence that a decisionmaker expressed discriminatory feelings around the time of and in reference to" the adverse employment action. *Coney v. Promotions Unlimited Corp.,* No. 03-4289, 2004 WL 2486758, at *3 (7th Cir., Oct. 28, 2004) (citing *Gorence v. Eagle Food Ctrs., Inc.,* 242 F.3d 759, 762 (7th Cir. 2001).

The first issue to be addressed is whether Jennings in fact suffered an adverse employment action.  Jennings argues that he suffered two distinct adverse employment actions.  He argues that his employment was adversely effected (1) when he was terminated from his position as a

corrections officer, and (2) when IDOC refused to offer him a last-chance settlement agreement, which forced him to submit to arbitration.

Jennings suffered an adverse employment action when he was terminated from his position. For purposes of Title VII, an adverse employment action is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

However, it is not as clear whether the refusal to offer Jennings a last-chance agreement meets the standard necessary for an adverse employment action. While the definition of an adverse employment action is generous, it is still subject to certain limitations. *Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 901 (7th Cir. 2003) (finding that an employee who was made to wear safety goggles did not suffer an adverse employment action). Specifically, the Seventh Circuit has noted that to be considered an adverse employment action for purposes of Title VII, the employer's action must be with one that effects the employee's compensation, terms, conditions, or privileges of employment. *Hernreiter v. Chicago Housing Auth.,* 315 F.3d 742, 743–44 (7th Cir. 2002) (citing 42 U.S.C. § 2000e–2(a)(1)).

The Court recognizes that a failure to offer Jennings a last-chance agreement is not the same as a decision to terminate Jennings because it did not conclusively resolve the question of whether Jennings would continue to be employed by IDOC. Refusing to offer Jennings a last-chance agreement merely forced him to proceed to arbitration where he was subjected to the risk of losing his position. Therefore, the actual issue here is whether forcing someone to subject himself to arbitration where he faces the possibility of losing his position is an adverse employment action.

In the context of this case, this Court believe that it is.

Jennings points to both Koster and Huskey as examples of other corrections officers who were given last-chance agreements instead of being forced to proceed to arbitration. In these last-chance agreements, both Koster and Huskey agreed not to bring further action against IDOC or proceed to arbitration, and in return they were allowed to keep their jobs with only a suspension. When looking at all three individuals, Koster, Huskey, and Jennings, it becomes clear that the refusal to offer Jennings a last-chance agreement affected the status of his employment. All three individuals were suspended pending discharge. Subsequently, the Illinois Department of Central Management Services ("DCM") offered Koster and Huskey last-chance agreements, which eliminated any risk that they would lose their jobs for their misconduct. In contrast, Jennings was suspended pending discharge, but DCM did not offer him a last-chance agreement and therefore, Jennings was forced to proceed to arbitration. This risk of losing his position unless he was able to convince an arbitrator that he should not be terminated for trading and trafficking was an actionable adverse employment action.

In this case, Jennings presents several items of circumstantial evidence which he argues are sufficient to cause a factfinder to infer that IDOC discriminated against him under the direct method of proof. Specifically, Jennings points to the racially derogatory remarks made by Major Wright and Warden Wyant. Although the Court agrees that these remarks are racially derogatory, they do not lead to an inference of discrimination because neither Major Wright nor Warden Wyant made the decision not to offer Jennings a last-chance agreement or to terminate him.

The decision to terminate Jennings was made by an independent arbitrator and not by either Warden Wyant or Major Wright. Additionally, as evidenced by the sworn affidavits of the DCM

employees involved in the decision making process regarding whether to offer Jennings a last-chance agreement, the decision not to offer Jennings a last-chance agreement was made by DCM alone without consultation with IDOC employees.

Jennings argues that Warden Wyant was still involved in the decision-making process with respect to the decision not to offer Jennings a last-chance agreement because any decision by DCM to reduce an employee's discipline must be approved by the Warden.  Jennings submitted supplemental affidavits from his union representatives who, after Jennings was recommended for termination by the Employee Review Board but before he filed a grievance, asked the Warden to consider lowering Jennings discipline to a suspension without the possibility of discharge.  The Warden refused and told the union representatives that he would not lower the discipline.  Jennings now attempts to argue that this statement by the Warden, coupled with the fact that the Warden must approve all reductions in disciplinary action recommended by DCM, indicates that the Warden was involved in the decision not to offer Jennings a last-chance agreement and that the Warden discriminated against Jennings because he approved the reduction in discipline for both Koster and Robert Huskey but not for Jennings.  However, this argument is not substantiated by the evidence. Unlike in the situation of Koster or Huskey, DCM never recommended that Jennings discipline be reduced to a suspension (i.e. that he be offered a last-chance agreement).  Accordingly, the Warden never had the opportunity to accept or refuse the recommendation.  DCM was the final decision-maker on whether or not to offer Jennings a last-chance agreement.  As Jennings has not any circumstantial evidence to show that DCM has a racial animus against Mexican-Americans, Jennings has failed to prove discrimination through the direct method.

-15-

### b.    Indirect Method

Even though Jennings cannot establish that IDOC discriminated against him based on his national origin under the direct method, he may be able to that he was discriminated against under the indirect or burden shifting method.  Under the burden-shifting method, the employee must first establish a prima facie case of discriminatory intent by proving certain elements that lead to an inference of impermissible discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792; *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 931 (7th Cir. 1996).  To establish a prima facie case of discrimination, Jennings must show that he belongs to a protected class, that he was performing up to IDOC's legitimate expectations, that he suffered an adverse employment action, and that IDOC treated similarly situated employees outside of the protected class more favorably. *Mateu-Aneregg v. Sch. Dist. of Whitefish Bay, ,* 304 F.3d 618, 625 (7th Cir. 2002). Once a plaintiff has established the prima facie case, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for its employment action.  *Steinhauer v. Degolier*, 359 F.3d 481, 484 (7th Cir. 2004).  At this point, the employer is entitled to summary judgment unless the plaintiff can present sufficient evidence that the employer's proffered reason is a pretext for discrimination. *Id.* Here, it is undisputed that Jennings is a member of a protected class because he is Hispanic. Additionally, as stated previously, this Court finds that Jennings suffered an adverse employment action when he was terminated from his position and when he was not offered a last-chance agreement which forced him to proceed to binding arbitration.

### 1.    Was Jennings performing up to IDOC's expectations?

The third element of the prima facie case requires Jennings to show that he was meeting IDOC's legitimate employment expectations at the time that he was discharged.  Although a review

of Jennings' performance evaluations indicates that Jennings was a good employee and generally met or exceeded IDOC's expectations throughout his employment, whether he was meeting IDOC's expectations at the time that he was terminated is another question. The issue is not whether the employee had ever met his employer's expectations but whether the employee was meeting his employer's expectations at the time that he suffered the adverse employment action. *Brummett v. Lee Enterprises, Inc.*, 284 F.3d 742, 745 (7th Cir. 2002) (finding that an employee who was required to maintain a good driving record as a condition of employment was not meeting his employer's expectations after his driver's license had been suspended).

Here, Jennings and IDOC disagree on the issue of whether Jennings was meeting IDOC's expectations. Jennings' annual performance evaluations indicate that, prior to the allegations that he was engaging in trading and trafficking, Jennings was performing up to IDOC's legitimate employment expectations. However, if Jennings did engage in trading and trafficking with inmates, he would not have been performing up to IDOC's expectations because trading and trafficking with inmates violates IDOC's rules. In this type of situation, where an employee is subject to disciplinary action for a sudden and egregious breach of company policy, the Seventh Circuit has assumed that the employee is meeting his employer's legitimate expectations and addressed this issue simultaneously with the issue of pretext. *Jones v. Union Pacific RR Co.,* 302 F.3d 735, 742 (2002). Therefore, this Court assumes for the purposes of the prima facie case that Jennings was performing up to IDOC's legitimate expectations, at least insofar as his performance prior to the allegations of trading and trafficking.

### 2.    Did IDOC treat similarly situated employees more favorably than Jennings?

Similarly, it is not clear in this case if IDOC treated non-protected similarly situated employees differently than it treated Jennings.  Specifically, Jennings argues that a number of employees were similarly situated and that IDOC treated these employees more favorably than they treated Jennings despite the fact that they violated similar IDOC rules.  "In determining whether two employees are similarly situated, a court must look at all relevant factors, the number of which depends on the context of the case." *Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 617 (7th Cir. 2000).  In situations where a plaintiff claims that he was disciplined by his employer more harshly than another employee, the plaintiff must show that he is similarly situated to the other employee "with respect to performance, qualifications, and conduct." *Id.*  Typically, this requires a plaintiff to show that the two employees "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. *Id.* at 617–18.  Jennings alleges that Mark Koster, Robert Huskey, John Krup, and Greg Hart were all similarly situated employees who were treated more favorably than Jennings because they were not discharged for violating IDOC rules regarding trading and trafficking with inmates.

Based on the record, it appears that Jennings has met his burden of showing that other similarly situated employees were treated more favorably than he was.  Specifically, Jennings may have been treated less favorably than Mark Koster or Robert Huskey because he was not given the option of entering into a last-chance agreement with IDOC prior to his termination. Mark Koster and Robert Huskey are both Caucasian corrections officers at the EMCC who, like Jennings, were disciplined for violating IDOC rules.  Unlike Jennings, however, Koster and Huskey were each

given the option of entering into a last-chance agreement with IDOC in exchange for continued employment and a reduced punishment. Koster's punishment was reduced to a five day suspension and Huskey's was reduced to a thirty day suspension as a result of their agreements to enter into last-chance agreements with IDOC. Accordingly, because Koster and Huskey, unlike Jennings, were given the option of entering into a last-chance agreement, the Court finds that these two individuals were similarly situated to Jennings and that it appears that IDOC treated them more favorably.

Additionally, with respect to John Krup and Gary Hart, whether these two individuals were similarly situated is difficult to determine based on the limited facts in the record regarding these two individuals. John Krup was a corrections officer assigned to the prison commissary. Like Jennings, an inmate accused Krup of engaging in trading and trafficking cigars with inmates. However, unlike Jennings, the allegations against Krup were only made by one inmate and were not corroborated by other inmates. Accordingly, the Court finds that John Krup was not similarly situated to Jennings because the underlying evidence to support disciplinary action for trading and trafficking was not nearly as extensive as the evidence in Jennings' situation.

Finally, the record contains very little information regarding Greg Hart. The record merely states that IDOC did not discipline Greg Hart despite the fact that he brought whiskey to inmates in the prison. Because the record is so scant, the Court finds that Jennings has failed to meet his burden of showing that he and Greg Hart were similarly situated or that Hart was treated more favorably than Jennings. Therefore, the Court finds that Jennings has established that only Koster and Huskey are similarly situated employees who were treated more favorably than Jennings because they were not terminated from their positions and were offered the option to enter into a last-chance agreement. Accordingly, Jennings has met his burden of establishing a prima facie case

of national origin discrimination.

   **3.     IDOC's reason for not offering Jennings a last-chance agreement and terminating Jennings.**

Because Jennings has established a prima facie case for discrimination, the burden of production then shifts back to IDOC to proffer a legitimate non-discriminatory reason for terminating Jennings and for refusing to offer him a last-chance agreement.  IDOC argues that it had a legitimate non-discriminatory reason for discharging Jennings because he engaged in trading and trafficking with inmates which is a violation of prison rules.  Additionally, IDOC argues that they were not the ones who made the decision not to offer Jennings a last-chance agreement because this decision was made by DCM.  Moreover, IDOC offers evidence to show that DCM decided not to offer Jennings a last-chance agreement because DCM believed that the evidence presented by IDOC was more than sufficient to support a charge of trading and trafficking with inmates.  Because IDOC has offered a legitimate non-discriminatory reason why Jennings was terminated and for discharging Jennings and for refusing to offer Jennings a last-chance agreement, the burden then shifts back to Jennings to prove that IDOC's reasons are a pretext for intentional national origin discrimination.

   **4.     Are IDOC's reasons for terminating Jennings a pretext for national origin discrimination?**

Pretext requires more than showing that the decision was "mistaken, ill considered or foolish" and so long as the employer "honestly believes those reasons, pretext has not been shown." *Ballance v. City of Springfield,* __ F3d __, 2005 WL 2271911 (7th Cir. Sept.19, 2005).  "Pretext 'means a dishonest explanation, a lie rather than an oddity or an error.'" *Id.* (quoting *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000).   Jennings argues that IDOC used the allegations that he was trading and trafficking as a pretext for discharging him and that IDOC

was actually motivated to discharge him because he is Mexican-American. As proof of this, Jennings argues that Warden Wyant and Major Wright's use of derogatory terms against Mexican-Americans is evidence that they fired him based on his national origin. Additionally, Jennings argues that IDOC's reason for terminating him is a pretext because IDOC did not terminate other similarly situated individuals who engaged in trading and trafficking. Finally, Jennings asserts that IDOC's reason is a pretext because Major Wright's letter referring Jennings for discipline states that Jennings was recommended for discipline based on admissions of staff and inmates despite the fact that no one on the staff implicated Jennings in trading and trafficking.

The Court finds that Jennings has not established that his termination was for anything other than legitimate and non-discriminatory reasons. Absent direct evidence of pretext, an employee may demonstrate that the stated reason for his discharge was a pretext for intentional discrimination by pointing to evidence which would tend to prove the proffered reason "was factually baseless, not the actual motivation for the discharge, or insufficient to motivate the discharge." *Dyrek v. Garvey,* 334 F.3d 590, 598 (7th Cir. 2003). In this case, there is nothing in the record from which a jury could reasonably find that the initial decision to terminate Jennings was not based on his conduct but rather on a bias against Mexican-Americans. Specifically, Jennings has not set forth any evidence that the investigator, the Employee Review Board, or the independent arbitrator came to the conclusion that Jennings engaged in trading and trafficking because they have an animus against Mexican-Americans. Accordingly, the Court finds that Jennings has not proven that IDOC's reasons for terminating him were a pretext for discrimination.

Moreover, Jennings has not set forth any evidence to demonstrate that the DCM employee who made the decision not to offer him a last-chance agreement had any animus against Mexican-

Americans.  In her affidavit, the DCM employee stated that she did not speak to either Warden Wyant or Major Wright regarding the possibility of offering Jennings a last-chance agreement. Additionally, as stated previously in this Order, because DCM did not recommend that Jennings' discipline be reduced, Warden Wyant did not have any reason to decide whether or not to approve the reduction.  Jennings has failed to prove that the decisions to terminate him and not to offer him a last-chance agreement were made by, or with the input of, Warden Wyant or Major Wright. Because Jennings has not alleged or offered any proof that any of the actual decision makers had any animus against Mexican-Americans or that the reasons for their decisions were anything but legitimate, IDOC is entitled to summary judgment.  ,

### CONCLUSION

For the reasons set forth above, the Court finds that Defendant's Motion for Summary Judgment [#11] is granted and their related Motion to Strike Plaintiff's Affidavits and/or Accompanying Statements of Additional Facts in Opposition to Summary Judgment [#18] granted in part and denied in part.

ENTERED this 15th day of February, 2006.


     s/ Michael M. Mihm     
Michael M. Mihm
United States District Judge